AUSA Stephen Baker (312) 353-1598
AUSA Katherine A. Sawyer (312) 697-4089
AUSA Shoba Pillay (312) 886-7631

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**

UNITED STATES OF AMERICA

v.

QUEENIE VARGAS; and
MARC DAVIS

CASE NUMBER:

JUN 1 1 2014

JUN 11 2014

THOMAS G. BRUTON
U.S. DISTRICT COURT

**UNDER SEAL**

**14 CR 333**

## CRIMINAL COMPLAINT   MAGISTRATE JUDGE MARTIN

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. From on or about March 2014 to on or about June 2014, at Chicago, in the Northern District of Illinois, Eastern Division, the defendants violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841(a)(1) and 846. | did conspire with each other and with others known and unknown to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846. |

This criminal complaint is based upon these facts:

  X  Continued on the attached sheet.

_James Long_

JAMES LONG
Special Agent, Drug Enforcement Administration
(DEA)

Sworn to before me and signed in my presence.

Date: June 11, 2014

_Daniel M. Martin_

*Judge's signature*

City and state: Chicago, Illinois

DANIEL G. MARTIN, U.S. Magistrate Judge
*Printed name and Title*

COUNTY OF COOK    )
                  )         SS
STATE OF ILLINOIS )

I, James Long, being duly sworn, states as follows:

## I.    Introduction

1.    I am a Special Agent with the United States Drug Enforcement Administration, United States Department of Justice.

2.    I have served as a Special Agent for eight years and prior to that was a police officer with the St. Louis, Missouri Police Department for twelve years.  As a DEA Special Agent, I investigate criminal violations of the Federal and State controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Section 846; possession with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); and use of communication facilities to facilitate drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b).  I have been personally involved in over 100 narcotics investigations, and as such I am familiar with the various methods used by narcotics traffickers to transport, store and distribute narcotics and narcotics proceeds. I have experience with

a wide range of investigative techniques, including various types of visual and electronic surveillance, the interception of wire communications, and the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, controlled deliveries, use of search and arrest warrants, management and use of informants, pen registers, the laundering and concealing of proceeds from drug trafficking, and the street gangs who participate in these illegal activities.

3. Because this Affidavit is for the limited purpose of establishing probable cause to support the Criminal Complaint and the issuance of arrest warrants against the proposed defendants, it contains only a summary of relevant facts. I have not included each and every fact known to me concerning the entities, individuals, and events described in this Affidavit. This Affidavit is made in support of a complaint that charges that:

a. From on or about September 2013 to on or about June 2014, at Chicago, in the Northern District of Illinois, Eastern Division, KENNETH SHOULDERS, aka "Kenny Shannon;" DERRICK WASHINGTON, aka "D-Rock;" SANDRA SHOULDERS, aka "Penny;" ANTHNONY HAYES, aka "Mustafa;" HARRISON HALL; KENNETH

WILLIAMS, aka "Lil' Kenny;" TIARA WHITE; MARLEANA PORTER; and CRANE MARKS; did conspire with each other and with others known and unknown to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 1000 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846 (*see* Sections i-xv; paragraphs 20-268);

b.     On or about March 5, 2014, at Chicago, in the Northern District of Illinois, Eastern Division, RODNEY BEDENFIELD, aka "Bump," knowingly and intentionally possessed with intent to distribute and distributed a controlled substance, namely, 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) (*see* Sections xiii, xv, xvi, xviii and paragraphs 214-48; 269-336; and 343-353);

c.     On or about April 8, 2014, at Chicago, in the Northern District of Illinois, Eastern Division, DORIAN MILLER knowingly and intentionally possessed with intent to distribute and distributed a controlled

substance, namely, a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) (*see* sections xv and xvi and paragraphs 269-326);

d.     On or about June 2, 2014, at Chicago, in the Northern District of Illinois, Eastern Division, JEWNEUS WILSON, aka "Jukebox," knowingly and intentionally possessed with intent to distribute and distributed a controlled substance, namely, a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) (*see* section xviii, paragraphs 343-53); and

e.     From on or about March 2014 to June 2014, at Chicago, in the Northern District of Illinois, Eastern Division, QUEENIE VARGAS and MARC DAVIS did conspire with each other and with others known and unknown to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846 (*see*

sections xv-xvii and paragraphs 269-342).

4.     This Affidavit is also made for the purpose of establishing probable cause in support of search warrants for the residences and vehicles listed below for evidence of the commission of conspiracy to possess a controlled substance with intent to distribute and distribute controlled substances, in violation of Title 21, United States Code, Section 846, and possession of a controlled substance with the intent to distribute, in violation of Title 21, United States Code, Section 841(a)(1):

a.     211 S. Lavergne, Apt. 3, Chicago, Illinois (KENNETH SHOULDERS's stash house);

b.     2950 W. Fillmore, Chicago, Illinois (HARRISON HALL's stash house);

c.     1638 S. Trumbull, 1st floor, Chicago, Illinois (location used by RODNEY BEDENFIELD for the distribution of narcotics);

d.     902 S. Mayfield, Chicago, Illinois (KENNETH SHOULDERS's residence);

e.     2103 S. Spaulding, 3rd Floor, Chicago, Illinois. (RODNEY BEDENFIELD's residence);

f.     17613 Arlington Lane, Hazel Crest, Illinois (DERRICK

WASHINGTON's Residence); and

g. 3527 S. Martin Luther King Drive Apt. 3N, Chicago, Illinois (MARC DAVIS's residence).

5. The statements contained in this Affidavit are based in part on: (a) my personal participation in this investigation; (b) information provided by other federal law enforcement officers and Chicago Police Department ("CPD") officers; (c) review of conversations intercepted pursuant to court orders authorizing the interception of wire and electronic communications; (d) laboratory analysis reports; (e) surveillance reports; (f) criminal history records maintained by CPD; (g) information from confidential informants; and (h) my training and experience and the training and experience of other law enforcement agents.

## II. Overview of Investigation

6. The complaint is based on a CPD, DEA and Internal Revenue Service investigation into the drug trafficking activities involving KENNETH SHOULDERS, RODNEY BEDENFIELD, MARC DAVIS, and their associates.

7. The investigation included the use of court-authorized interceptions of conversations over various cellular telephones used by

KENNETH SHOULDERS (Target Phones 2, 4 and 9), KENNETH WILLIAMS (Target Phones 1 and 3), DERRICK WASHINGTON (Target Phones 5 and 6), SANDRA SHOULDERS (Target Phone 7); HARRISON HALL (Target Phone 8); ANTHONY HAYES (Target Phones 10 and 11); RODNEY BEDENFIELD (Target Phones 12 and 14); and QUEENIE VARGAS (Target Phone 13).[1]

## III. Probable Cause

### A. Summary

8.    During this investigation, DEA and CPD discovered evidence that members of the Conservative Vice Lords ("CVL") street gang are

---

[1]    Specifically, Chief Judge Rubén Castillo or an Acting Chief Judge authorized thirty day interception periods for each of the Target Phones for various periods from September 2013 through June 2014:

- (773) 459-1874 ("Target Phone 1");
- (312) 434-2284 ("Target Phone 2");
- (312) 399-4736 ("Target Phone 3");
- (312) 217-1773 ("Target Phone 4");
- (773) 957-2334 ("Target Phone 5");
- (312) 523-1862 ("Target Phone 6");
- (773) 416-5276 ("Target Phone 7");
- (773) 876-5846 ("Target Phone 8");
- (312) 880-8111 ("Target Phone 9");
- (773) 459-6834 ("Target Phone 10");
- (773) 828-0587 ("Target Phone 11");
- (312) 678-7675 ("Target Phone 12");
- (773) 647-5162 ("Target Phone 13"); and
- (773) 580-7360 ("Target Phone 14).

distributing narcotics in the area of Roosevelt Road, on the northern edge of Douglas Park, in Chicago, Illinois. Specifically, investigators learned that KENNETH SHOULDERS, aka "Kenny Shannon," controls the distribution of narcotics in this area, assigning responsibility for distribution on specific corners within the 12 blocks he runs to specific individuals, who further delegate distribution responsibility to shift workers who sell narcotics throughout the day, comprising the SHOULDERS Drug Trafficking Organization ("SHOULDERS DTO").

9.     A cooperating individual ("CI1")[2] with knowledge of the area informed investigators that KENNETH WILLIAMS, aka "Lil' Kenny," SHOULDERS's son, was responsible for managing SHOULDERS's heroin distribution efforts on one of these corners, Francisco and Fillmore, in Chicago. CI1 also informed investigators that Charles Weathersby, aka "Chill,"[3] was responsible for managing SHOULDERS's crack cocaine

---

[2]     CI1 is cooperating with CPD in return for monetary payment. In the past, CI1 has been arrested and charged with various felony drug offenses, but not convicted. CI1 has provided reliable information in the past. CI1's information has been confirmed by investigators through surveillance, other source information, consensual calls, and two controlled-purchases of heroin.

[3]     As a result of this investigation, I anticipate that other individuals involved in the DTO's narcotics distribution—such as Charles Weathersby and John Perry—efforts will be charged simultaneously for violations of the Illinois Controlled Substances Act by the Cook County State's Attorney's Office in the Circuit Court of Cook County. Where those individuals are relevant to the

8

distribution from the same corner. Investigators confirmed CI's information through a controlled-buy of narcotics from both WILLIAMS and Weathersby.

10.     In February 2013, investigators also spoke to a self-admitted member of the Traveling Vice Lords ("TVL") from the "12th Street" faction ("CI2").[4] CI2 informed investigators that SHOULDERS is a high ranking member of the CVL. Specifically, CI2 confirmed that SHOULDERS controls all the Vice Lords and the several drug operations between California Avenue and Kedzie Avenue, and Roosevelt Road to Fillmore Street. CI2 stated that this boundary is known as 12th Street and explained that the term comes from Roosevelt Road's location at 1200 South on the Chicago Street grid. CI2 stated that Vice Lords sell drugs and maintain drug operations between the 1100 and 1200 blocks located within the 12th Street geographical boundary. CI2 explained that the 12th Street Vice Lords predominantly consist of CVL members, but that they also consist of TVL, Black Souls Nation members,

---

allegations of this affidavit, I will mention them by name but their names will be demarcated in lower case letters. Consistent with the policy of the Department of Justice, relevant individuals who are uncharged will be referred to by the alias "Individual __," followed by the sequential letter in the alphabet.

[4]     CI2 has numerous arrests and convictions dating back to 1990, including more than five convictions for narcotics related offenses. CI2 cooperated and provided information in return for monetary compensation. Agents found CI2's information to be reliable, and corroborated much of it through consensually recorded conversations and controlled purchases of narcotics.

Gangster Disciples, and New Breed street gang members. The non-Vice Lord gang members are mostly "pack workers," or street level drug dealers, who have no direct allegiance to the 12th Street Vice Lords other than making money from selling drugs within the 12th Street territory.

### SHOULDERS DTO

11. As described in more depth below, the investigation into KENNETH SHOULDERS and his associates began in 2013. During the investigation, law enforcement determined that SHOULDERS was a wholesale supplier of heroin, working with his partner DERRICK WASHINGTON, sister SANDRA SHOULDERS, son KENNETH WILLIAMS, and other members of the DTO, including ANTHONY HAYES, HARRISON HALL, TIARA WHITE, MARLEANA PORTER, and CRANE MARKS to distribute heroin in the area north of Douglas Park on Chicago's west side.

12. Specifically, SHOULDERS DTO controls heroin distribution from specific locations like 2902 W. Fillmore, 2950 W. Fillmore and 1107 S. Mozart in this area. KENNETH SHOULDERS has tasked his DTO members with different responsibilities from helping him to dilute the DTO's heroin for further profit, to distributing heroin from the DTO's main stash house at 211 S. Lavergne to the specific DTO street level distribution stash houses in the

12th Street area, like 2902 W. Fillmore and 2950 W. Fillmore. The DTO employs individuals, like HARRISON HALL, to manage these stash houses and advise KENNETH SHOULDERS when resupply is needed. The DTO deploys other individuals to manage the street level distribution and the workers responsible for the retail sale of the DTO's heroin. A detailed description of the DTO's members, its suppliers, and each defendant's individual role is summarized below and further explained in the body of the affidavit:

a.     The information concerning KENNETH SHOULDERS, wholesale heroin distributor, CVL leader, and leader of the DTO is detailed in paragraphs 17-268, below. SHOULDERS directed the DTO's distribution efforts, procuring heroin for the DTO's further distribution, mixing it at the DTO's stash house at 211 S. Lavergne, and coordinating its delivery to stash houses like 2902 W. Fillmore and 2950 W. Fillmore in the 12th Street area. SHOULDERS informed others like SANDRA SHOULDERS and KENNETH WILLIAMS and TIARA WHITE when the heroin was available to be picked up and distributed and advised them on the manner of its distribution. After supplying the heroin and later collecting the proceeds, SHOULDERS required DTO members to return to him his share of the profits.

b.     The information concerning DERRICK WASHINGTON, SHOULDERS's partner responsible for procuring heroin for the DTO, preparing the heroin for sale to users by mixing and bagging the heroin into small user-portion bags with either a green dollar-sign or a black bomb symbol stamped on them, distributing the heroin to the DTO's sales managers like KENNETH WILLIAMS, SANDRA SHOULDERS and ANTHONY HAYES in the 12th Street area, and providing payment to the DTO's suppliers, is detailed in paragraphs 31-39; 158-69; 170-97; 198-213; and 214-48, below.

c.     The information concerning SANDRA SHOULDERS, KENNETH SHOULDERS's sister responsible for picking up heroin at the DTO's stash house and distributing it to the DTO's sales managers, like HARRISON HALL and ANTHONY HAYES at 2950 W. Fillmore in Chicago, is detailed in paragraphs 132-248, below.

d.     The information concerning ANTHONY HAYES, the DTO member responsible for managing the DTO's street sales in the area of the 2950 W. Fillmore and 1107 S. Mozart locations, is detailed in paragraphs 170-97; 214-48; and 249-68, below.  HAYES retrieves the DTO's heroin from HARRISON HALL at the DTO's 12th Street area stash house location of 2950

W. Fillmore and returns money to the DTO through HALL as well. In his capacity, HAYES directs the activity of several of the the DTO's retail sales workers, like Milton Taylor, Amos Hadley and David Higgs.

e. The information concerning HARRISON HALL, the DTO member responsible for storing the heroin for distribution at the 2950 W. Fillmore location and collecting the DTO's heroin proceeds for delivery to SHOULDERS, is detailed in paragraphs 158-69; 170-97; 198-213; 214-48; and 249-68, below.

f. The information concerning KENNETH WILLIAMS, SHOULDERS's son and the DTO member responsible for managing the DTO's heroin distribution at the 2902 W. Fillmore location, is detailed in paragraphs 17-61; 65-157, below. WILLIAMS is responsible for collecting packaged heroin from the 211 S. Lavergne stash house for delivery, along with TIARA WHITE, to the DTO's sales location at 2902 W. Fillmore, the residence of MARLEANA PORTER. WILLIAMS directs the activity of WHITE, PORTER, and other of the DTO's retail sales workers, like CRANE MARKS.

g. The information concerning TIARA WHITE, the DTO member responsible, along with KENNETH WILLIAMS, for retrieving and

13

transporting heroin from the DTO's stash house at 211 S. Lavergne and delivering it to the distribution location at 2902 W. Fillmore, is detailed in paragraphs 65-107; 108-13; 114-24; and 132-57, below.

h. The information concerning MARLEANA PORTER, the DTO member responsible for storing and selling heroin from the DTO's distribution location at 2902 W. Fillmore, which is her residence, is detailed in paragraphs 25-43; 65-107; 108-13; and 114-24, below. PORTER is responsible to KENNETH WILLIAMS for the delivery of the heroin proceeds for the DTO drugs he provides her to sell.

i. The information concerning CRANE MARKS, one DTO member responsible for street sales of heroin in the area of 2950 W. Fillmore, is detailed in paragraphs 125-31, below. MARKS is responsible to KENNETH WILLIAMS for the delivery of the heroin proceeds for the DTO drugs WILLIAMS provides him to sell.

**DTO's Heroin Supplier**

13. The information concerning RODNEY BEDENFIELD, a supplier of heroin to the SHOULDERS DTO, is detailed in paragraphs 214-48; 269-306; 307-26 and 343-53, below.

**BEDENFIELD's customers**

14. The information concerning DORIAN MILLER, BEDENFIELD's recurrent heroin customer, is detailed in paragraphs 269-306; and 307-26, below.

15. The information concerning JEWNEUS WILSON, aka "Jukebox," BEDENFIELD's heroin customer, is detailed in paragraphs 343-53, below.

**BEDENFIELD's Heroin Supplier**

16. The information concerning MARC DAVIS, supplier of heroin to BEDENFIELD, and thus, in turn, to customers like MILLER, is detailed in paragraphs 269-342, below.

17. The information concerning QUEENIE VARGAS, DAVIS's heroin courier responsible for transporting DAVIS's heroin from one location to another, delivering it to customers, and collecting proceeds on DAVIS's behalf, is detailed in paragraphs 269-342, below.

**B.    Law Enforcement Seizures of Heroin**

18. The probable cause section of this affidavit sets forth a chronological detail of some of the narcotics distribution efforts of the defendants involved, and includes detailed information concerning the following seizures of narcotics in Section C:

i.     An August 22, 2013 purchase of approximately 2.6 grams of heroin from KENNETH WILLIAMS and his worker, as detailed in paragraphs 17-20.

ii.     A September 19, 2013 purchase of approximately 3 grams of heroin from MARLEANA PORTER which she received from WILLIAMS and SHOULDERS, as detailed in paragraphs 25-43.

iii.     A December 4, 2013 seizure of approximately 15 grams of heroin from 2902 W. Fillmore, MARLEANA PORTER's residence and the site from which she handled street sales for the DTO, as detailed in paragraphs 114-24.

iv.     A December 29, 2013 purchase of approximately 0.8 grams of heroin from KENNETH WILLIAMS and his worker CRANE MARKS, as detailed in paragraphs 125-31.

v.     A December 30, 2013 seizure of approximately 42 grams of heroin from the car driven by KENNETH WILLIAMS, after he and TIARA WHITE collected the heroin from SHOULDERS and WASHINGTON in the DTO's stash house at 211 S. Lavergne, as detailed in paragraphs 132-57.

vi.     A March 5, 2014 seizure of approximately 313.5 grams of heroin from the purse of SANDRA SHOULDERS, involving KENNETH

SHOULDERS, WASHINGTON, BEDENFIELD, HALL and HAYES, as detailed in paragraphs 214-48.

vii. An April 8, 2014 seizure of approximately 50 grams of heroin from the car of DORIAN MILLER, involving RODNEY BEDENFIELD, QUEENIE VARGAS and MARC DAVIS, as detailed in paragraphs 307-26.

viii. A May 13, 2014 seizure of approximately 100 grams of heroin from QUEENIE VARGAS, involving MARC DAVIS, as detailed in paragraphs 327-42.

ix. A June 2, 2014 seizure of approximately 11 grams of heroin from JEWNEUS WILSON, supplied by RODNEY BEDENFIELD, as detailed in paragraphs 343-53.

19. Section D of the probable cause portion of this Affidavit sets out additional information regarding the residences for which law enforcement is requesting search warrants.

C. **Narcotics Activity**

i. **On August 22, 2013, CI1 and an undercover officer purchase approximately 2.6 grams of heroin in 13 user bags from KENNETH WILLIAMS and his narcotics worker "Kemp."**

20. On August 22, 2013, investigators met with CI1 in order to place

17

a call to KENNETH WILLIAMS, who was using Target Phone 1,[5] in order to order heroin and arrange for a controlled purchase. CI1 knew WILLIAMS as "Lil' Kenny," KENNY SHOULDERS's son. CI1 stated that WILLIAMS was responsible for distributing heroin in the area of Francisco and Fillmore on SHOULDERS's behalf. According to CI1, CI1 had a relative who regularly purchased heroin from WILLIAMS prior to the relative's arrest. Investigators showed CI1 a copy of WILLIAMS's prior arrest photograph, and CI1 informed investigators that this is the person CI1 knows as "Lil' Kenny."

21.    On August 22, at approximately 1:51 p.m., investigators watched and monitored as CI1 dialed and placed a consensually recorded phone call to WILLIAMS at Target Phone 1. During the conversation, CI1 arranged to purchase a "jab," or 13 user portions of heroin, from WILLIAMS's worker "Kemp" in the area of Fillmore and Francisco. Specifically, WILLIAMS

---

[5]    WILLIAMS was identified in this and other conversations listed in this affidavit by CI1 who identified a photograph of WILLIAMS as "Lil' Kenny" and identified Target Phone 1 as his. CI1's information was corroborated by the subsequent consensually recorded phone call, in which CI1 referred to WILLIAMS as "Kenny" and later, when CI1 went to purchase the narcotics discussed, CI1 identified CI1 to WILLIAMS's worker "Kemp," by stating "Lil' Kenny" knew CI1 was coming to purchase heroin. Finally, as noted below, in subsequent calls and messages intercepted on this and other telephones throughout the investigation, WILLLIAMS indicated to his co-conspirators that he would travel to different locations and law enforcement surveillance then observed him in those places, such as 211 S. Lavergne where he and TIARA WHITE picked up heroin before being stopped and identified on December 30, 2013.

stated, "Hello."  CI1 stated, "Hey, Kenny, this is [CI's nickname, and relationship to CI's relative]."[6] Later in the conversation, CI1 described CI1's physical appearance and WILLIAMS stated, "Ah, Ah, yeah, yeah, I know who you talking about."  CI1 stated, "Hey, me an my boy is coming off Cermak [CI1's purported customer for heroin was driving into the area].  Just want you to know I sent him yesterday by himself and they wouldn't play ball with him [CI1 stated that CI1 sent the purported customer to buy heroin from WILLIAMS's workers the day before but they would not sell to someone they did not know], so I'm gonna come with him today [CI1 stated CI1 would travel with the customer (actually an undercover officer, "UC") in order to purchase the heroin]."  WILLIAMS stated, "Alright."  CI1 stated, "Alright, I'll

———————————

[6]     Some of the consensually-recorded and intercepted conversations (hereinafter "recorded conversations") have been summarized in this Affidavit.  The language that is quoted from the recorded conversations throughout this Affidavit is based upon a preliminary review of the recorded conversations, and not on final transcripts of the recorded conversations

The times listed for the recorded conversations are approximate.  The summaries do not include all statements or topics covered during the course of the recorded conversations.

At various points in the Affidavit I have included in brackets my interpretation of words and phrases used in the recorded conversations.  My interpretations are based on information received from CS1, the contents and context of the recorded conversations, events occurring before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

be there in like ten minutes." WILLIAMS stated, "Okay."

22. Following the recorded conversation, investigators searched CI1 for contraband and currency. After finding none, investigators, UC, and CI1 relocated in UC's vehicle to the area of Francisco and Fillmore for the heroin transaction as arranged with WIILIAMS. Neither CI1, nor UC were equipped with a recording device. Upon arriving at the intersection of Francisco and Fillmore in the UC vehicle, UC and CI1 observed an unknown male on the corner. CI1 called out to the unknown male, known only as "Kemp," and Kemp approached the UC vehicle on the passenger's side and had a conversation with the CI1. CI1 stated to Kemp that CI1 spoke to "Lil' Kenny [WILLIAMS]" and "Lil' Kenny" knew CI1 was coming to purchase heroin. Kemp asked CI1 how many, at which time the CI1 responded, "13," an individual "Jab" of heroin.

23. At this time, the UC observed Kemp walk over to a building located at 2902 W. Fillmore and then out of view. After a short time, UC observed Kemp return to the UC vehicle and, through the passenger side window, hand the CI1 a plastic bag, containing 13 clear ziplock baggies with green dollar sign logos, each containing a white powder like substance. CI1 handed Kemp $130.00 of prerecorded funds. Following the transaction, CI1

handed the bag of 13 ziplock bags to UC. UC and CI1 drove away from the area to pre designated location where the CI1 was again checked for USC and contraband with negative results.

24.     Investigators performed a field test of a small sample of the recovered white powder and it indicated the presence of heroin. The recovered bags and mixtures have been submitted to the DEA lab for testing for fingerprints and drug testing.

> ii.     **On September 18 and 19, 2013, SHOULDERS supplies WILLIAMS with heroin, 3 grams of which CI1 purchases from MARLEANA PORTER.**

25.     On September 18, 2013, investigators met with CI1 in order to place a call to KENNETH WILLIAMS, who was using Target Phone 1, to arrange for a controlled purchase of heroin.

26.     On September 18, 2013, at approximately 4:18 p.m., WILLIAMS, who was using Target Phone 1, had a conversation (Call #641) with CI1, which was both recorded and intercepted pursuant to a court-authorized wiretap over Target Phone 1. During the conversation, CI1 stated, "Hey, Little Kenny, this is [CI1 nickname]. Call Big Girl [MARLEANA PORTER, WILLIAMS's heroin worker on Fillmore] for me and tell her I'm on my way [to purchase heroin]. 'Cause my phone went dead and I can't get her number

out of the other phone." WILLIAMS asked, "Who's this?" CI1 replied, "This is [CI1's nickname]." WILLIAMS asked, "And call who?" CI1 replied, "Big Girl." WILLIAMS stated, "There ain't even nothing going on [WILLIAMS informed CI1 that he did not have any narcotics at that time]." CI1 stated, "Alright."

27.     On September 18, 2013, at approximately 7:42 p.m., WILLIAMS, who was using Target Phone 1, had a telephone conversation (Call #668) with an John Perry, who was using (773) 426-9255.[7]   During the conversation,

---

[7]     Investigators identified Perry as the user of (312) 426-9255 in the following manner. On September 16, 2013, at approximately 1:42 p.m., WILLIAMS, using Target Phone 1, had a conversation (Call #303) with PERRY, who identified himself as "Bam," using (773) 587-6980.  A LexisNexis database search of this phone number showed the user to be "John Perry" with an address of 6707 S. Racine, Chicago, IL.  Investigating officers searched the address of 6707 S. Racine and the name John Perry which resulted in a photograph of John Perry tied to his criminal history.

On September 20, 2013, at approximately 9:34 a.m., WILLIAMS, using Target Phone 1, had a conversation (#808) with Perry, who again identified himself as "Bam," using (773) 426-9255.  Monitors recognized the speaker as the same individual intercepted in Call number 303.

On September 21, 2013, at approximately 2:33 p.m., WILLIAMS, using Target Phone 1, had a conversation (#994) with Perry, using (773) 426-9255.  During this call, Perry informed WILLIAMS that Perry was at the gas station on Roosevelt and Pulaski, his heroin sales spot.

On September 23, 2013, at approximately 9:09 a.m., WILLIAMS, using Target Phone 1, had a conversation (#1177) with Perry, using (773) 426-9255.  During this call, Perry informed WILLIAMS he was trying to sell the last of his narcotics supply.  At approximately 9:15 a.m., surveillance observed Perry engaging other unknown males in the gas station in hand to hand narcotics sales and identified him through comparison to his photograph in CPD's criminal history

Perry asked, "Did he ever come back to the gym [Perry asked if WILLIAMS's narcotic supplier arrived with the heroin]?" WILLIAMS responded, "He ain't never landed. We should be right by the morning [WILLIAMS expected the source would be able to supply a quantity of heroin on the following day], though."

28. On September 19, 2013, at approximately 8:36 a.m., WILLIAMS, using Target Phone 1, had a second telephone conversation (Call #692) on with John Perry, who was using (773) 426-9255. During the conversation, the Perry asked, "What's good, big bro [Perry was again inquiring about the availability of heroin]?" WILLIAMS replied, "Shit Joe, I'm finna hit his ass [WILLIAMS would call his source, subsequently identified as SHOULDERS], right now, see what's going on." Perry stated, "Alright, just uh, shit, hit me back then." WILLIAMS responded, "Alright."

29. Immediately following this conversation, WILLIAMS, using Target Phone 1, sent a text message to (312) 394-9351 ("SHOULDERS Phone

---

information. Monitors familiar with Perry's voice from these interceptions recognized him as the speaker on (312) 426-9255 in this and other conversations detailed in this affidavit.

A"). Law enforcement subsequently identified SHOULDERS as the user of SHOULDERS Phone A.[8]

### (a) SHOULDERS supplies WILLIAMS with heroin.

30. On September 19, 2013, at approximately 9:20 a.m., WILLIAMS had a telephone conversation (Call #699) on Target Phone 1 with SHOULDERS, using SHOULDERS Phone A. During the conversation, SHOULDERS informed WILLIAMS that SHOULDERS had a supply of heroin and directed WILLIAMS to meet him at a stash house at 211 S. Lavergne in Chicago. Specifically, WILLIAMS stated, "What's up, buddy?" SHOULDERS stated, "Oh naw, I'm around [SHOULDERS had a supply of

---

[8] Investigators identified SHOULDERS as the user of SHOULDERS Phone A in this and subsequent phone calls, as detailed below. Following the September 19, 2013, calls (#699 and #700 on Target Phone 1) in which SHOULDERS, using SHOULDERS Phone A, told WILLIAMS to meet him at around 9:45 a.m. in order to pick up narcotics. Following the call, on September 19, 2013, at approximately 10:02 a.m., law enforcement surveillance observed SHOULDERS arrive at and enter 211 S. Lavergne. Approximately 5 minutes later, surveillance observed WILLIAMS arrive in his Cadillac, and TIARA WHITE, with a large purse, left the car and entered the building at 211 S. Lavergne. Moments later, WHITE left the building, still carrying the large purse, and reentered WILLIAMS's car. WILLIAMS then began making phone calls to other narcotics workers letting them know that he would be distributing the newly acquired narcotics. Because the user of SHOULDERS Phone A told WILLIAMS to meet with him to pick up narcotics, and then WILLIAMS went to meet with SHOULDERS and immediately began distributing narcotics to workers, I believe SHOULDERS was using SHOULDERS Phone A. Through voice comparison and surveillance identification, monitors and investigators recognized SHOULDERS as the speaker on Target Phone 2, Target Phone 4 and Target Phone 9 in the remaining paragraphs highlighted in this affidavit.

24

heroin for WILLIAMS to pick up]." WILLIAMS confirmed, "Oh, you around?" SHOULDERS replied, "Yeah." WILLIAMS asked, "You need me to come that way, or stay this way?" SHOULDERS replied, "Oh shit, you can come this way [211 S. Lavergne] in about, shit... I'll meet you there about 9:45 [a.m.]." WILLIAMS stated, "Ok then." SHOULDERS repeated, "I'll meet you there about 9:45 [a.m.]." WILLIAMS replied, "Alright, let me put my pants back on."

31.     On September 19, 2013, at approximately 9:39 a.m., surveillance observed a silver Cadillac CTS, bearing Illinois license plate R596004, (the "silver Cadillac") which is registered to "Tiara White," parked behind 1650 S. St. Louis. At approximately 9:55 a.m., surveillance observed WILLIAMS and WHITE exit the rear door of the first floor apartment at 1650 S. St. Louis. WHITE entered the driver's door and WILLIAMS entered the front passenger side door of the silver Cadillac. WHITE and WILLIAMS then drove from the area.

32.     On September 19, 2013, at approximately 9:56 a.m., surveillance observed a white Mercedes ML350, arrive and park at approximately 5011 W. Quincy. Surveillance observed SHOULDERS, recognized by officers through a comparison to his Illinois State driver's license photograph, the

lone occupant, remain seated in the Mercedes and holding a cellular phone having an apparent conversation.

33. On September 19, 2013, at approximately 9:56 a.m., the same time that surveillance observed SHOULDERS on his cell phone, WILLIAMS, using Target Phone 1, had a telephone conversation (Call #700) with SHOULDERS, who was using SHOULDERS Phone A. During the conversation, WILLIAMS stated, "I'm en route. I'm already en route. I'm uh, getting on the e-way, now." SHOULDERS stated, "Oh shit, alright." WILLIAMS stated, "(Unintelligible) like three minutes." SHOULDERS replied, "I'm sitting right here. Alright, cool." Following the conversation, surveillance observed SHOULDERS get out of the Mercedes and walk around the corner into the front door at 211 S. Lavergne.

34. On September 19, 2013, at approximately 10:00 a.m., surveillance observed the silver Cadillac arrive and park on the street at 211 S. Lavergne. Surveillance observed WHITE, carrying a large black purse, get out of the Cadillac and walk into the front door at 211 S. Lavergne. Surveillance observed WILLIAMS remain in the Cadillac in the passenger seat. Approximately three minutes later, surveillance observed WHITE,

carrying the large black purse, come out of the front door at 211 S. Lavergne and get into the Cadillac which drove from the area.

**(b) WILLIAMS passes out the heroin.**

35. On September 19, 2013, between 9:59 a.m. and 10:08 a.m., call records show WILLIAMS, using Target Phone 1, placed five outgoing calls to (312) 221-0796—a telephone utilized by MARLEANA PORTER, WILLIAMS's heroin worker on Fillmore—and two outgoing calls to the John Perry, using (773) 426-9255, who called inquiring about the supply of heroin. Each of the calls went unanswered.

36. On September 19, 2013, at approximately 10:11 a.m., WILLIAMS, who was using Target Phone 1, had a telephone conversation (Call #717) with an unknown female ("UF1") using (773) 826-1516. During the conversation, WILLIAMS stated, "Hello, can I speak to Marleana [PORTER]?" UF1 responded, "She's not here." WILLIAMS responded, "Oh, you know where she had went?" UF1 answered, "Nope, I actually don't know where Marleana goes."

37. On September 19, 2013, at approximately 10:13 a.m., WILLIAMS, using Target Phone 1, had a conversation (Call #718) with an unknown female ("UF2") using (312) 834-9280. During the conversation,

WILLIAMS stated, "Hey, where you at? You in the crib?" UF2 replied, "Mm-hmm [positive response]." WILLIAMS asked, "Where your mama at? She there, right now?" UF2 replied, "Uh-uh [Negative response]." WILLIAMS stated, "Hey, I need you to grab this from me, real quick, 'til uh, baby girl come. I don't know where she at, right now. You heard me?" UF2 stated, "I say, I don't know where Marleana." WILLIAMS replied, "Yeah, I don't know the fuck she at, lord. She don't answerin' her phone, man." The unknown female responded, "Yeah." WILLIAMS stated, "Alright, just come on the front right now, lord. I'm already right here." UF2 replied, "Alright."

38. On September 19, 2013, at approximately 10:26 a.m., WILLIAMS, using Target Phone 1, had another telephone conversation (Call #726) UF2, who was using (312) 834-9280. During the conversation, WILLIAMS stated, "Hey, girl (unintelligible) she [MARLEANA PORTER] right there at the door." UF2 replied, "Huh?" WILLIAMS stated, "I said, there she go, she [PORTER] right there at the door [outside 2902 W. Fillmore]."

39. On September 19, 2013, at the same time as the 10:26 a.m. phone call, surveillance observed the following in the area of 2902 W. Fillmore, in Chicago:

a.    A silver Cadillac arrived and parked on the street in the area of 2902 W. Fillmore. Surveillance observed WILLIAMS get out of the Cadillac and approach a group of five persons on the street, which included PORTER.[9]  WILLIAMS remained on the street speaking with the group. After his conversation, surveillance observed WILLIAMS walk to a parked silver Pontiac parked on the street and speak with the unknown occupants.

b.    At approximately 10:31 a.m., surveillance observed the silver Pontiac drive from the area. At this time, surveillance observed PORTER lean into the front seat passenger side window of the silver Cadillac.  PORTER removed her arms and upper torso from the window and walked directly into the front door of the garden apartment at 2902 W. Fillmore. WILLIAMS remained on the street.

c.    At approximately 10:40 a.m., WILLIAMS approached a black Chevrolet Aveo which arrived and parked behind the silver Cadillac. WILLIAMS handed the driver of the Chevrolet an unknown object through the front window, at which time the Chevrolet drove from the area.

---

[9]    Law enforcement surveillance recognized PORTER by reference to a driver's license photograph on file, following CI1's identification of her both concerning PORTER's phone number and her role in distributing the narcotics on September 19, 2013.

Approximately one minute later, WILLIAMS entered the front passenger seat of the silver Cadillac which then drove from the area.

### (c) CI1 purchases heroin from WILLIAMS's worker PORTER.

40. On September 19, 2013, at approximately 12:30 p.m., investigators met with CI1 for the purpose of calling WILLIAMS to attempt to arrange for a controlled purchase of heroin through a consensually recorded telephone call.

41. On September 19, 2013, at approximately 12:30 p.m., WILLIAMS, who was using Target Phone 1, had a telephone conversation (Call #731) with CI1. The conversation was recorded by law enforcement and over the wiretap of Target Phone 1. During the conversation, CI1 stated, "Hey, Kenny. What you doing, man?" WILLIAMS replied, "(Unintelligible) who's this?" CI1 stated, "This [CI1's nickname and family member]. I called you yesterday." WILLIAMS replied, "Oh, what's up, lord?" CI1 stated, "Okay, look lord, is I'm good [CI1 asked if WILLIAMS had a supply of heroin he could sell to CI1]?" WILLIAMS replied, "Yeah, they over there [PORTER had a supply of heroin at 2902 W. Fillmore]." CI1 stated, "Alright. Call big girl [PORTER] let her know I'm on my way. Alright?" WILLIAMS replied, "(Unintelligible)." CI1 responded, "Okay. Alright."

42. Following the conversation, investigators formulated a plan to purchase two bundles, each containing thirteen individually packaged quantities of heroin from PORTER. Investigators searched CI1 for contraband. After finding none, investigators supplied CI1 with $260.00 in government funds. Investigators instructed CI1 to walk westbound on Fillmore from California Avenue in order to meet with PORTER to purchase the heroin. CI1 was not equipped with any recording device for this activity but was monitored by surveillance.

43. On September 19, 2013, at approximately 12:43 p.m., surveillance observed PORTER standing on the street in front of 2902 W. Fillmore. Surveillance observed CI1 approach PORTER and engage in a brief conversation with her. Following the meeting, surveillance observed PORTER and CI1 walk toward the front door of the garden apartment at 2902 W. Fillmore. While outside the door, surveillance observed CI1 hand PORTER the $260.00 in funds. Surveillance watched as PORTER and CI1 then entered the front door of the garden apartment. While in the apartment, according to CI1, PORTER handed CI1 two clear plastic bags each containing a quantity of individually ziplock packets of heroin. Following the delivery, surveillance observed CI1 walk out of the rear door of the apartment and

northbound on California Avenue. Investigators met with CI1 and CI1 surrendered the two bundles of suspect heroin. Investigators debriefed CI1 and again searched CI1 for any additional money or contraband and found none. The recovered bags and mixtures have been submitted to the DEA lab for testing for fingerprints and drug testing.

> ### iii. On October 10, 2013, SHOULDERS arranges for WASHINGTON to obtain $3,000 worth of heroin for WILLIAMS.

44. On October 10, 2013, at approximately 11:09 a.m., WILLIAMS, who was using Target Phone 3, sent an outgoing text (Call #31) to SHOULDERS at Target Phone 2. SHOULDERS received the text message at 4:16 p.m., when SHOULDERS's phone was powered on. The text message read: "U gud"

45. On October 10, 2013, at approximately 2:19 p.m., WILLIAMS, using Target Phone 3, sent an outgoing text (Call #32) to SHOULDERS at Target Phone 2. SHOULDERS received the text message at 4:17 p.m., when SHOULDERS's phone was powered on. The text message read: "Wat up".

46. On October 10, 2013, at approximately 4:18 p.m., SHOULDERS, using Target Phone 2, had a conversation (Call #33) with WILLIAMS, who was using Target Phone 3. During the call, SHOULDERS stated, "What up?"

WILLIAMS responded, "What's up, buddy?" SHOULDERS stated, "Nothing. In the crib, sicker than a mother fucker." WILLIAMS replied, "I knew. That's why I... (unintelligible) say, what's good. I know, last time I see you, you was like, alright then. I ain't heard nothing. I'm like, something got to be wrong with him." SHOULDERS stated, "Sick as a mother fucker. Bum ass is going over there for me." WILLIAMS replied, "What you say?" SHOULDERS stated, "I say, bum ass is gonna go over there [DERRICK WASHINGTON would head over to the 211 S. Lavergne stash house to prepare the heroin]." WILLIAMS replied, "You gonna call me when you want me to shoot off or he [WASHINGTON] gonna call? No, he don't got the number." SHOULDERS stated, "He gonna call me." WILLIAMS replied, "Okay. Let me go catch up with Tiara [WHITE] then, real quick. Her ass in the wind." SHOULDERS stated, "Alright. Well, that's cool. He... (Unintelligible) let me call him see is he (unintelligible), yet." WILLIAMS replied, "Alright."

47.     Phone records show on October 10, 2013, between 4:20 p.m. and 4:47 p.m., there were six contacts between SHOULDERS on his other phone, Target Phone 4,[10] and WASHINGTON, at (312) 523-1862.[11] Based upon the

---

[10]     SHOULDERS was identified as the user of Target Phone 4 as it is registered in his name, to "Kenneth Shoulders, 1113 S. Mozart, Chicago IL." Additionally, on August 1, 2013, at approximately 2:12 p.m., investigating agents made a ruse call to the number and observed SHOULDERS on surveillance answer

33

information in Call number 33 summarized in the previous paragraph, the information relayed below, and the timing of these contacts, I believe SHOULDERS contacted WASHINGTON to check on WASHINGTON's progress preparing the heroin for WILLIAMS.

48. On October 10, 2013, at approximately 4:30 p.m., law enforcement surveillance observed a silver Jeep Grand Cherokee which surveillance had observed previously utilized by WASHINGTON parked, unoccupied, on the street at 5006 W. Quincy, which is around the corner from the DTO's 211 S. Lavergne Stash House.

---

the phone.

[11] WASHINGTON was identified as the user of (312) 523-1862 in the following manner. Following a May 23, 2013 state court order authorizing the use of a digital analyzer device to determine which phone numbers WASHINGTON was using, investigators observed him on June 19, 2013, in the same area as a phone using (312) 523-1862 in the following three separate locations: (1) 17613 Arlington Lane, Hazel Crest, IL; (2) Interstate 94 and the Cermak Road exit; and (3) 1100 S. Sacramento, in concurrence with location information indicating that (312) 523-1862 was in the same areas. Additionally, on June 20, 2013, while conducting a surveillance of WASHINGTON's residence located at 17613 Arlington Lane, Hazel Crest, Illinois, surveillance observed WASHINGTON exit his residence and enter a silver jeep. Surveillance observed WASHINGTON get out of the vehicle and open the hood of the vehicle. At approximately 12:23 p.m., an officer placed a ruse call to (312) 523-1862 and observed WASHINGTON retrieving a cellular phone from his pants pocket. The officer observed WASHINGTON answer the phone and watched him and listened over the call as he stated, "Hello." The officer responded, "Is Ed there?" WASHINGTON replied, "You have the wrong number. No Ed here." Surveillance then observed WASHINGTON place the cellular telephone back in his pocket. Investigators and monitors recognized WASHINGTON as the speaker in the remaining identified conversations and messages in this affidavit through familiarity to his voice developed through conversations involving (312) 523-1862.

34

49. On October 10, 2013, at approximately 6:07 p.m., WILLIAMS, using Target Phone 3, sent an outgoing text (Call # 38) to SHOULDERS at Target Phone 2. The text message read: "Wat roc say" [WILLIAMS inquired if WASHINGTON, aka "D-Rock" had completed packaging the heroin].

50. On October 10, 2013, at approximately 6:23 p.m., phone records show WASHINGTON, using 312-523-1862, received an incoming call from SHOULDERS, who was using Target Phone 4. Based upon WILLIAMS's text summarized in the paragraph above, and the other interceptions and surveillance of October 10, 2013, I believe SHOULDERS called WASHINGTON to inquire about WASHINGTON's progress with the heroin packaging for WILLIAMS.

51. On October 10, 2013, at approximately 6:23 p.m., SHOULDERS, using Target Phone 2, sent an outgoing text (Call # 40) to WILLIAMS, who was using Target Phone 3. The text message read: "He at work now" [SHOULDERS explained that WASHINGTON was currently packaging heroin].

52. On October 10, 2013, at approximately 6:26 p.m., WILLIAMS, using Target Phone 3, sent an outgoing text (Call # 41) to SHOULDERS at Target Phone 2. The text message read: "K".

53. On October 10, 2013, at approximately 6:41 p.m., phone records show WASHINGTON, using 312-523-1862, placed an outgoing call to SHOULDERS, who was using Target Phone 4. Based upon the intercepted text message from SHOULDERS to WILLIAMS summarized in the paragraph below, which occurred approximately one minute after this call and stated, "Ready," and the remaining interceptions and surveillance on October 10, 2013, I believe WASHINGTON called SHOULDERS on Target Phone 4 to tell him the heroin was ready to be picked up.

54. On October 10, 2013, at approximately 6:42 p.m., SHOULDERS, using Target Phone 2, sent an outgoing text (Call # 43) to WILLIAMS, who was using Target Phone 3. The text message read: "Ready."

55. On October 10, 2013, at approximately 6:58 p.m., SHOULDERS, using Target Phone 2, had a conversation (Call # 44) with WILLIAMS, who was using Target Phone 3. During the conversation, SHOULDERS asked, "Yeah, you on the way?" WILLIAMS replied, "Yeah, I'll be on my way (unintelligible)." SHOULDERS responded, "Okay."

56. On October 10, 2013, at approximately 7:00 p.m., WILLIAMS, using Target Phone 3, had a conversation (Call #87) with TIARA WHITE, who was using MARLEANA PORTER's phone, (312) 221-0796 (the "PORTER

36

Phone").[12]  During the call, WILLIAMS stated, "Hey, where you..." WHITE replied, "Huh?" WILLIAMS stated, "Where you at, baby girl?"  WHITE replied, "Sitting in front of Marleana's [PORTER's] house. Why?" WILLIAMS stated, "Sit right there, I'm gonna come grab you. We gotta make this run [to pick up heroin], real quick." WHITE replied, "Shit, this late?" WILLIAMS stated, "Hell, yeah. I ain't gonna wait on D-Rock [WASHINGTON] 'til tomorrow [WILLIAMS did not want to wait until the following day for WASHINGTON to deliver the heroin]. You got to be crazy." WHITE replied, "Oh well, you got to meet me there [211 S. Lavergne]."  WILLIAMS responded, "No. Oh, you gonna meet me out there?" WHITE replied, "Yeah. You just follow me back [WHITE will pick up the heroin from WASHINGTON and deliver it to PORTER]." WILLIAMS stated, "Alright. I'm

_____

[12]    Monitors recognized WHITE as the speaker on this call as they were familiar with her voice from prior calls in which she identified herself as "Tiara," such as: calls 25 and 26 intercepted over Target Phone 3 on October 9, 2013, at approximately 9:44 and 9:59 p.m. respectively.  Further identification of WHITE is discussed based upon surveillance observations below.

    Investigators determined that the phone number was often used by MARLEANA PORTER through information from CI1 who identified her as the user of (312) 221-0796, and KENNETH WILLIAMS's heroin worker living at 2902 W. Fillmore as corroborated by the three separate controlled purchases of heroin from her in August and September, along with surveillance of PORTER during these and other narcotics distributions detailed throughout this complaint, including the calls following her December 4, 2013 arrest with approximately 15 grams of heroin in the 2902 W. Fillmore residence detailed below.  Finally, interceptions involving the phone number involve the mention of her name "Marleana" by the caller on multiple calls.

gonna meet you where I usually meet you at. I'm gonna be... I'm gonna be like, by the expressway parked." WHITE replied, "Okay. Bye." WILLIAMS stated, "Alright. Go on and head, right now." WHITE replied, "Alright."

57.    On October 10, 2013, at approximately 7:11 p.m., surveillance observed the silver Cadillac, driven by WILLIAMS, and a silver Buick, driven by WHITE, arrive and park on the street near 211 S. Lavergne. Surveillance observed WASHINGTON leave the front door of 211 S. Lavergne and approach the silver Buick. WASHINGTON then handed a black plastic bag to WHITE through the front driver's side window of the silver Buick.

58.    On October 10, 2013, at approximately 7:12 p.m., WILLIAMS, using Target Phone 3, had a conversation (Call # 92) with TIARA WHITE, who was using PORTER Phone. During the conversation, WHITE asked, "Where you?" WILLIAMS replied, "I'm right here [WILLIAMS remained seated in the silver Cadillac on Lavergne]. Where you?" WHITE stated, "Oh, I'm gonna pull out. He saying, it's three." WILLIAMS stated, "Huh?" WHITE replied, "Huh?" WILLIAMS stated, "(unintelligible) you say?" WHITE replied, "He say, it's just three. Three thousand [WASHINGTON delivered $3000 worth of heroin (300 individual user packets or approximately 60 grams of heroin) to WHITE]. That what he say." WILLIAMS responded,

"Alright."

59.   On October 10, 2013, at approximately 7:12 p.m., surveillance observed WHITE, driving the silver Buick, and WILLIAMS, driving the silver Cadillac, drive away from the area. Surveillance observed WASHINGTON enter the silver Jeep, parked on Quincy, and drive from the area.

60.   On October 10, 2013, at approximately 7:19 p.m., surveillance observed the silver Buick and the silver Cadillac arrive and park in the alley in the rear of 2902 W. Fillmore. WILLIAMS got out of the Cadillac and walked toward the silver Buick where WHITE handed the black plastic bag to WILLIAMS. WILLIAMS entered the silver Cadillac and drove to the intersection of Fillmore and Francisco. Surveillance observed MARLEANA PORTER approach the silver Cadillac and WILLIAMS hand the black plastic bag to PORTER. PORTER then carried the black bag into the front, ground level apartment at 2902 W. Fillmore. This is the same apartment from which PORTER sold CI1 two "jabs" (26 user portions) of heroin on September 19, 2013, at approximately 12:43 p.m., as summarized above.

61.   Based upon the above wire and electronic interceptions, phone records, the corresponding law enforcement surveillance, and three separate controlled purchases by CI1 of over $100 of heroin each time from PORTER

in August and September of 2013, I believe that WASHINGTON mixed and packaged 300 user portions, or approximately 60 grams of heroin which he distributed on SHOULDERS's behalf to WHITE and WILLIAMS, which was ultimately delivered to PORTER for sale on the street in the area of Fillmore and Francisco on October 10, 2013.

### iv. On October 20, 2013, SHOULDERS discusses a 300 gram heroin deal with Individual A.

62.     On October 20, 2013, at approximately 9:46 a.m., SHOULDERS, using Target Phone 2, received a text message (Call # 579) from Individual A, who was using (216) 624-0642.[13] The individual informed SHOULDERS that he was in the city and wanted an unknown amount of heroin. The text message read: "Whats up brah i went to the residence inn downtown on river north the one i was at last time."

63.     On October 20, 2013, at approximately 9:46 a.m., SHOULDERS,

---

[13]     Investigators identified Individual A as the user of (216) 624-0642 in the following manner. As detailed below, following interceptions arranging for a meeting with SHOULDERS so that Individual A could deliver payment in return for 300 grams of heroin, surveillance officers observed him and followed him back to the Marriott Hotel at 6520 S. Cicero. Surveillance observed Individual A enter room 409 of the hotel on November 6, 2013. Records from the hotel on November 6, 2013, indicate that Individual A was the registered guest in room 409 for the evening of November 6, 2013. Surveillance officers who had observed Individual A meet with SHOULDERS to receive the heroin compared his driver's license photograph with the person they observed on surveillance and recognized him as the heroin customer and, given the context of the calls setting up the deal, the user of (216) 624-0642.

using Target Phone 2, sent a text message (Call # 580) to Individual A, who was using (216) 624-0642. In the text, SHOULDERS asked how much heroin the customer wanted to obtain. The text message read: "Up bru where we going."

64. On October 20, 2013, at approximately 9:48 a.m., SHOULDERS, using Target Phone 2, received a text message (Call # 582) from Individual A, who was using (216) 624-0642. In the text, the customer stated that he wanted to obtain 300 grams of heroin. Specifically, the text message read: "300 street."

> **v.   On October 26, 2013, SHOULDERS again packages and distributes heroin to WILLIAMS and WHITE, which they deliver to PORTER.**

65. On October 26, 2013, at approximately 12:04 p.m., SHOULDERS, using Target Phone 2, had a conversation (Call # 984) with WILLIAMS, who was using Target Phone 3. During the conversation, WILLIAMS stated, "I say, you want me to bring these ones to you, while I got 'em?" SHOULDERS replied, "Yeah. I'm here." WILLIAMS stated, "Alright (unintelligible). Yeah, I got two of 'em. Unless you want me..." SHOULDERS replied, "That's cool." WILLIAMS stated, "Unless you want me to get you some more, real, quick." SHOULDERS asked, 'Uh... You got it with... You got uh, you got it with you?"

WILLIAMS replied, "I, I got some of it with me, shit (Laughter). Well, I'm gonna have to turn around, anyway." SHOULDERS stated, "Alright, just grab two. C'mon."

66.    On October 26, 2013, at approximately 3:54 p.m., SHOULDERS, using Target Phone 2, sent a text message (Call # 993) to WILLIAMS, who was using Target Phone 3. The text message read: "Ready."

67.    At approximately 4:04 p.m., surveillance observed the silver Cadillac, driven by WILLIAMS, arrive and double park on the street at 211 S. Lavergne. TIARA WHITE got out of the silver Cadillac and entered the front door at 211 S. Lavergne. Approximately four minutes later, WHITE left the building and entered the silver Cadillac which then drove from the area.

68.    On October 26, 2013, at approximately 4:14 p.m., TIARA WHITE, using WILLIAMS's Target Phone 3, had a conversation (Call # 1577) with PORTER, who was using PORTER Phone. WHITE asked, "Where you at, Marleana?" PORTER replied, "In the house." WHITE stated, "Okay. Well, we gonna be on our way to you." PORTER replied, "Alright."

69.    On October 26, 2013, at approximately 4:32 p.m., WHITE, using WILLIAMS's Target Phone 3, had a conversation (Call # 1587) with PORTER, who was using PORTER Phone. PORTER answered, "Hello."

WHITE stated, "Yeah. Come to the back." PORTER replied, "Alright."

70.     At approximately 4:32 p.m., surveillance observed the silver Cadillac, driven by WILLIAMS, enter the alley and stop at the rear of 2902 W. Fillmore. WHITE left the Cadillac and walked toward the rear of the building. Less than one minute later, WHITE returned to the Cadillac, which then drove from the area.

> **vi.    On November 6, 2013, the SHOULDERS DTO obtains 500 grams of heroin for distribution from BEDENFIELD.**
>
> **(a)    SHOULDERS arranges to receive heroin from BEDENFIELD.**

71.     On November 4, 2013, at approximately 2:53 p.m., SHOULDERS, using Target Phone 2, had a conversation (Call # 1433) with RODNEY BEDENFIELD, aka "Bump," who was using (312) 566-1484.[14]

---

[14]     BEDENFIELD was identified as the speaker on (312) 566-1484 in the following manner. Based upon Accurint database information, investigators associated the phone number (312) 566-1484 with the address at 1614 S. Springfield, Chicago, Illinois, and that address with BEDENFIELD. On November 12, 2013, at approximately 11:25 a.m., surveillance observed a gray Audi bearing Illinois license plate N81634, which was registered to a "Sarah Bedenfield" arrive at the 1614 S. Springfield address. After a short period of time, surveillance observed BEDENFIELD get out of the vehicle and enter the residence located at 1614 S. Springfield, Chicago, Illinois. Surveillance officers recognized BEDENFIELD through a comparison to his driver's license photograph.

At approximately 11:32 a.m., surveillance observed BEDENFIELD come out of the residence located at 1614 S. Springfield, Chicago, Illinois. BEDENFIELD

BEDENFIELD answered, "Hey don't get too busy, because when my buddy gets back from therapy we gonna be good [BEDENFIELD expected to deliver a quantity of heroin to SHOULDERS]." SHOULDERS replied, "Alright, I'll be around." BEDENFIELD stated, "Yeah, uh, no he gotta go to at therapy at 3:30, so after that." SHOULDERS replied, "Ok." BEDENFIELD stated, "That's what I'm saying, don't get too busy." Later in the conversation, BEDENFIELD stated, "I'm just telling you, Joe, you get what you got, (Unintelligible) and you get what you got coming, just make sure you didn't get the short half end of it." SHOULDERS replied, "I know, that's why I'm coming to get it [SHOULDERS stated that he normally picks up the supply of heroin himself to avoid any loss due to theft by an appointed courier]." BEDENFIELD stated, "It's sure, it's sure gonna gonna be there

---

walked toward the gray Audi. At this time, a surveillance officer placed a call to BEDENFIELD's cell phone (312) 566-1484. The officer observed BEDENFIELD reach into his pant pocket and retrieve his cell phone. BEDENFIELD looked at the cell phone after he retrieved it from his pant pocket but did not answer the call. As BEDENFIELD entered the Audi, surveillance observed BEDENFIELD still looking at his cell phone. BEDENFIELD then drove away.

Additionally, on November 17, 2013, at approximately 1:50 p.m., following similar intercepted calls with (312) 566-1484 arranging for a meeting between SHOULDERS and BEDENFIELD, surveillance observed SHOULDERS and BEDENFIELD at 2103 S. Spaulding, following another heroin delivery. Surveillance observed SHOULDERS drive to his stash house location at 211 S. Lavergne. Monitors familiar with BEDEFIELD's voice through interceptions of (312) 566-1484 recognized him as the speaker on Target Phone 12 and Target Phone 14 as well.

[BEDENFIELD assured SHOULDERS that the weight of the heroin would be accurate]." SHOULDERS replied, "Yeah, I'm coming to get it, I'll meet you up. I ain't gonna even gonna call him [WASHINGTON]. I'm coming to get it." BEDENFIELD replied, "Alright." SHOULDERS replied, "Alright."

72.   On November 4, 2013, at approximately 2:56 p.m., SHOULDERS, using Target Phone 2, sent a text (Call # 1434) to Individual A, who was using (216) 624-0642. The text read: "Ready."

73.   On November 4, 2013, at approximately 3:00 p.m., SHOULDERS, using Target Phone 2, received a text (Call # 1435) from Individual A, who was using (216) 624-0642.   In the text, Individual A conveyed that he would be in the area on the following day to pick up the requested heroin from SHOULDERS. The text read: "Ill be down to tomorrow".

74.   On November 5, 2013, at approximately 11:12 a.m., SHOULDERS, using Target Phone 2, had a conversation (Call # 1499) with BEDENFIELD, who was using (312) 566-1484. During the conversation, SHOULDERS stated, "How are you gonna forget about a mother fucker that making money for you, man [SHOULDERS complained when he had not heard from BEDENFIELD about the heroin]."   BEDENFIELD replied,

"Because, because the little guy, the little guy, was late and you know he gotta go to the doctor, shit, and, and he got it was late and then [BEDENFIELD stated it was too late in the evening to deliver the heroin]." SHOULDERS replied, "I'm like a step-child (unintelligible) around this mother fucker." BEDENFIELD replied, "No, No, cause when we do it it's going, it's gonna happen, he's like man I (unintelligible) like we gonna do it in the morning, he's like yeah, but ya know we gotta stop by Shorty's funeral stop by there (unintelligible) you know, and after that, we gotta get rock and roll [BEDENFIELD explained to SHOULDERS that an unknown person would deliver the heroin in the morning] and we gonna be rockin' and rollin' for a while (unintelligible) [BEDENFIELD told SHOULDERS that BEDENFIELD would have a supply of heroin that will last for a while]." SHOULDERS replied, "(unintelligible) Y'all treat me like a cousin, what the fuck." BEDENFIELD replied, "As soon as I get it in my hand I'm calling you. I ain't calling D-Rock [WASHINGTON] because he owe me some money."

75. On November 5, 2013, at approximately 11:19 a.m., SHOULDERS, using Target Phone 2, received a text (Call # 1500) from Individual A, who was using (216) 624-0642. During the text, Individual A

informed SHOULDERS he was in route to see SHOULDERS. The text read: "Whats up brah im taking off now."

76. On November 5, 2013, at approximately 11:19 a.m., SHOULDERS, using Target Phone 2, had a conversation (Call # 1501) with BEDENFIELD, who was using (312) 566-1484. During the conversation, SHOULDERS stated, "Hey, so you want me to tell my man [SHOULDERS's heroin customer Individual A] to come on up here or wait till tomorrow?" BEDENFIELD replied, "Uh, no they can come on with it, I mean a I'm sure it's gonna go down [BEDENFIELD assured SHOULDERS that he would be able to supply the heroin]." SHOULDERS replied, "Ok, so tell him to come on?" BEDENFIELD replied, "Alright." SHOULDERS replied, "Alright, I'm fitting to tell him now [SHOULDERS would inform Individual A that he would be ready to deliver the heroin]." BEDENFIELD replied, "Alright." SHOULDERS replied, "Ok."

> **(b)** **SHOULDERS informs Individual A that he should come to Chicago because SHOULDERS would be able to supply him with heroin.**

77. On November 5, 2013, at approximately 11:20 a.m., SHOULDERS, using Target Phone 2, sent a text (Call # 1502) to Individual A, who was using (216) 624-0642. The text read: "Come on."

78. On November 5, 2013, at approximately 5:38 p.m., SHOULDERS, using Target Phone 2, received a text (Call # 1548) from Individual A, who was using (216) 624-0642. In the text, Individual A informed SHOULDERS of his estimated time of arrival. The text read: "Whats up brah be there at 7:30."

79. On November 5, 2013, at approximately 5:39 p.m., SHOULDERS, using Target Phone 2, sent a text (Call # 1549) to Individual A, who was using (216) 624-0642. In the text, SHOULDERS inquired as to the amount of heroin Individual A wished to purchase. The text read: "okay where we going."

80. On November 5, 2013, at approximately 5:40 p.m., SHOULDERS, using Target Phone 2 (Call # 1550), received a text from Individual A, who was using (216) 624-0642. In the text, Individual A stated that he wanted to obtain 300 grams of heroin. The text read: "300 street."

81. On November 5, 2013, at approximately 8:15 p.m., SHOULDERS, using Target Phone 2, received a text message (Call # 1558) from Individual A, who was using (216) 624-0642. In the text, Individual A informed SHOULDERS where he would be staying while in the area. The text read: "Whats up brah im about to be heading to the mariot on Cicero."

    **(c)**    **SHOULDERS arranges to pick up 500 grams of heroin from BEDENFIELD on November 6, 2013.**

82.    On November 5, 2013, at approximately 9:49 p.m., SHOULDERS, using Target Phone 2, had a conversation (Call # 1561) with BEDENFIELD, who was using (312) 566-1484. During the conversation, BEDENFIELD stated, "Hey first thing in the morning man [BEDENFIELD would deliver the heroin to SHOULDERS in the morning]." SHOULDERS replied, "Yeah, no, I was telling you my man here [SHOULDERS customer had arrived to purchase the heroin]." BEDENFIELD stated, "Okay. We got some (unintelligible). Two hundred more [BEDENFIELD asked if SHOULDERS wanted 200 grams of heroin]?" SHOULDERS replied, "Yeah. That's what I'm saying, just add uh, a trey [SHOULDERS related he wanted the 200 grams and an additional 300 grams of heroin for the customer]." BEDENFIELD stated, "Trey? Okay. First thing in the morning. Call me." SHOULDERS stated, "About nine. I'm gonna call you about nine."

83.    On November 6, 2013, at approximately 9:08 a.m., SHOULDERS, using Target Phone 4, had a conversation (Call # 791) with DERRICK WASHINGTON, who was using (312) 523-1862. SHOULDERS answered, "Yeah." WASHINGTON stated, "Yeah. Bump [BEDENFIELD] is up there but he won't have the full order, though [BEDENFIELD only had a portion of

49

the 500 grams of heroin requested by SHOULDERS]." SHOULDERS replied, "I seen that [SHOULDERS acknowledged WASHINGTON's point about the heroin supply]."

84. On November 6, 2013, at approximately 9:53 a.m., SHOULDERS, using Target Phone 2, sent a text message (Call # 1576) to BEDENFIELD, who was using (312) 566-1484. In the text, SHOULDERS informed BEDENFIELD he needed an additional 300 grams of heroin. The message read: "3xl hoodies."

85. On November 6, 2013, at approximately 11:47 a.m., SHOULDERS, using Target Phone 2, had a conversation (Call # 1589) with BEDENFIELD, who was using (312) 566-1484. During the conversation, SHOULDERS stated, "Alright, I'm fittin' to come there now." BEDENFIELD replied, "You what?" SHOULDERS stated, "I'm fittin to come there now [SHOULDERS told BEDENFIELD he was on his way to pick up the heroin]." BEDENFIELD stated, "What, to me?" SHOULDERS stated, "Yeah, you want me to come now, or you want me to, I mean just give me time [SHOULDERS asked BEDENFIELD if he wanted SHOULDERS to come now and pick up the heroin]." BEDENFIELD stated, "(unintelligible) How long you gonna be?" SHOULDERS stated, "If you want me to come right now, I'm fittin' to

get one out of the way. Hold on, I got a State Trooper on me [SHOULDERS was prepared to leave to pick up the heroin from BEDENFIELD]."

86. On November 6, 2013, at approximately 11:58 a.m., SHOULDERS, using Target Phone 2, had a conversation (Call # 1594) with BEDENFIELD, who was using (312) 566-1484. During the conversation, SHOULDERS stated, "Come on down [SHOULDERS arrived at BEDENFIELD location to pick up heroin]." BEDENFIELD stated, "Alright."

> **(d) SHOULDERS confirms the delivery and price of heroin with Individual A and informed WASHINGTON that there would be heroin to mix for the DTO.**

87. On November 6, 2013, at approximately 12:01 p.m., SHOULDERS, using Target Phone 2, had a conversation (Call # 1597) with Individual A, who was using (216) 624-0642. Individual A stated, "What up, Bro?" SHOULDERS replied, "What up, you woke, right?" Individual A stated, "Yeah." SHOULDERS stated, "Hey, you at the same one [SHOULDERS asked if Individual A was at the same hotel as the previous visit], right?" Individual A replied, "Yep." SHOULDERS stated, "By the, uh, by the restaurant, we be doing this [SHOULDERS asked where Individual A wanted to meet to get the heroin]? You by the restaurant by the airport, right?" Individual A replied, "Yeah, I'm in the one in the back though not the

51

one (unintelligible) in the back." SHOULDERS stated, "Yeah, the pretty joint." Individual A stated, "Yeah." SHOULDERS stated, "Alright, alright, I'll be out there within the next, however the traffic treat me, about the next twenty [SHOULDERS was on his way to deliver the heroin]." Individual A replied, "Alright."

88. On November 6, 2013, at approximately 12:09 p.m., SHOULDERS, using Target Phone 4, had a conversation (Call # 796) with WASHINGTON, who was using (312) 523-1862. SHOULDERS stated, "Go head out there [SHOULDERS instructed WASHINGTON to go to 211 S. Lavergne where the heroin would be packaged for sale on the street]." WASHINGTON replied, "Okay."

89. On November 6, 2013, at approximately 12:21 p.m., SHOULDERS, using Target Phone 2, had a conversation (Call # 1598) with Individual A, who was using (216) 624-0642. Individual A stated, "What's up bro?" SHOULDERS replied, "A twenty-four, right [SHOULDERS confirmed with Individual A the price for the 300 grams of heroin was $24,000 ($80 a gram)]?" Individual A replied, "Yeah." SHOULDERS stated, "Ok cool, you went through 'em [SHOULDERS asked Individual A whether he had counted the money]? Huh?" Individual A stated, "Say what?" SHOULDERS stated,

"You went through, right?" Individual A stated, "Yeah [Individual A stated to SHOULDERS that he counted the money and it was all there]." SHOULDERS replied, "Ok, cool, when you trying to leave today?" Individual A replied, "I wanted to because I got to get back tomorrow but. . ." SHOULDERS stated, "Ok cool, what time you leave, about 5:30?" Individual A stated, "I will probably leave about 6, but if not, I got to leave in the morning." SHOULDERS stated, "No, I'll be there. We'll be done before then alright, alright, I'm fittin' [SHOULDERS explained to Individual A that he would deliver the heroin before 5:30 pm]. . ." Individual A stated, "Alright." SHOULDERS stated, "You know what? Put it on ten, ten, four, [SHOULDERS instructed Individual A to separate the money into two bundles of $10,000 each and one bundle of $4,000] Okay?" Individual A replied, "Alright." SHOULDERS stated, "You heard me? Yeah, so when we doing it, be quick, put 'em in, in ones, yeah." Individual A replied, "Yeah." SHOULDERS stated, "Alright. Alright. I'm on my way."

(e)     **SHOULDERS receives heroin from BEDENFIELD.**

90.    On November 6, 2013, at approximately 12:30 p.m., SHOULDERS, using Target Phone 2, had a conversation (Call # 1603) with BEDENFIELD, who was using (312) 566-1484. SHOULDERS stated, "Come

down, right quick, Block [SHOULDERS arrived for a second time at BEDENFIELD's location to pick up heroin]."

91. At approximately 12:40 p.m., law enforcement surveillance observed WASHINGTON seated in a white Kia parked on the street at approximately 5003 W. Quincy. At the same time, surveillance observed a blue Chevrolet Impala, driven by SHOULDERS, arrive and park on the street behind the white Kia. SHOULDERS and WASHINGTON got out of their respective vehicles and entered the front door at 211 S. Lavergne. Approximately one minute later, surveillance observed WASHINGTON leave the front door at 211 S. Lavergne and walk to the parked Kia. WASHINGTON opened the driver's door of the Kia, removed a black bag and returned to 211 S. Lavergne.

### (f) SHOULDERS tells WILLIAMS to come pick up heroin for the DTO's street sales, which WILLIAMS and TIARA WHITE did.

92. On November 6, 2013, at approximately 1:58 p.m., SHOULDERS, using Target Phone 2, sent a text message (Call # 1611) to WILLIAMS, who was using Target Phone 3. The text message read: "Ready."

93. On November 6, 2013, at approximately 2:01 p.m., SHOULDERS, using Target Phone 2, had a conversation (Call # 1612) with WILLIAMS, who was using Target Phone 3. During the call, WILLIAMS stated, "What's up,

54

buddy?" SHOULDERS asked, "Are you on your way?" WILLIAMS replied, "Yeah." SHOULDERS stated, "Alright."

94. On November 6, 2013, at approximately 2:02 p.m., surveillance observed SHOULDERS leave the front door of 211 S. Lavergne and enter the blue Chevrolet which drove from the area.

95. On November 6, 2013, at approximately 2:17 p.m., WHITE, who was using WILLIAMS's Target Phone 3, had a conversation (Call # 2890) with PORTER, who was using PORTER Phone. During the conversation, WHITE stated, "Marleana, where you at?" PORTER replied, "In the house." WHITE stated, "We coming down that way to you [WHITE informed PORTER that she and WILLIAMS would be dropping off a supply of heroin to the Fillmore stash house]."

96. On November 6, 2013, at approximately 2:26 p.m., surveillance observed the silver Cadillac, driven by WILLIAMS, arrive and park at 211 S. Lavergne. Surveillance observed WHITE leave the front passenger side door of the silver Cadillac and enter the front door at 211 S. Lavergne. Approximately one minute later, WHITE came out of the building, carrying a black plastic bag, and entered the silver Cadillac which drove from the area.

97.     On November 6, 2013, at approximately 2:40 p.m., WILLIAMS, using Target Phone 3, had a conversation (Call # 2905) with PORTER, who was using PORTER Phone.   During the conversation, PORTER stated, "Hello." WILLIAMS stated, "Yeah, meet me on the back [WILLIAMS had arrived at 2902 W. Fillmore to give PORTER the heroin]."   PORTER replied, "Alright."

**(g)     SHOULDERS collects $24,000 in payment for heroin from Individual A.**

98.     On November 6, 2013, at approximately 2:32 p.m., SHOULDERS, using Target Phone 2, had a conversation (Call # 1627) with Individual A, who was using (216) 624-0642. During the conversation, SHOULDERS stated, "Yeah, alright you can shoot down [SHOULDERS instructed Individual A to come down from his hotel room to deliver the $24,000 for the heroin]." Individual A replied, "Alright." SHOULDERS stated, "Okay."

99.     On November 6, 2013, at approximately 2:31 p.m., SHOULDERS, using Target Phone 2, had a conversation (Call # 1632) with Individual A, who was using (216) 624-0642. During the conversation, Individual A stated, "Yeah, I'm out here.   Where you at?" SHOULDERS replied, "Yo, I see [SHOULDERS observed Individual A standing outside the hotel]."

100.  On November 6, 2013, at approximately 2:35 p.m., surveillance observed SHOULDERS, driving the blue Chevrolet Impala, enter the Midway Hotel Center at 65th Street and Cicero Avenue.  Approximately two minutes later, SHOULDERS parked near the T.G.I.Friday's restaurant at 6600 S. Cicero.  Individual A, holding a black plastic bag, entered the front door of the Chevrolet. After approximately one minute, Individual A got out of the Chevrolet, which SHOULDERS then drove from the complex.  Surveillance observed Individual A walk through the parking lot, no longer holding the plastic bag in his hands, and enter Marriott Hotel located at 6520 S. Cicero.

101.  At approximately 2:55 p.m., surveillance observed Individual A come out of the Marriott Hotel and walk through the parking lot and enter the Courtyard by Marriott Hotel located at 6610 S. Cicero. Approximately 20 minutes later, surveillance located Individual A seated in the T.G.I.Friday's restaurant.

      **(h)**    **SHOUDLERS returns to BEDENFIELD to receive the 300 grams of heroin in order to provide it to Individual A.**

102.  On November 6, 2013, at approximately 3:37 p.m., SHOULDERS, using Target Phone 2, had a conversation (Call # 1639) with BEDENFIELD, who was using (312) 566-1484. During the conversation, BEDENFIELD

stated, "Hey, buddy said, come on by bando [BEDENFIELD directed SHOULDERS to meet at an unknown location where he would deliver 300 grams of heroin to SHOULDERS]." SHOULDERS replied, "Alright. I'm gonna shoot by." BEDENFIELD stated, "I'm gonna meet you over there. Alright."

103. On November 6, 2013, at approximately 4:34 p.m., SHOULDERS, using Target Phone 2, had a conversation (Call # 1654) with WILLIAMS , who was using Target Phone 3. WILLIAMS answered, "Hello." SHOULDERS stated, "Yeah. You made it out there, right [SHOULDERS asked if WILLIAMS picked up the heroin from WASHINGTON at 211 S. Lavergne]?" WILLIAMS asked, "Did I make it out where?" SHOULDERS stated, "Out... You made it out there? 'Cause, I had left." WILLIAMS replied, "Oh yeah, I had made it. Unc had gave me some [WASHINGTON delivered an amount of heroin to WILLIAMS]. I think (unintelligible)." SHOULDERS responded, "Okay, cool."

### (i) SHOULDERS delivers the 300 grams of heroin to Individual A.

104. On November 6, 2013, at approximately 4:35 p.m., SHOULDERS, using Target Phone 2, had a conversation (Call # 1655) with Individual A, who was using (216) 624-0642. Individual A answered, "What up Bro?"

SHOULDERS stated, "I'm coming through this bottle neck, I be at you in a minute, I'm right at, I'm right down, I'm right down the road from you. (unintelligible)." Individual A replied, "Yeah, I'm at the bar." SHOULDERS replied, "Ok, that's cool. I'm gonna call then just come out." Individual A replied, "Alright." SHOULDERS stated, "Alright".

105. On November 6, 2013, at approximately 4:50 p.m., SHOULDERS, using Target Phone 2, had a conversation (Call # 1659) with Individual A, who was using (216) 624-0642. During the conversation, Individual A stated, "What's up, Bro?" SHOULDERS replied, "Yeah, shootout [SHOULDERS told Individual A to come outside to pick up the heroin]." Individual A replied "Alright."

106. On November 6, 2013, at approximately 4:50 p.m., surveillance observed a white Mercedes, driven by SHOULDERS, arrive and park near the T.G.I.Friday's restaurant. Individual A, carrying a white bag, left the restaurant and entered the white Mercedes. SHOULDERS drove the white Mercedes through the parking lot and parked near the Marriott Hotel at 6520 S. Cicero. Surveillance observed Individual A get out of the Mercedes carrying the white bag, and enter the Marriott Hotel. SHOULDERS then drove from the area. Surveillance followed Individual A back to his room at

the Marriott, Room 409, and maintained surveillance on his location throughout the night and into the following day when Individual A boarded a Megabus in downtown Chicago, headed to Cleveland, Ohio.

107. Based upon the above interceptions and surveillance, and the separate seizures of heroin from the SHOULDERS DTO mentioned in this complaint, I believe SHOULDERS and WASHINGTON received 500 grams of heroin from BEDENFIELD on November 6, 2013, 300 grams of which SHOULDERS sold to Individual A for $24,000 and some portion of the remainder of which WASHINGTON distributed to WILLIAMS for street sale.

      **vi.   On November 26, 2013, 2013, the DTO provides heroin to MARLEANA PORTER at her residence which was the DTO's distribution location of 2902 W. Fillmore.**

108. On November 26, 2013, at approximately 4:11 p.m., WILLIAMS, using Target Phone 3, received a text message (Call # 4777) from SANDRA SHOULDERS, who was using Target Phone 7.[15] The text read: "He ready

---

[15]    Investigators identified SANDRA SHOULDERS as the user of (773) 416-5276 ("Target Phone 7") through the following means: (1) Chicago Police Department records which show 1113 S. Mozart as the residence of SANDRA SHOULDERS dating back to 1996 and the phone number (773) 416-5276 to have been supplied by SANDRA SHOULDERS on numerous victim reports filed between July 2005 and December 2010; (2) Illinois Department of Corrections records indicate an inmate, incarcerated since December 2010, supplied the telephone number (773) 416-5276 for his mother, SANDRA SHOULDERS; and (3) (773) 416-5276 is subscribed to Leslie Teague, at 1113 S. Mozart, Chicago, Illinois, SANDRA

know."

109. On November 26, 2013, at approximately 4:12 p.m., WILLIAMS, using Target Phone 3, sent a text message (Call #4778) to SANDRA SHOULDERS, who was using Target Phone 7. The text message read: "On way."

110. On November 26, 2013, at approximately 4:29 p.m., surveillance observed WILLIAMS's silver Cadillac near Quincy and Lavergne Streets, near the 211 S. Lavergne location. At approximately 4:30 p.m., surveillance observed WHITE leaving 211 S. Lavergne with KENNETH SHOULDERS. WHITE entered WILLIAMS's silver Cadillac and the silver Cadillac pulled away from the area. SHOULDERS entered his blue Chevrolet Impala and drove away.

111. On November 26, 2013, at approximately 4:47 p.m., TIARA WHITE, using Target Phone 3, had a telephone conversation (Call # 4792) with MARLEANA PORTER, who was using PORTER Phone. PORTER answered, "Hello." WHITE stated, "To the back, Ms. Lady [WHITE instructed PORTER to go to the back of the house at 2902 W. Fillmore to pick up the heroin]" PORTER stated, "I am." WHITE stated, "Ok."

---

SHOULDERS's historically listed residence.

112. On November 26, 2013, at approximately 4:48 p.m., surveillance observed WILLIAMS's silver Cadillac drive into the alley behind 2902 W. Fillmore. Surveillance then observed PORTER reach into the passenger side of the Cadillac and walk back into the house.

113. Based upon the intercepted communications, surveillances observations on this date and over the course of the investigation, and the law enforcement seizures of heroin from PORTER on December 4, 2013, and WILLIAMS and WHITE on December 30, 2013, I believe that KENNETH SHOULDERS prepared heroin for distribution at the 211 S. Lavergne location, which WILLIAMS and WHITE then delivered to PORTER at the 2902 W. Fillmore drug spot on November 26, 2014.

      **vii.  On December 4, 2013, Chicago Police Officers recover approximately 15 grams of heroin from MARLEANA PORTER at her residence which was the DTO's distribution location of 2902 W. Fillmore.**

114. On December 2, 2013, at approximately 12:30 p.m., WILLIAMS, using Target Phone 3, had a telephone conversation (Call # 5350) with PORTER, who was using PORTER Phone. During the conversation, WILLIAMS asked, "You at the crib [2902 W. Fillmore, whre PORTER stored heroin for street sales]?" PORTER stated, "Nope, I'm walking to the liquor store real quick (unintelligible)." WILLIAMS stated, "Oh, you cool, I just

wanted you to give me one of those other shit, I wanted to give it to somebody real quick [WILLIAMS wanted to retrieve some of the heroin stored at 2902 W. Fillmore to give to someone to sell]. I wanted to see what's to it." PORTER stated, "Ok."

115. On December 3, 2013, at approximately 6:28 p.m., WILLIAMS, using Target Phone 3, had a telephone conversation (Call # 5482) with John Perry, aka "Bam," who was using (773) 999-3789. Perry stated, "This is Bam, bro." WILLIAMS stated, "I know." Perry stated, "Hey, what's that number, Joe [Perry wanted MARLEANA PORTER's number to obtain heroin]?" WILLIAMS stated, "Baby Girl's [PORTER's]?" Perry stated, "Yeah, man." WILLIAMS stated, "That's why she just called me and (Unintelligible) I told her to call." Perry stated, "Huh?" WILLIAMS stated, "She just called me talking about some shit, I'm finna' call her back, you looking, you need 'em [packets of heroin]?" Perry stated, "Yeah man, we need 'em man. Call they ass cause we was going to knock on the door, Lord, but they, they said don't knock back on this door and other goofy ass (Unintelligible). Call shorty back tell 'em we need her man [Perry needed to meet with PORTER to obtain heroin]." WILLIAMS stated, "Alright."

116. On December 3, 2013, at approximately 6:29 p.m., WILLIAMS,

using Target Phone 3, had a telephone conversation (Call # 5483) with PORTER, who was using PORTER Phone. PORTER stated, "Hello." WILLIAMS stated, "Yeah, I didn't need you, Lord." PORTER stated, "Why didn't you tell them come to the back [PORTER asked why WILLIAMS did not tell Perry to come back to pick up heroin]?" WILLIAMS stated, "They already back there. They said they've been sitting back there waiting on your ass, that the people been passing them and everything [WILLIAMS told PORTER that the street sellers were waiting on her at 2902 W. Fillmore and missing out on customers because they did not have heroin to sell]."

117. On December 3, 2013, at approximately 9:26 p.m., WILLIAMS, using Target Phone 3, had a telephone conversation (Call # 5503) with PORTER, who was using PORTER Phone. During the conversation, PORTER stated, "You ain't want this [PORTER asked whether WILLIAMS wanted the heroin proceeds she had at 2902 W. Fillmore]? WILLIAMS stated, "Yeah, I want to see where these police go." PORTER stated, "Oh...Alright."

118. On December 4, 2013, at approximately 7:53 a.m., WILLIAMS, using Target Phone 3, sent a text message (Call # 5508) to PORTER, who was using the PORTER Phone. The text read: "Y'all up?"

119. On December 4, 2013, at approximately 8:09 a.m., WILLIAMS,

using Target Phone 3, received a text message (Call # 5510) from PORTER, who was using the PORTER Phone, informing him that she was about to start selling heroin. The text read: "Yea on my way that way."

120. On December 4, 2013, CPD officers received information from an anonymous source that drugs were being sold out of the location at 2902 W. Fillmore by a larger build female wearing a blue-hooded sweatshirt. Officers conducted surveillance and observed PORTER (who matched the description) at 2902 W. Fillmore receive cash from an unknown male on the street, enter 2902 W. Fillmore for a brief period, and then return to the street to hand the unknown male something small. Based upon their observations, officers detained PORTER and knocked on the door to speak to the resident, PORTER's mother, who granted them written consent to search the premises. Officers searched PORTER's bedroom and recovered a purse containing 159 mini-ziplock baggies each containing suspect heroin. The approximately 15.9 grams of substance were submitted to DEA's North Central Laboratory for further testing.

121. On December 4, 2013, at approximately 11:43 a.m., TIARA WHITE, using WILLIAMS's Target Phone 3, had a telephone conversation (Call # 5521) with her mother. During the conversation, WHITE stated,

"Mom, Marleana going to jail." Her mother stated, "You kidding, Tiara." WHITE stated "Nope." Her mother stated, "How?" WHITE stated, "We were in the front of her house, they come out asking do we got some weed. . .We were smoking a blunt, but I threw the blunt, they didn't, they weren't thinking about that. Why they went inside, they came to the car. Soon as they walked up to the car, they talked to me, talked to Marleana, talked to dude. . . ."

    **a.**    Later in the conversation, her mother asked, "Did they find anything?" WHITE stated, "Yeah." Her mother stated, "Oh, Tiara. Why didn't they flush the shit?" WHITE stated, "Big Girl [PORTER] said she didn't know where it was at. Big Girl says (unintelligible) always moving it." Later in the conversation, her mother stated, "I knew something was gonna happen. I didn't know what it was gonna be, but she was on my mind too much." WHITE stated, "But ma, this is her first case, you don't think she gonna get out?" Her mother stated, "Not on a I Bond." WHITE stated, "Will she get a cheap bond?" Her mother stated, "Depends on how much they found." WHITE stated, "Oh, Lord." Her mother stated, "That depends on how much they found. But tell Little Kenny [WILLIAMS] that's not his fault, that's Marleana's fault, because Tiara, ain't nobody coming up in my house without

a mother fuckin warrant." WHITE stated, "Thank you, mom." Later in the conversation, her mother stated, "They just walked in that girl's house? And once she get down there she gonna sing like a bird." WHITE stated, "I swear to God, I see." Her mother said, "Marleana's gonna sing. This is her first time going to jail and she's a scary ass. She gonna sing like a bird. But see, that's Little Kenny's [WILLIAMS's] fault, Tiara, because you know you say yourself this girl [PORTER] slow as a mother fucker. Why keep dealing with that, you know? Why keep dealing with that? You got to think. He got to think like his daddy [KENNETH SHOULDERS]. How do think his daddy been in the game for so long?"

     **b.**    Later in the conversation, her mother stated, "You need to listen because Daddy [SHOUDLERS] know. You know Big Daddy know what's going on. Big Daddy been in the game for years, ok, he know. He (unintelligible) him what to do. Anybody know you don't put all your eggs in one basket."

    122.  On December 4, 2013, at approximately 12:19 p.m., WILLIAMS, using Target Phone 3, had a telephone conversation (Call # 5529) from SANDRA SHOULDERS, who was using Target Phone 7.

    a.    During the conversation, WILLIAMS stated, "I need you to do me

one favor, Auntie." SANDRA SHOULDERS stated, "I already talked to them [KENNETH SHOULDERS and WASHINGTON]. They not ready yet [SANDRA SHOULDERS said there was not more heroin ready to distribute]. What you want?" WILLIAMS stated, "No, it ain't that they ain't ready. They just god damn ran in the lick, bumped fat ass, all type of shit [WILLIAMS stated that the police had gone into the 2902 W. Fillmore house and arrested PORTER]." SANDRA SHOULDERS stated, "They did what?" WILLIAMS stated, "They just ran in baby girl house, bumped her, called for search warrants, all types of shit." SANDRA SHOULDERS asked, "Damn, they bumped a ,a Marleana?" WILLIAMS stated, "Hell yeah, man."

b.    Later in the conversation, WILLIAMS stated, "That's why I keep calling, I called unc [WASHINGTON], he won't answer and daddio [KENNETH SHOULDERS], ain't got no numbers that I got." SANDRA SHOULDERS stated, "Which one, the black one?" WILLIAMS stated, "Yeah, no, he ain't answer the phone. The light one." SHOULDERS stated, "The light one don't answer me either. I said let me get my hair braided so I said, let me call the black one, before they get to screaming, cause I'm gonna be gone all day, I gotta get my hair braided and I gotta do some shit for myself sometimes and I can't be on hold waiting on they mother fucking ass all the

time so he answered and was like, yeah whatever. So I'm like all right. So let me call him and let him know what's going down cause they dumb ass, cause you have to be careful with all of this shit and I'm gonna tell. Does Chuck know what's going on?"

c. Later in the conversation, SANDRA SHOULDERS stated, "They wanted who they wanted. They wanted who they wanted. It was a search warrant and somebody been talking, that's a talking ass neighborhood. (Unintelligible) But you know what, we are gonna still play [continue to sell heroin], cause looking at that stuff they might just throw that out. You have to get her a lawyer and take it from there. Her, she gonna be all good. She knew what she doing, I know you upset, you know what I'm saying, but you, this happens, everybody went to jail, you gonna be all right. She wrote you all number somewhere, but did they grab her phone?" WILLIAMS stated, "I don't know, she probably had her phone in her pocket." SANDRA SHOULDERS stated, "She probably gonna try it, so you probably gonna have to change your number. They gonna try and do a lot of (unintelligible) stuff there's a lot of shit going on, they've been watching her. The lady told me everything when they was under investigation on Kiki. Well, let me call black boy and let me let him know the business [SANDRA SHOULDERS was going

to call KENNETH SHOULDERS and tell him about PORTER's arrest and the search of 2902 W. Fillmore]." WILLIAMS stated, "Let them know that I got most of that shit that I was supposed to give them, I gotta put some money with the shit, fuck it [WILLIAMS told SANDRA SHOULDERS to tell KENNETH SHOULDERS and DERRICK WASHINGTON that WILLIAMS had most of the money from the sale of heroin given to PORTER previously]." SHOULDERS stated, "Yeah, it be like that, we know the game so, it be like that. Thank god it ain't TIARA."

123.　On December 4, 2013, at approximately 12:38 p.m., WHITE, using WILLIAMS's Target Phone 3, had a telephone conversation (Call # 5532), with SANDRA SHOULDERS, who was using Target Phone 7. During the conversation, SANDRA SHOULDERS stated, "Tell (unintelligible) because I ain't calling no nigger's on no phone anymore, because you don't know who talk or who telling anymore. Tell him his stupid Daddio [KENNETH SHOULDERS] not answering the phone but the black one [WASHINGTON] be calling me soon because I got to hollar at him." Later in the conversation, SANDRA SHOULDERS stated, "Girl that sad about Marleana, ain't it?" WHITE stated, "Yeah, yes." SHOULDERS stated, "Well it happens to everybody so I mean, she gotta women-up like I be telling

people about 'Koo.' I mean she got money up. I mean it happens, you know?" WHITE stated, "Yep." SHOULDERS stated, "It happens, ain't nothing nobody can do."

124. On December 4, 2013, at approximately 1:01 p.m., WILLIAMS, using Target Phone 3, had a telephone conversation (Call # 5541) with John Perry, who was using (773) 426-9255. During the conversation, WILLIAMS stated, "Hey, ya'll don't got no lawyer number real quick?" Perry stated, "No lawyer number. Hell no, not on smash." WILLIAMS stated, "I got one, he ain't answering the phone. Yeah man, I'm trying to have him go up there, man." Perry stated, "Let me try and get one, Bro. I'll send it to you." WILLIAMS stated, "Yeah, I got one but he ain't answering the phone. It going to his voicemail." Perry stated, "What you want to have him go up there?" WILLIAMS stated, "Man, I'm fitttin' to tell her [PORTER] don't have to talk no more when the lawyer come up there." Perry stated, "Right." WILLIAMS stated, "You feel me? They might can trick her and some shit [WILLIAMS was worried that PORTER would tell police about his involvement with the heroin and the DTO's narcotics distribution efforts]." Perry stated, "Exactly, alright 10-4."

### viii. On December 29, 2013, an Undercover Officer purchases approximately 0.8 grams of heroin from DTO worker CRANE MARKS at Fillmore and Francisco.

125. On December 29, 2013, at approximately 7:45 a.m., WILLIAMS, using Target Phone 3, had a telephone conversation (Call #8767) with CRANE MARKS, who was using (773) 370-1925.[16] During the call, MARKS explained that he was looking for John Perry for a supply of heroin to sell. MARKS stated that he was "by the house on Polk" but could not find Perry. MARKS stated, "I'm outside, already [MARKS was ready to sell heroin on WILLIAMS's behalf, but could not find the supply]."

126. On December 29, 2013, at approximately 7:50 a.m., WILLIAMS, using Target Phone 3, had a telephone conversation (Call #8772) with MARKS, who was using (773) 370-1925. During the call, WILLIAMS explained that Perry was not answering his phone. WILLIAMS stated, "I'll be by you in 10 minutes."

127. On December 29, 2013, at approximately 8:13 a.m., WILLIAMS,

---

[16] Investigators identified MARKS as the speaker on (773) 370-1925 through his self-identification as "Crane" on several calls intercepted with WILLIAMS such as Call No. 4684 on Target Phone 3. Additionally, on December 27, 2013, WILLIAMS placed a call to the phone number (Call #8508) and reached the user's voicemail which identified him as "Crane Marks." Finally, the undercover officer who conducted the purchase of heroin detailed below on December 29, 2013, recognized the individual he met and purchased heroin from as the same individual pictured in MARKS's prior arrest photograph.

using Target Phone 3, had a telephone conversation (Call #8773) with MARKS, who was using (773) 370-1925. During the call, WILLIAMS asked where MARKS was and stated, "I'm out front."

128. Based upon the telephone calls above, on December 29, 2013, at approximately 9:50 a.m., an undercover officer working with this investigation approached MARKS in the area of Francisco and Fillmore Avenue, in Chicago, Illinois. The UCO observed MARKS engage in hand-to-hand transactions with several individuals. As the UCO approached, MARKS called out to him, "How many?" The UCO replied, "Four," and showed MARKS four fingers on his left hand. When the UCO met with MARKS, MARKS stated, "You said four blows [packets of heroin], right?" The UCO replied, "Yes." MARKS walked west on Fillmore and indicated that the UCO should follow him. MARKS then went south on Richmond. The UCO observed MARKS open and reach into the trunk of a blue colored, parked car. UCO observed MARKS obtain items from the trunk and then close it. MARKS then approached the UCO and distributed four ziplock bags. After receiving them, UCO tendered $40 to MARKS.

129. Following the transaction, UCO asked MARKS for a telephone number so that UCO could purchase more heroin in the future. MARKS

asked UCO to wait and then headed into 1108 S. Fillmore and came back with a white piece of paper with "1-312-678-6556" and the name "Dallas" written on it. UCO asked MARKS if "Dallas" was his name. MARKS responded that Dallas was his brother's name, but that UCO could call this number and ask for him by the name "School" which was his nickname, as in "Crane High School," because MARKS's real name was "Crane." MARKS told UCO that MARKS would take care of him if UCO called him or came back to the same location.

130. UCO inventoried the approximately 0.8 grams and tendered the purchased substance to the Illinois State Police Forensic Lab for further analysis.

131. On December 29, 2013, at approximately 10:03 a.m., KENNETH WILLIAMS had a telephone conversation (#8801) with CRANE MARKS, who was using (773) 370-1925. During this call, MARKS informed WILLIAMS he had sold out of his supply of heroin. Specifically, MARKS stated, "Man, B U [busted], Joe [MARKS sold his supply of heroin]." Williams responded, "10-4, there's a Crown [Victoria (Police Vehicle)] on Mozart. I'm right here, though. I'm finna, uh, you got the cash? You can bring me the cash now [WILLIAMS told MARKS to bring him the heroin proceeds]." MARKS asked,

"Do what now?" WILLIAMS said, "I said, you got the receipts [cash] on you?"

ix. **On December 30, 2013, investigators recover approximately 42 grams of heroin from KENNETH WILLIAMS and TIARA WHITE, supplied to them by SHOULDERS and WASHINGTON from the DTO's stash house at 211 S. Lavergne.**

132. On December 30, 2013, at approximately 9:43 a.m., KENNETH SHOULDERS, using Target Phone 2, had a conversation (Call # 8879) with WILLIAMS, using Target Phone 3. During the conversation, SHOULDERS stated, "You need to go [SHOULDERS asked if WILLIAMS needed a quantity of heroin]?" WILLIAMS replied, "Yeah, yeah, hell yeah. I told Rock [WASHINGTON] yesterday, I told him yesterday." SHOULDERS replied, "Well, you know you gotta call me [SHOULDERS informed WILLIAMS that WILLIAMS needed to call SHOULDERS when WILLIAMS needed heroin]." WILLIAMS replied, "Yeah, that man (unintelligible) you called me and said you were getting up, so I thought you were gonna go anyway [WILLIAMS stated that he believed SHOULDERS understood WILLIAMS needed more heroin]."

133. On December 30, 2013, at approximately 11:25 a.m., WILLIAMS, using Target Phone 3, had a conversation (Call # 8884), with Individual B,

who was using (773) 676-3452.[17] During the conversation, WILLIAMS stated, "I, will be, I be up there probably later on, about, about a couple hours. I already talked to Buddy [WILLIAMS informed Individual B that WILLIAMS would be receiving a quantity of heroin from SHOULDERS]." Individual B replied, "Alright, that's gonna be good. Later on?" WILLIAMS replied, "Yeah it's gonna be later on."

134. On December 30, 2013, at approximately 2:34 p.m., SHOULDERS, using Target Phone 2, received a text message (Call # 73) from KENNETH WILLIAMS, who was using Target Phone 3. The text read: "Ready[?]."

135. On December 30, 2013, at approximately 2:35 p.m., WILLIAMS,

---

[17] Investigators identified Individual B as the speaker on this and other calls in the following manner: on December 27, 2013, at approximately 8:36 a.m., WILLIAMS, using Target Phone 3, had a conversation (#8507) with an unknown female, later identified as Individual B, using (773) 676-3452. During this call WILLIAMS informed the female caller that he was coming over to grab four dollars. The subscriber information on (773) 676-3452 lists Individual B's name and address.

On December 27, 2013, at approximately 9:02 a.m., WILLIAMS, using Target Phone 3, had a phone conversation (#8513) with Individual B, using (773) 676-3452. During this call, WILLIAMS informed Individual B that he would be stopping by her location in one to two minutes.

On December 27, 2013, at approximately 9:49 a.m., surveillance observed WILLIAMS arrive in the silver Cadillac and park on the 1200 block of S. Troy at the address registered to Individual B's phone. A short period later, surveillance observed a woman recognized as Individual B based upon a comparison to her photograph in the CPD arrest database listed for the same name and address, leave the front door of the house located on the 1200 block of S. Troy.

using Target Phone 3, received a text message (Call # 8933) from KENNETH SHOULDERS, who was using Target Phone 2. The text read "15mins."

136.  On December 30, 2013, at approximately 2:36 p.m., WILLIAMS, using Target Phone 3, sent a text message (Call # 8934) to SHOULDERS, who was using Target Phone 2. The text read "K."

137.  On December 30, 2013, at approximately 2:51 p.m., KENNETH SHOULDERS, using Target Phone 2, sent a text message (Call # 76), to WILLIAMS, who was using Target Phone 3. The text read: "Ready."

138.  On December 30, 2013, at approximately 3:05 p.m., WILLIAMS, using Target Phone 3, had a conversation (Call # 8942) with Individual B, who was using (773) 676-3453. During the conversation, WILLIAMS stated, "Hey you gonna, where you at?" Individual B stated, "I'm at my house (unintelligible)." WILLIAMS stated, "You can um, you stay right there [WILLIAMS told Individual B to stay at her home because he would bring her heroin soon]." Individual B stated, "Alright." WILLIAMS stated, "I'm on my way to you."

139.  On December 30, 2013, at approximately 3:09 p.m., surveillance observed WILLIAMS arrive in the area of 211 S. Lavergne, driving the silver Cadillac. WILLIAMS pulled up and double parked in front of 211 S.

Lavergne. Surveillance observed WHITE get out of the vehicle from the passenger side with a small child and then enter the building located at 211 S. Lavergne.

140. On December 30, 2013, at approximately 3:11 p.m., surveillance observed WHITE, carrying a bag in her left hand, and the small child leave the building located at 211 S. Lavergne. WHITE opened the passenger door of the silver Cadillac with her right hand. Surveillance observed WHITE and the small child enter the silver Cadillac. The silver Cadillac then drove south on Lavergne and turned east on Harrison.

141. On December 30, 2013, at approximately 3:14 p.m., surveillance observed the silver Cadillac pull up and stop at approximately 4519 W. Harrison. Surveillance observed WILLIAMS get out of the vehicle and open the hood. Surveillance then observed WILLIAMS lean into the engine area of the vehicle and then close the hood of the vehicle. After he closed the hood of the Cadillac, WILLIAMS reentered the driver's seat of the silver Cadillac, drove east on Harrison, entered Interstate 290 heading east, and exited at Sacramento Avenue.

142. On December 30, 2013, at approximately 3:19 p.m., while driving south on Sacramento after leaving Interstate 290, CPD enforcement officers

working at the request of this investigation observed WILLIAMS change lanes without signaling. Officers activated their emergency equipment and curbed WILLIAMS's silver Cadillac at approximately 756 S. Sacramento. Officers approached the driver's side door of WILLIAMS's vehicle and asked him to produce a driver's license and proof of insurance. WILLIAMS was unable to produce a valid driver's license and was then placed under arrest for operating a motor vehicle without a license.

143. CPD officers then transported WILLIAMS, WHITE and the small child to the 11th District where WILLIAMS was issued citations for the traffic violations. WILLIAMS's silver Cadillac was impounded per Chicago Police Department guidelines. Upon seizing the silver Cadillac, officers conducted an inventory search of the vehicle and discovered, under the hood in the engine compartment by the battery, one clear-knotted, plastic bag containing numerous knotted clear plastic bags which contained zip-lock packets with green dollar sign logos, totaling approximately 210 such packets. Each zip-lock packet contained a white powdery substance of suspect heroin. Several such packets field tested positive for the presence of heroin. Based upon the weight found in prior undercover buys from the SHOULDERS DTO, of similarly marked dollar-sign packets weighing

approximately 0.2 grams, and the total gross weight of the packages in addition to their plastic containers, investigators estimated that the seized substance contained approximately 42 grams of heroin. The seized materials were inventoried and submitted to DEA's North Central Lab for further forensic testing.

144. On December 30, 2013, at approximately 4:09 p.m., WHITE, using Target Phone 3, sent a text (Call # 8669) to her mother at (773) 503-8953, informing her that the police had stopped her and WILLIAMS. The text read: "Police got me red n lilkenny I will call u when we leave out the station".

145. On December 30, 2013, at approximately 4:22 p.m., WHITE, using Target Phone 3, had a conversation (Call # 8972) with KENNETH SHOULDERS, who was using Target Phone 2. During the conversation, WHITE stated, "Can somebody come get us from the, from the police station?" SHOULDERS stated, "What happened?" WHITE stated, "They got us." SHOULDERS stated, "(Unintelligible) leaving from here [211 S. Lavergne]?" WHITE stated, "No, when we got on Sacramento." SHOULDERS stated, "When you all got off?" WHITE stated, "Yep." SHOULDERS stated, "What they say?" WHITE stated, "A man and a lady, a

black man and a lady, but they didn't find it [the heroin] 'cause it was under the hood." SHOULDERS stated, "Why?" WHITE stated, "They didn't find it [the heroin supplied by SHOULDERS] but they keeping the car now, they keeping car and I ask them what they finna do? Lil' Kenny talking about he be home in an hour, they writing him up some tickets." SHOULDERS stated, "Damn, so they let you all go? Where you all at, the station?"

146. On December 30, 2013, at approximately 4:24 p.m., WHITE, using Target Phone 3, had a conversation (Call # 8974) with John Perry at (773) 426-9255. During the conversation, WHITE stated, "The police got Little Kenny." Perry stated, "Where at?" WHITE stated, "We were getting off at Sacramento and the expressway." Perry stated, "You all was on the expressway?" WHITE stated, "We were getting off on Sacramento on the expressway."

147. On December 30, 2013, at approximately 4:26 p.m., WHITE, using Target Phone 3, had a conversation (Call # 8975) with SANDRA SHOULDERS, who was using Target Phone 7. During the conversation, WHITE stated, "Little Kenny going to jail." SANDRA SHOULDERS stated, "Oh no, why?" WHITE stated, "Girl, somebody must have called the police on us." SANDRA SHOULDERS stated, "They came in your house?" WHITE

stated, "No, we were getting off the Sacramento expressway and the police just pulled us over for nothing." SANDRA SHOULDERS stated, "Did you have the stuff on you [SANDRA asked if WILLIAMS and WHITE were in possession of heroin when the police stopped them]?" WHITE stated, "(Unintelligible) it's under the trunk of the car and they took the car and they talking about they just gonna write him some tickets [WHITE informed SANDRA SHOULDERS that the heroin was concealed under the hood of the vehicle]."

148. On December, 30, 2013, at approximately 4:28 p.m., WHITE, using Target Phone 3, had a conversation (Call # 8978) with SANDRA SHOULDERS, who was using Target Phone 7.

a. During the conversation, SANDRA SHOULDERS stated, "The stuff... Okay, listen... They didn't get nothing on him [SHOULDERS asked if the police recovered any narcotics from WILLIAMS]? The stuff [heroin] is hid?" WHITE replied, "Yeah. It... It's under the hood." SHOULDERS stated, "They just... They not gonna go under [SHOULDERS stated the police would not search under the hood of the car]... They gonna pound the car [SHOULDERS asked if the police would tow the car to the impound lot]?" WHITE replied, "Yeah. That's what he said. And he's gonna write some

tickets."

**b.** Later in the conversation, WHITE switched to an awaiting incoming call from KENNETH SHOULDERS (Call # 8979). WHITE answered, "Hello." KENNETH SHOULDERS stated, "Yeah." WHITE stated, "Yeah. Uh, we gotta ride. Bam came and got us [John Perry picked up WHITE and her child from the police station]." SHOULDERS replied, "Okay. So look, was it a blue and white [SHOULDERS asked if the police car that pulled them over was a marked CPD vehicle]?" WHITE responded, "Yeah." SHOULDERS stated, "Yeah. They probably pulled a mother fucker over for anything. Like, your tail light... What he got? He got them tinted windows... The car with tints on 'em?" WHITE replied, "Yeah. But he say... He, he said, that he pulled us over because little Kenny switched lanes." SHOULDERS stated, "Yeah. See, they stopping you for everything and anything. Little Kenny got a license?" WHITE replied, "No." SHOULDERS stated, "No. That's all. He had no license. Is insurance on the car?" WHITE replied, "Yeah." SHOULDERS stated, "Well, he [the police officer] got to take you in 'cause, he ain't got no license. And they... They gonna write the car up... So, it ain't nothing like that. They ain't gonna go at him like that. They probably ain't gonna even search the car. It's on him, if he don't make no indication like

nothing, you know, strange or nothing [SHOULDERS believed the police would not search the car for narcotics if WILLIAMS did not cause the police to become suspicious through any statement or action while under arrest]."

149. On December 30, 2013, at approximately 4:37 p.m., WHITE, using Target Phone 3, had a conversation (Call # 8990) with SANDRA SHOULDERS, who was using Target Phone 7. During the conversation, SANDRA SHOULDERS asked, "They let him go?" WHITE stated, "Nope, they, they, um, shit they fittin' to write him some tickets and stuff. That's what they say." SANDRA SHOULDERS stated, "If they're gonna write him some tickets you are all right, we have to go get that car." WHITE replied, "I know, but they ain't gonna let us have the car. He say he gonna have the car towed." Later in the conversation, SANDRA SHOULDERS stated, "He gotta go cause you know the situation, you gotta hurry up and go get it [SHOULDERS told WHITE that they needed to get the car from the impound lot in order to retrieve the heroin]."

150. On December 30, 2013, at approximately 4:57 p.m., WASHINGTON, using Target Phone 6, had a conversation (Call # 21541), with KENNETH SHOULDERS, who was using Target Phone 4. During the conversation, WASHINGTON stated, "You talk to Mommio [SANDRA

84

SHOULDERS]?" SHOULDERS stated, "Yeah, she out there and um. . ." WASHINGTON stated, "She what?" SHOULDERS replied, "He out, and she saying payday [SHOULDERS informed WASHINGTON that WILLIAMS has been released from police custody]." WASHINGTON stated, "Oh, Ok." SHOULDERS stated, "Gonna make it happen now, you hear me?" WASHINGTON stated, "Huh?" SHOULDERS stated "(unintelligible) it's all we can do." WASHINGTON stated, "Yeah." SHOULDERS stated, "Yeah, (unintelligible) come right in, soon as you know, damn, Goddamn, you all sending mother fuckers out right back to back. I'll tell you all, mother fucker they better take advantage of this shit [SHOULDERS told WASHINGTON that WILLIAMS and WHITE were fortunate that the police did not find the heroin that was concealed in WILLIAMS's vehicle]." WASHINGTON stated, "Yeah, neither one of them got no damn license, Goddamn."

151. On December 30, 2013, at approximately 5:12 p.m., WILLIAMS, using Target Phone 3, had a conversation (Call # 9000) with KENNETH SHOULDERS, who was using Target Phone 2. During the conversation, WILLIAMS stated, "Yeah, man, the police pulled a motherfucker over, man." SHOULDERS replied, "Yeah. That's your license and they (unintelligible) for all that shit. License, insurance, your sticker. They stopping a motherfucker

for all that shit." WILLIAMS stated, "Well, I'm talking about. . .We (Unintelligible) for them [police] to even get on us, we ain't even did nothing. (Unintelligible) Goddamn!" SHOULDERS responded, "No, they did. . .they did D-Rock [WASHINGTON] and them like that. They just told him. . .told him, man, your head light out. He's like, man, my motherfucking headlight ain't out. Oh, it must be fixed, now. No, you like, you got the wrong (unintelligible). You got license and insurance? Yeah. Showed him license and insurance. Oh, Ok. No, they been doing that. (Unintelligible)." WILLIAMS stated, "They gonna try to. . . they gonna impound the car." SHOULDERS replied, "Yep. Yep. You got to pay. They want the money, man. It's gonna be the end of the year, Jack. They want that money." WILLIAMS stated, "Yeah I got. . . I got to get back in there, though. Before they do that [WILLIAMS wanted to retrieve the heroin from the car before it was discovered]. Shit." SHOULDERS replied, "They don't go in the hood in uh, in the pound [SHOULDERS was aware the heroin was hidden beneath the hood and did not believe the police/auto pound would search the engine compartment of the car]." WILLIAMS responded, "No?" SHOULDERS stated, "They gonna take that mother fucker on Sacramento [SHOULDERS instructed WILLIAMS that the car would be towed to the impound lot on Sacramento

Avenue]." WILLIAMS replied, "Ten-four."

152. On December 30, 2013, at approximately 5:18 p.m., WILLIAMS, using Target Phone 3, had a conversation (Call # 9002) with Individual B, who was using (773) 676-3452. During the conversation, Individual B stated, "I'm just checking, I'm just checking on you, make sure you was good [Individual B called to check that WILLIAMS was okay because he never came by her home to deliver the heroin]." WILLIAMS replied, "Yeah, man. Them motherfuckers [the police], man, pulled a motherfucker over, taking my mother fucking car. They trying to keep my ID and my keys. Man, let me have my keys, man. The car gonna go to the pound, just give me my keys." Individual B asked, "Right now?" WILLIAMS replied, "Yeah." Individual B stated, "Well, I been calling you. But you never no answer. Huh, you been. . . Yeah. When I. . . You talking about when I talked to you?" WILLIAMS responded, "Yeah, but after that."

153. On December 30, 2013, at approximately 6:51 p.m., WILLIAMS, using Target Phone 3, had a conversation (Call # 9019) with John Perry, who was using (312) 426-9255. During the conversation, WILLIAMS stated, "Hey man,(unintelligible) Buddy, that's the little young nigger with the GT playing." Perry stated, "Yeah." WILLIAMS stated, "Hey man, tell him man

you, he know what's going on, man. Tell him you fittin' to search the shit out of that car. So, he gotta give you some light or something (unintelligible) [WILLIAMS informed Perry that the worker at the impound lot knew about the heroin in the vehicle and WILLIAMS instructed Perry to get a light from the worker so Perry could look for the heroin concealed under the hood]." Perry stated, "Alright, 10-4." WILLIAMS stated, "He say inventory. Ask him what the fuck inventory mean? What he mean by inventorying the car? 'Cause, he say he inventory [WILLIAMS instructed Perry to ask the impound worker about the inventory procedure of his vehicle]."

154. On December 30, 2013, at approximately 7:38 p.m., WILLIAMS, using Target Phone 3, had a conversation (Call # 9027) with an unknown male ("UM1") who was using (773) 414-8990.

a. During the conversation, WILLIAMS stated, "Big Boy, you don't even know when I left you, you don't even know, the police pulled me over and took my fuckin' car." UM1 stated, "What?" WILLIAMS stated, "On my mama, soon as I pulled off from you I went and grabbed (unintelligible). I told you I had to take care of some business?" UM1 stated, "Right." WILLIAMS stated, "Then I pull off from them, Lord, I'm on my way back, Lord, I'm dirty and all type of shit [WILLIAMS had heroin he received from SHOULDERS at

88

211 S. Lavergne in his car], them people [the police] pulled me over took the car they didn't even find the shit [WILLIAMS believed that the police did not find the heroin under the hood of the vehicle]." UM1 stated, "So the shit [the heroin] still in the car?" WILLIAMS stated, "We don't know that now, we don't know that now, we done searched the car. The shit ain't in there and they let me go I don't know what the fuck to think [WILLIAMS went to the impound and could not find the heroin in his vehicle]."

    **b.**    Later in the conversation, UM1 stated, "They didn't find shit?" WILLIAMS stated, "Man, listen that shit ain't, I don't know. They didn't find it. I don't know where it's at [WILLIAMS informed UM1 that WILLIAMS had no idea what happened to the heroin]. I just went, we done searched the pound three, we done searched the pound three fuckin' times man." UM1 stated, "Damn, if they, I mean, if they would of found it they would of got up with you though." WILLIAMS stated, "That's what I'm saying. I hoping they didn't like double back and find nothing and, God dammit, and try to catch me down later [WILLIAMS was concerned that the police went back to his vehicle at the impound and recovered the heroin]."

    155. On December 30, 2013, at approximately 8:16 p.m., WILLIAMS, using Target Phone 3, sent a text message (Call # 9043) to KENNETH

SHOULDERS, who was using Target Phone 2, informing SHOULDERS that WILLIAMS was fortunate not to get caught with the heroin but could not find the heroin in the vehicle when WILLIAMS went to the impound. The text read: "Um blessed but can't find the address to the new apartment somebody might bet me to it cause I just left from up there and I had no luck".

156. On December 30, 2013, at approximately 10:24 p.m., WILLIAMS, using Target Phone 3, had a conversation (Call # 9059) with KENNETH SHOULDERS, who was using Target Phone 2.

a. During the conversation, WILLIAMS stated, "You got my message [WILLIAMS asked if SHOULDERS received his text message informing SHOULDERS that WILLIAMS could not find the heroin in his vehicle]." SHOULDERS stated, "Yeah, I was trying to read it, yeah." WILLIAMS stated, "They, we, I went up there, I ain't, I don't know. Buddy talking about it might of came out when the truck picked it up, but I, I, don't know man [WILLIAMS and an unknown individual discussed the heroin falling out of his vehicle when the vehicle was towed]."

b. Later in the conversation, WILLIAMS stated, "Only thing I can, when I get that motherfucker out, whenever I go get that motherfucker, that

shit done fell somewhere in that motherfucker, but other than that I don't see how it could of though [WILLIAMS explained to SHOULDERS that he hoped he would find the heroin in some other portion of the vehicle when WILLIAMS retrieved his vehicle from the impound lot]."

157. Investigators obtained video footage taken from the Sacramento Avenue Impound lot on the afternoon and evening of December 30, 2013. Investigators recognized KENNETH WILLIAMS and TIARA WHITE on the video footage searching for WILLIAMS's impounded silver Cadillac on that date.

> **x. On January 22, 2014, the DTO supplies heroin to the drug spot run out of HARRISON HALL's residence at 2950 W. Fillmore.**

158. On January 22, 2014, at approximately 10:30 a.m., surveillance observed WASHINGTON in the driver's seat of his silver Jeep parked at approximately 2952 W. Fillmore, in the vicinity of the DTO's 2950 W. Fillmore stash house, operated by HARRISON HALL. Surveillance observed ANTHONY HAYES[18] in conversation with WASHINGTON and hand him an

---

[18] Investigators recognized and identified HAYES and identified HAYES the speaker of the summarized calls in the following manner. On October 18, 2013, at approximately 4:59 p.m., KENNETH SHOULDERS, using Target Phone 2, had a conversation (Call #433) with ANTHONY HAYES, who was using (773) 828-0587. During the conversation, SHOULDERS stated, "I need you to go over there on Independence." HAYES stated, "And what?" SHOULDERS stated, "Roosevelt,

unknown amount of United States currency.

159. On January 22, 2014, at approximately 10:31 a.m., WASHINGTON, using Target Phone 6, had a conversation (Call # 25441) with SHOULDERS, who was using Target Phone 4. During the conversation, SHOULDERS stated that he was approaching the stash house located at 211

---

where you know them guys." HAYES stated, "Where I know them guys?" SHOULDERS stated, "You know, what you all suppose to do when you go to that store at Independence and Roosevelt [SHOULDERS instructed HAYES to purchase Dormin to cut heroin at the store on Roosevelt and Independence]?" HAYES stated, "Ok. Ok, I do that, I'm right here with them your friends (unintelligible) what you want me to do?" SHOULDERS stated, "Well someone needs to go to that store (unintelligible)" HAYES replied, "Ok, um, ok I can go get, what you want me to get? You know, get the whole thing again or something?" SHOULDERS stated, "No, just get a couple of them, just get a couple of them, to get us going." HAYES stated. "Ok."

Later, on October 18, 2013, at approximately 7:25 p.m., SHOULDERS, using Target Phone 2, had a conversation (Call #458) with HAYES, who was using (773) 828-0587. During the conversation, SHOULDERS stated, "Hey come on meet me up there Independence." HAYES stated, "Alright."

On October 18, 2013, at approximately 7:38 p.m., SHOULDERS, using Target Phone 2, had a conversation (Call #460) with HAYES, who was using (773) 828-0587. During the conversation, SHOULDERS stated, "What up?" HAYES stated, "What it is, where you at?" SHOULDERS stated, "The gas station." HAYES stated, "Huh?" SHOULDERS stated, "What is it, the gas station." HAYES stated, "Yeah B-P [HAYES told SHOULDERS he would meet him at the B-P gas station on Roosevelt to drop off the Dormin]." SHOULDERS stated, "Alright, B-P, I'm finna pull in there, I'm right there. I didn't know where I was at man."

On October 18, 2013, at approximately 7:39 p.m., surveillance observed HAYES, whom they recognized based upon comparison to his driver's license photograph, on a maroon scooter enter the B-P gas station located at Independence and Roosevelt. Surveillance observed SHOULDERS enter the gas station driving his blue Chevrolet Impala. HAYES handed a dark bag to SHOULDERS. HAYES and SHOULDERS then engaged in a brief conversation before SHOULDERS drove away.

S. Lavergne. Specifically, WASHINGTON stated, "Yo. What up?" SHOULDERS replied, "Ah, shit. Pulling up out west [211 S. Lavergne]." WASHINGTON stated. "Okay. I'm by... I'll be right there."

160. On January 22, 2014, at approximately 10:31 a.m., surveillance observed WASHINGTON drive the silver Jeep away from 2950 W. Fillmore. At approximately 11:10 a.m., surveillance observed WASHINTON's silver Jeep and SHOULDERS's gray Audi parked in the area of the DTO stash house at 211 S. Lavernge.

161. On January 22, 2014, at approximately 1:19 p.m., SANDRA SHOULDERS, using Target Phone 7, received a text message (Call # 11609) from KENNETH SHOULDERS, who was using Target Phone 4. The text message read: "Yep."

162. On January 22, 2014, at approximately 1:20 p.m., SANDRA SHOULDERS, using Target Phone 7, received a text message (Call # 11611) from WASHINGTON, who was using Target Phone 6. The text message read: "Yep yep yep sweety"

163. On January 22, 2014, at approximately 1:20 p.m., SANDRA SHOULDERS, using Target Phone 7, sent a text message (Call # 11612) to WASHINGTON, who was using Target Phone 6. The text message read:

93

"Kk."

164. On January 22, 2014, at approximately 1:52 p.m., surveillance observed SANDRA SHOULDERS arrive in the area of 211 S. Lavergne in a white Pontiac Vibe and park. At approximately 1:56 p.m., surveillance observed SANDRA SHOULDERS carrying a plastic Jewel Food store bag get out of the car and enter the location at 211 S. Lavergne.

165. On January 22, 2014, at approximately 2:02 p.m., SANDRA SHOULDERS, using Target Phone 7, sent a text message (Call # 11634) to HARRISON HALL, who was using Target Phone 8,[19] informing HALL that she was on her way to meet him with a delivery of heroin to 2950 W. Fillmore. The text message read: "Omw 2 u."

166. On January 22, 2014, at approximately 2:08 p.m., SANDRA SHOULDERS, using Target Phone 7, had a conversation (Call # 11641) with

---

[19] HARRISON HALL was identified as the user of Target Phone 8 in the following manner: first, Target Phone 8 is registered to "Harrsaon Hall;" additionally, on January 3, 2014, WASHINGTON, using Target Phone 6, had a conversation (Call #22110) with the user of Target Phone 8. During the conversation, WASHINGTON asked the user of Target Phone 8 to pick him up at the auto repair shop on Ogden, just off Kedzie. Surveillance in the area of Odgen and Kedzie observed a white Ford van bearing Illinois license plate S223078 arrive at Robbins Service station located at 3238 W. Ogden. Surveillance then observed HALL, who had been previously identified during surveillance in the course of this investigation as the driver of the vehicle through comparison to his identification photograph, driving the white van. Surveillance observed WASHINGTON enter the white van and then the van drove away from the area.

HALL, who was using Target Phone 8. During the conversation, SHOULDERS stated, "Yeah, I'm on my way [SHOULDERS was on her way to deliver heroin]." HALL replied, "Okay. No problem." SHOULDERS stated, "Bye."

167. On January 22, 2014, at approximately 2:38 p.m., surveillance observed SANDRA SHOULDERS carrying a large white purse, WASHINGTON, and KENNETH SHOULDERS, leave the building at 211 S. Lavernge and enter their respective vehicles and drive away from the area: SANDRA SHOULDERS entered the Pontiac Vibe; WASHINGTON entered the silver Jeep; and KENNETH SHOUDLERS entered the gray Audi.

168. On January 22, 2014, at approximately 2:49 p.m., surveillance observed SANDRA SHOULDERS park the white Pontiac Vibe near 2950 W. Fillmore and enter the 2950 W. Fillmore building. At approximately 2:51 p.m., surveillance observed KENNETH SHOULDERS, WASHINGTON and an unknown male wearing a blue hoody sweatshirt walk towards 2950 W. Fillmore and stand in front of the building while engaged in conversation. At approximately 3:04 p.m., SANDRA SHOULDERS left the 2950 W. Fillmore building and entered the Pontiac Vibe. WASHINGTON also entered the passenger seat of the Pontiac Vibe and SANDRA SHOULDERS and

95

WASHINTON drove away from the area. At the same time, KENNETH SHOULDERS entered the building at 2950 W. Fillmore.

169. Based upon the intercepted communications, surveillance observations on this date and over the course of the investigation, and the law enforcement seizures of heroin from PORTER on December 4, 2013, WILLIAMS and WHITE on December 30, 2013, and SANDRA SHOULDERS on March 5, 2014, as discussed in paragraphs 214-48 below, I believe that KENNETH SHOULDERS and WASHINGTON prepared heroin for distribution at the 211 S. Lavergne location, which SANDRA SHOULDERS then delivered to HARRISON HALL at the 2950 W. Fillmore drug spot on January 22, 2014, for subsequent distribution to the DTO's retail heroin customers.

      **xi.**    **On February 4, 2014, the DTO supplies heroin to the drug spot run out of HARRISON HALL's residence at 2950 W. Fillmore.**

170. On February 4, 2014, at approximately 11:04 a.m., surveillance observed HAYES park his Kia in front of 2950 W. Fillmore and enter the building. Approximately one minute later, surveillance observed HAYES and HALL come out of the building and HAYES get into his car and drive away. HALL reentered the 2950 W. Fillmore building.

171. On February 4, 2014, at approximately 11:07 a.m., HALL, using Target Phone 8, sent a text message (Call # 3586) to KENNETH SHOULDERS, who was using Target Phone 4, informing SHOULDERS that HALL needed a new supply of heroin at 2950 W. Fillmore. The text message read: "Work-out!"

172. On February 4, 2014, at approximately 11:09 a.m., HALL, using Target Phone 8, sent the same text message (Call # 3587) to WASHINGTON, who was using Target Phone 6, informing WASHINGTON that HALL needed a new supply of heroin at 2950 W. Fillmore. The text message read: "Work-out!"

173. On February 4, 2014, at approximately 11:09 a.m., HALL, using Target Phone 8, received a text message (Call # 3590) from WASHINGTON, who was using Target Phone 6. The text message read: "Ok."

174. On February 4, 2014, at approximately 11:54 a.m., WASHINGTON, using Target Phone 6, had a conversation (Call # 27063) with KENNETH SHOULDERS, who was using Target Phone 4. During the conversation, SHOULDERS stated, "Yeah." WASHINGTON replied, "Yo, what up?" SHOULDERS stated, "Shit, I'm around." WASHINGTON replied, "Oh, okay." SHOULDERS stated "I got the call [SHOULDERS acknowledged

hearing from HALL about the need for more heroin at 2950 W. Fillmore]." WASHINGTON responded, "Huh?" SHOULDERS stated, "I said, I got the call. I was fittin' to call you." WASHINGTON replied, "Oh, okay."

175. On February 4, 2014, at approximately 12:03 p.m., WASHINGTON, using Target Phone 6, had a conversation (Call # 27065) with KENNETH SHOULDERS, who was using Target Phone 4. During the call, WASHINGTON informed SHOULDERS he was on the way to the stash house at 211 S. Lavergne. Specifically, SHOULDERS asked, "You on the way?" WASHINGTON replied, "Yeah. Yeah. I'll be there (unintelligible)."

176. On February 4, 2014, at approximately 12:15 p.m., surveillance observed SHOULDERS's gray Audi parked at 211 S. Lavergne. At approximately 12:16 p.m., surveillance observed WASHINGTON park a black BMW in the area of 5002 W. Quincy, get out of the car and enter 211 S. Lavergne.

177. On February 4, 2014, at approximately 2:20 p.m., surveillance observed WASHINGTON leave the 211 S. Lavergne building, enter the black BMW and pull away from the curb headed west on Jackson Boulevard.

178. On February 4, 2014, at approximately 2:33 p.m., surveillance observed HALL park his white van in front of 2950 W. Fillmore.

179. On February 4, 2014, at approximately 2:36 p.m., SANDRA SHOULDERS, using Target Phone 7, received a text a message (Call #14552) from KENNETH SHOULDERS, who was using Target Phone 4. The message read: "Yep yep."

180. On February 4, 2014, at approximately 2:38 p.m., surveillance observed KENNETH SHOULDERS leave 211 S. Lavergne and enter his gray Audi and drive west on Jackson Boulevard.

181. On February 4, 2014, at approximately 2:39 p.m., HALL, using Target Phone 8, had a conversation (Call # 3669) with SHOULDERS, who was using Target Phone 4. During the conversation, SHOULDERS informed HALL that he would be arriving at 2950 W. Fillmore. HALL answered, "Yes, sir." SHOULDERS stated, "What up?" HALL replied, "What down?" SHOULDERS stated, "Nothing. I'm gonna run by there." HALL replied, "Alright."

182. On February 4, 2014, at approximately 2:47 p.m., surveillance observed KENNETH SHOULDERS pull his gray Audi in front of 2950 W. Fillmore. Surveillance observed ANTHONY HAYES standing on the porch of the residence.

183. On February 4, 2014, at approximately 2:48 p.m., SANDRA

SHOULDERS, using Target Phone 7, sent a text a message (Call #14559) to KENNETH SHOULDERS, who was using Target Phone 4, acknowledging that she received the message about the heroin supply. The text message read: "Okay keep me posted."

184. On February 4, 2014, at approximately 2:50 p.m., surveillance observed KENNETH SHOULDERS get out of his gray Audi and walk toward HARRISON HALL to engage him in conversation. Another unknown male approached SHOULDERS and HALL and the three men entered 2950 W. Fillmore.

185. On February 4, 2014, at approximately 2:51 p.m., SANDRA SHOULDERS, using Target Phone 7, received a text a message (Call #14563) from KENNETH SHOULDERS, who was using Target Phone 4. The text message read: "Okay where you at?"

186. On February 4, 2014, at approximately 2:57 p.m., HALL, using Target Phone 8, had a conversation (Call # 3678) with HAYES, who was using Target Phone 11. During the call, HALL instructed HAYES to come to 2950 W. Fillmore and turn in any money obtained from heroin sales. Specifically, HAYES stated, "Hey, man. Tell that man [SHOULDERS] I been there like five times, man. You wasn't there (unintelligible) [HAYES

complained that he was at the 2950 W. Fillmore residence with the heroin proceeds but that HALL was not present]." HALL stated, "Come here. Come here. I need to see you [HALL needed to collect the heroin proceeds]. Come here." HAYES replied, "I'll make it that way in a few minutes."

187. On February 4, 2014, at approximately 3:08 p.m., surveillance observed two trucks park near 2950 W. Fillmore, and two unknown individuals and Individual C walk into the building. At approximately 1:17 p.m., surveillance observed KENNETH SHOULDERS, Individual C, and three other unknown individuals leave the 2950 W. Fillmore building. SHOULDERS engaged in conversation with the unknown driver of the first truck, and then all five men returned to their respective vehicles and drove away.

188. On February 4, 2014, at approximately 4:16 p.m., SANDRA SHOULDERS, using Target Phone 7, had a conversation (Call # 14626) with KENNETH SHOULDERS, who was using Target Phone 4. During the conversation, SANDRA SHOULDERS stated, "But I'm finna, uh, uh, come to the office [SANDRA SHOULDERS stated she would pick up the heroin at 211 S. Lavergne]." KENNETH SHOULDERS replied, "Alright. Just call if you want." SANDRA SHOULDERS stated, "Okay." KENNETH SHOULDERS

stated, "You know. 'Cause, you know how it be over there. It be vroom, vroom, vroom [KENNETH SHOULDERS stated there was a heavy police presence by the 2950 W. Fillmore location]." SANDRA SHOULDERS stated, "Yep. Okay uh, (Unintelligible overlapping conversation). Oh, yeah. I know how to vroom, vroom, vroom baby. Trust me. (Unintelligible over lapping conversation.) Uh-huh. That's why I feel so good [SANDRA SHOUDLERS stated she knew how to avoid law enforcement]." KENNETH SHOULDERS asked, "You alone? License [KENNETH SHOULDERS checked to see that SANDRA SHOULDERS had her driver's license]? Who with you?" SANDRA SHOULDERS replied, "Yeah. See daddy, my license... You got no reason to mess with me. Yeah, see (unintelligible)." KENNETH SHOULDERS asked, "Did you ever see what's her name?" SANDRA SHOULDERS replied, "Huh?" KENNETH SHOULDERS stated, "(Unintelligible) Your plates, though. Your license still suspended, ain't it?" SANDRA SHOULDERS replied, "No, it's not. I'm straight." KENNETH SHOULDERS stated, "Oh, you straight. Okay."

189. On February 4, 2014, at approximately 4:31 p.m., SANDRA SHOULDERS, using Target Phone 7, sent a text message (Call #14630) to HALL, who was using Target Phone 8. The text message read: "20 mins."

190. On February 4, 2014, at approximately 4:32 p.m., SANDRA SHOULDERS, using Target Phone 7, had a conversation (Call # 14631) with HALL, who was using Target Phone 8. During the call, SANDRA SHOULDERS asked, "Did you get my text?" HALL replied, "Yeah. I gotta pick the boys up at 5:00. You make it before then?" SANDRA SHOULDERS stated, "I should be. I'm on Harlem, now. I'm coming that way now." HALL replied, "Okay." SANDRA SHOULDERS stated, "(Unintelligible) I should be there before 5:00." HALL replied, "Okay."

191. On February 4, 2014, at approximately 4:49 p.m., surveillance observed SANDRA SHOULDERS pull her maroon Mercedes up and park near 211 S. Lavergne. SANDRA SHOULDERS got out of the vehicle and entered the building.

192. On February 4, 2014, at approximately 4:51 p.m., SANDRA SHOULDERS, using Target Phone 7, sent a text message (Call #14641) to HALL, who was using Target Phone 8, informing HALL that she was en route to 2950 W. Fillmore. The text message read: "Omw."

193. On February 4, 2014, at approximately 4:58 p.m., surveillance observed SANDRA SHOULDERS leaving 211 S. Lavergne and placing a bag in the back seat of her maroon Mercedes.

194. On February 4, 2014 at approximately 4:58 p.m., SANDRA SHOULDERS, using Target Phone 7, sent a text message (Call #14642) to HALL, who was using Target Phone 8. In the text, SANDRA SHOULDERS inquired how long it would be until HALL returned to 2950 W. Fillmore. The text message read: "How long u goin b?"

195. On February 4, 2014, at approximately 4:58 p.m., HALL, using Target Phone 8, had a conversation (Call # 3779) with SANDRA SHOULDERS, who was using Target Phone 7. SANDRA SHOULDERS answered, "Hello." HALL stated, "Yeah. Where you at?" SANDRA SHOULDERS replied, "Yeah. You said, you have to be there at five. It (unintelligible) time. I'm on my way." HALL stated, "Oh, shit. I'm finna' be on Jackson, I'm finna be on Jackson and Kedzie." SANDRA SHOULDERS replied, "Do I have time, right now? I need to (unintelligible)." HALL stated, "(Unintelligible) Huh?" SANDRA SHOULDERS replied, "I was saying (unintelligible)." HALL stated, "Hey. Listen. Listen. Listen. Just come in and come up stairs. The upstairs door is open, already. Come in, come upstairs and have a seat." SANDRA SHOULDERS replied, "Okay." HALL stated, "Can you do that? Okay." SANDRA SHOULDERS replied, "Which upstairs? To the left [The door to the left leading to the second floor] or where I always

go [The door to the right leading to the first floor.]?" HALL stated, "The left. To the left." SHOULDERS replied, "To the left. Okay." HALL stated, "Push it hard. It's open."

196. On February 4, 2014, at approximately 5:01 p.m., surveillance observed HARRISON HALL driving his white van away from 2950 W. Fillmore. At approximately 5:10 p.m., surveillance observed SANDRA SHOULDERS pull up her maroon Mercedes in front of 2950 W. Fillmore. At approximately 5:15 p.m., SANDRA SHOULDERS got out of the Mercedes and entered 2950 W. Fillmore. At approximately 5:35 p.m., SANDRA SHOULDERS left the residence, got back into the Mercedes, and drove away.

197. Based upon the intercepted communications, surveillance observations on this date and over the course of the investigation, and the law enforcement seizures of heroin from PORTER on December 4, 2013, WILLIAMS and WHITE on December 30, 2013, and SANDRA SHOULDERS on March 5, 2014, I believe that KENNETH SHOULDERS and WASHINGTON prepared heroin for distribution at the 211 S. Lavergne location, which SANDRA SHOULDERS then delivered to HALL at the 2950 W. Fillmore drug spot on February 4, 2014, for subsequent distribution to the DTO's retail heroin customers.

**xii. On February 11, 2014, the DTO supplies heroin to the drug spot run out of HARRISON HALL's residence at 2950 W. Fillmore.**

198. On February 11, 2014, at approximately 3:58 p.m., SANDRA SHOULDERS, using Target Phone 7, received a text message (Call # 16799) from WASHINGTON, who was using Target Phone 6. The text message read: "Yep yepf."

199. On February 11, 2014, at approximately 3:59 p.m., SANDRA SHOULDERS, using Target Phone 7, sent a text message (Call # 16800) to WASHINGTON, who was using Target Phone 6. The text message read: "Ok."

200. On February 11, 2014, at approximately 4:26 p.m., SANDRA SHOULDERS, using Target Phone 7, received a text message (Call #16802) from KENNETH SHOULDERS, who was using Target Phone 4. Specifically, the text read: "Yep yep."

201. On February 11, 2014, at approximately 4:29 p.m., SANDRA SHOUDLERS, using Target Phone 7, sent a text message (Call #16803) to KENNETH SHOULDERS, who was using Target Phone 4. The text read: "I kn omw."

202. On February 11, 2014, at approximately 4:30 p.m., surveillance

observed KENNETH SHOULDERS and WASHINGTON leave the 211 S. Lavergne building and enter a white Mercedes.

203. On February 11, 2014 at approximately 4:30 p.m., HALL, who was using Target Phone 8, received a text message (Call #9188) from SANDRA SHOULDERS, who was using Target Phone 7, informing HALL that SANDRA SHOULDERS would be delivering heroin to 2950 W. Fillmore. The text message read: "Omw bro."

204. On February 11, 2014, at approximately 4:32 p.m., surveillance observed SANDRA SHOULDERS arrive at 211 S. Lavergne in her maroon Mercedes with an unknown female in the passenger seat.

205. On February 11, 2014, at approximately 4:38 p.m., HALL, who was using Target Phone 8, had a conversation (Call # 3779) with SANDRA SHOULDERS, who was using Target Phone 7. HALL answered, "Yes, ma'am." SANDRA SHOULDERS stated, "(Unintelligible)." HALL replied, "Hey, you breaking up." SANDRA SHOULDERS stated, "I'm on my way to you [SANDRA SHOULDERS explained that she was on her way to 2950 W. Fillmore with heroin for HALL]." HALL asked" Uh, can you be here before 5:00?" SANDRA SHOULDERS stated, "I can't... I'm walking out the door. I can't promise you." HALL replied, "Alright. C'mon. C'mon. C'mon." SANDRA

SHOULDERS stated, "Try to." HALL replied, "C'mon." SANDRA
SHOULDERS stated, "Okay."

206. On February 11, 2014, at approximately 4:42 p.m., surveillance
observed SANDRA SHOULDERS leave the 211 S. Lavergne building with
her hands inside her jacket with a big bulge. SANDRA SHOULDERS
entered her maroon Mercedes and pulled away from the location.

207. On February 11, 2014, at approximately 4:44 p.m., surveillance
observed KENNETH SHOULDERS and WASHINGTON arrive at 2950 W.
Fillmore in the white Mercedes and enter the 2950 W. Fillmore building.

208. On February 11, 2014, at approximately 4:49 p.m., SANDRA
SHOULDERS, using Target Phone 7, sent a text message (Call #16808) to
HALL, who was using Target Phone 8, informing HALL that she was en
route to 2950 W. Fillmore with the heroin and would be there in 10 minutes.
The text message read: "1o mins."

209. On February 11, 2014, at approximately 4:50 p.m., SANDRA
SHOULDERS, using Target Phone 7, received a text message (Call #16809)
from HALL, who was using Target Phone 8. The text message read: "Ok."

210. On February 11, 2014, at approximately 4:50 p.m., surveillance
observed KENNETH SHOULDERS and WASHINGTON leave the 2950 W.

Fillmore building and enter the white Mercedes and drive away. At approximately 4:54 p.m., surveillance observed HALL arrive at the location in a white Chevy van.

211. On February 11, 2014, at approximately 4:57 p.m., SANDRA SHOULDERS, using Target Phone 7, sent a text message (Call # 16810) to HALL, who was using Target Phone 8. The text message read "Here."

212. On February 11, 2014, at approximately the same time as the text message mentioned above, surveillance observed SANDRA SHOULDERS arrive at 2950 W. Fillmore in maroon Mercedes, leave the vehicle, and enter the building. At approximately 5:00 p.m., only 3 minutes after arriving at the location, surveillance observed SANDRA SHOULDERS leave 2950 W. Fillmore, reenter her maroon Mercedes and drive away from the location.

213. Based upon the intercepted communications, surveillance observations on this date and over the course of the investigation, and the law enforcement seizures of heroin from PORTER on December 4, 2013, WILLIAMS and WHITE on December 30, 2013, and SANDRA SHOULDERS on March 5, 2014, I believe that KENNETH SHOULDERS and WASHINGTON prepared heroin for distribution at the 211 S. Lavergne

location, which SANDRA SHOULDERS then delivered to HALL at the 2950 W. Fillmore drug spot on February 11, 2014, for subsequent distribution to the DTO's retail heroin customers.

> **xiii. On March 5, 2014, law enforcement recovers approximately 350 grams of heroin from SANDRA SHOULDERS which was supplied by RODENY BEDENFIELD to the SHOULDERS DTO.**
>
> **(a) On March 4, 2014, BEDENFIELD supplies KENNETH SHOULDERS with heroin.**

214. On March 4, 2014, at approximately 12:53 p.m., KENNETH SHOULDERS, using Target Phone 9, had a conversation (Call # 842) with BEDENFIELD, who was using Target Phone 12. During the conversation, SHOULDERS asked, "What up with you, buddy?" BEDENFIELD stated, "Uh, shit. Just got back in town." SHOULDERS asked, "Where did y'all go, Detroit?" BEDENFIELD stated, "(Unintelligible.) But the other thing, from the last time I left. (Unintelligible) You know what you said you had from that?" SHOULDERS replied, "Yeah." BEDENFIELD stated, "Got that with that other package [BEDENFIELD had heroin available to give to SHOULDERS]." SHOULDERS replied, "I still got that." BEDENFIELD stated, "Call you. I'm gonna call you. Be ready for you in a little while. So, be ready [BEDENFIED would be ready to deliver heroin to SHOULDERS in a

110

little while so he asked SHOULDERS to be ready]." SHOULDERS replied, "Okay. Alright." BEDENFIELD stated, "You know, we gonna swap it out [BEDENFIELD would exchange a previous supply of heroin that SHOULDERS was displeased with for a better quality of heroin]." SHOULDERS replied, "Alright."

215. On March 4, 2014, at approximately 1:13 p.m., SHOULDERS, using Target Phone 9, had a conversation (Call # 845) with BEDENFIELD, who was using Target Phone 12. SHOULDERS answered, "Yo." BEDENFIELD stated, "C'mon (unintelligible) [BEDENFIELD told SHOULDERS that the heroin was available for SHOULDERS to pick up]." SHOULDERS replied, "Alright. I'm gonna get moving. Let me (unintelligible)." BEDENFIELD stated, "Huh?" SHOULDERS replied, "I'm gonna get moving, now." BEDENFIELD asked, "You know how long you might be?" SHOULDERS replied, "Uh, shit. I ain't gonna... Where you at? Grandma's [1638 S. Trumbull]?" BEDENFIELD replied, "Yeah." SHOULDERS stated, "Alright. Here I come, right now."

216. On March 4, 2014, at approximately 1:44 p.m., surveillance observed KENNETH SHOULDERS driving his gray Audi south on Homan Avenue from 15th Street. At approximately 1:45 p.m. surveillance observed

SHOULDERS pull the Audi up and park in front of 1638 S. Trumbull.

217. On March 4, 2014, at approximately 1:47 p.m., SHOULDERS, using Target Phone 9, had a conversation (Call # 854) with BEDENFIELD, who was using Target Phone 12. During the conversation, BEDENFIELD stated, "Yeah, what up?" SHOULDERS responded, "I'm on front [SHOULDERS was parked in front of BEDENFIELD's stash house located at 1638 S. Trumbull]." BEDENFIELD stated, "(Unintelligible.)" SHOULDERS replied, "What'd you say? Hold on. What'd you say?" BEDENFIELD stated, "Come up to the door."

218. On March 4, 2014, at approximately 1:50 p.m., surveillance observed KENNETH SHOULDERS get out of the Audi and enter 1638 S. Trumbull. Approximately three minutes later, surveillance observed SHOULDERS come out of 1638 S. Trumbull. After leaving the front door, surveillance observed SHOULDERS stand by the front porch of 1638 S. Trumbull and speak to BEDENFIELD. At approximately 1:57 p.m., surveillance observed SHOULDERS enter the Audi and drive away from the area.

219. Surveillance observed SHOULDERS drive to and park in front of 211 S. Lavergne. At approximately 2:10 p.m., surveillance observed

SHOULDERS leave his Audi and enter the apartment building at 211 S. Lavergne. At approximately 2:15 p.m., surveillance observed SHOULDERS leave the building located at 211 S. Lavergne. SHOULDERS entered his vehicle and drove away from the area.

**(b)    SHOULDERS meets with WASHINGTON and HAYES.**

220.    Later in the evening of March 4, 2014, at approximately 8:10 p.m., surveillance observed SHOULDERS's sliver Audi parked in the 200 block of South Lavergne.

221.    On March 4, 2014, at approximately 10:11 p.m., SHOULDERS, using Target Phone 9, had a conversation (Call # 891) with HAYES, who was using Target Phone 10. During the conversation, SHOULDERS stated, "Meet me at the Uncle Remus up there on Central." HAYES stated, "Uncle, meet you where?" SHOULDERS stated, "On Central." HAYES replied, "Ok." SHOULDERS stated, "Central and Madison [SHOULDERS told HAYES to meet him at the Uncle Remus restaurant on Central and Madison in Chicago]."

222.    On March 4, 2014, at approximately 10:20 p.m., surveillance observed SHOULDERS and WASHINGTON leave the 211 S. Lavergne stash house. SHOULDERS entered his gray Audi while WASHINGTON entered a

black Volvo. Surveillance observed both vehicles travel to the Uncle Remus restaurant parking lot located at 5611 W. Madison. SHOULDERS and WASHINGTON left their respective vehicles and entered the Uncle Remus restaurant located at 5611 W. Madison in Chicago.

223. On March 4, 2014, at approximately 10:28 p.m., surveillance observed SHOULDERS and WASHINGTON leave the restaurant and engage in a conversation by the black Volvo. Approximately five minutes later, surveillance observed HAYES walk up from the east and engage in conversation with SHOULDERS and WASHINGTON. A few minutes later, both SHOULDERS and WASHINGTON got into their vehicles and drove from the parking lot and HAYES walked east away from the restaurant.

### (c) SHOULDERS instructs SANDRA SHOULDERS to pick up the heroin.

224. On March 5, 2014, at approximately 8:06 a.m., KENNETH SHOULDERS, using Target Phone 9, sent a text message (Call # 904) to SANDRA SHOULDERS, who was using Target Phone 7. The text read, "Yep yep at last."

225. On March 5, 2014, at approximately 9:11 a.m., KENNETH SHOULDERS, using Target Phone 9, received a text message (Call # 907) from SANDRA SHOULDERS, who was using Target Phone 7. The text read,

"Dammmm ima glad [SANDRA SHOULDERS was glad to be able to pick up more heroin]."

226. On March 5, 2014, at approximately 9:12 a.m., KENNETH SHOULDERS, using Target Phone 9, received a text message (Call # 908) from SANDRA SHOULDERS, who was using Target Phone 7. The text read, "Yes yes."

227. On March 5, 2014, at approximately 9:13 a.m., SANDRA SHOULDERS, using Target Phone 7, sent a text message to HARRISON HALL, who was using Target Phone 8, informing him that she had a supply of heroin she was going to bring to him. The text message read, "Hey boo finally I got cum hollow at u."[20]

228. On March 5, 2014, at approximately 9:16 a.m., SANDRA SHOUDLERS, using Target Phone 7, received a text message from HALL, using Target Phone 8. The text read: "Wow! Okay."

229. On March 5, 2014, at approximately 9:18 a.m., SANDRA SHOULDERS, using Target Phone 7, sent a text message to HALL, who was using Target Phone 8. The text read: "That's wat i said shit."

---

[20] Arresting Officers searched SANDRA SHOULDER's telephone, Target Phone 7, incident to her arrest on March 5, 2014, and discovered the text messages between SANDRA SHOULDERS and HALL on that date in the search of the phone.

230. On March 5, 2014, at approximately 9:30 a.m., surveillance observed SANDRA SHOULDERS leave the building located at 4312 W. Thomas. SANDRA SHOULDERS entered her maroon Mercedes Benz and drove away from the area.

231. On March 5, 2014, at approximately 9:56 a.m., surveillance observed SANDRA SHOULDERS as she arrived in the area of 211 S. Lavergne in her maroon Mercedes Benz. A short time later, SANDRA SHOULDERS got out of the vehicle carrying a blue bag. SANDRA SHOULDERS then entered the building at 211 S. Lavergne.

232. On March 5, 2014, at approximately 10:07 a.m., approximately 10 minutes after she entered the building, surveillance observed SANDRA SHOULDERS come out of the building located at 211 S. Lavergne. Surveillance observed her carrying a blue bag and enter her maroon Mercedes Benz. A short time later, SANDRA SHOULDERS drove away from the area.

233. On March 5, 2014, at approximately 10:13 a.m., SANDRA SHOULDERS, using Target Phone 7, sent a text message to HARRISON HALL, who was using Target Phone 8, informing him that she would deliver the heroin in 10 minutes. The text read: "B der in 10 mins."

**(d)     Police seize approximately 350 grams of heroin from SANDRA SHOULDERS.**

234.   On March 5, 2014, at approximately 10:21 a.m., uniformed CPD officers working at the behest of this investigation observed SANDRA SHOULDERS commit a minor traffic violation while driving eastbound on Interstate 290. The uniformed CPD officers in a marked squad car activated their emergency equipment and curbed SANDRA SHOULDERS's vehicle at approximately 2949 W. Congress Parkway.   One officer approached the driver's side door of SANDRA SHOULDERS's vehicle and asked her to produce a driver's license and proof of insurance.   SANDRA SHOULDERS was unable to produce a valid driver's license and was then placed under arrest for operating a motor vehicle without a license. After being placed in custody, SANDRA SHOULDERS began crying and became visibly distraught. The arresting officer asked SANDRA SHOULDERS about her well-being and asked SANDRA SHOULDERS if she had any weapons on her person. At this time, SANDRA SHOULDERS spontaneously volunteered, "No, but I have a lot of drugs on me."

235.   The arresting officers searched SANDRA SHOULDERS and her vehicle and found: (1) the previously observed blue bag on the passenger seat; (2) on SANDRA SHOULDERS's person, shoved up her sleeve, a tan reusable

grocery bag containing many clear plastic bags. Each of the clear plastic bags contained small red-tinted zip-lock bags, with small black bomb images printed on them, each containing a white powdery substance containing suspect heroin. Officers recovered a total of 666 such bags, the style of which is consistent with bags purchased during undercover buys of the street-dealers in the 12th Street area controlled by the SHOULDERS DTO.

236. The recovered 666 bags were submitted to the Illinois State Police Division of Forensic Science Center for analysis. At this stage in the investigation, the lab tested 50 of the bags and found them to contain 26.6 grams of heroin. Based upon the aggregate weight of all 666 bags and the amount found in the initial 50 bags, the ISP Lab estimated an addition and 323.7 grams in the remaining bags still awaiting analysis.

237. Officers transported SANDRA SHOULDERS to the CPD's 11th District station where she was informed of her *Miranda* rights. SANDRA SHOULDERS informed the officers that she wanted to give information concerning the heroin she was transporting. An investigator involved in this investigation then conducted an interview with SANDRA SHOULDERS. The investigator reiterated SANDRA SHOULDERS's rights and she stated she understood and still wanted to be interviewed.

238. In the interview, SANDRA SHOULDERS lied to investigators about the origin of the heroin. SANDRA SHOULDERS stated that she picked up the heroin earlier in the morning from a person known to her only as "Big Mike," and gave additional details about this person which were inconsistent with what the investigators know based upon the interceptions and previous surveillance of SANDRA SHOULDERS, KENNETH SHOULDERS, and other members of the DTO. SANDRA SHOULDERS stated that "Big Mike" walked over to her vehicle and handed her a plastic bag filled with drugs. SANDRA SHOULDERS then stated "Big Mike" instructed her to take the heroin to Polk and Western and then park her vehicle in front of the hot dog stand. SANDRA SHOULDERS then stated that "Big Mike" instructed her that upon her arrival she was to call "Big Mike" and then he would call an unknown individual to meet her and pick up the heroin. SANDRA SHOULDERS stated that she was to receive $700 from "Big Mike" for transporting the heroin. In order to preserve the covert nature of this investigation, officers led SHOULDERS to believe that they thought she was telling the truth and did not reveal any of the information developed in the wiretap or surveillance which demonstrated that she was lying.

**(e) DTO Members discuss the stop and seizure.**

239. On March 5, 2014, at approximately 10:42 a.m., KENNETH SHOULDERS, using Target Phone 9, sent a text message (Call # 912) to SANDRA SHOULDERS at Target Phone 7 asking if she had picked up the heroin yet. The text read, "We yup yet."

240. On March 5, 2014, at approximately 10:47 a.m., SANDRA SHOULDERS, using Target Phone 7, received a text message from HALL, who was using Target Phone 8. The text message read: "Okay."

241. On March 5, 2014, at approximately 10:58 a.m., KENNETH SHOULDERS, using Target Phone 9, sent a text message (Call # 913) to SANDRA SHOULDERS, who was using Target Phone 7. The text read, "K."

242. On March 5, 2014, at approximately 11:05 a.m., SANDRA SHOULDERS, using Target Phone 7, received a text message from HALL, who was using Target Phone 8, asking again if she was okay because she had not arrived with the heroin. The text message read: "U Okay?"

243. On March 5, 2014, at approximately 11:03 a.m., SHOULDERS, using Target Phone 9, had a conversation (Call # 915) with HAYES, who was using Target Phone 10. HAYES stated, "She's been over, right [HAYES asked if SANDRA SHOULDERS had picked up the heroin and delivered it to the

DTO's distribution area]?" SHOULDERS replied, "No, man, they done stopped her. Fuck [SHOULDERS informed HAYES that SANDRA SHOULDERS had been stopped by police]."

244. On March 5, 2014, at approximately 11:04 a.m., SHOULDERS, using Target Phone 9, had a conversation (Call # 916) with WASHINGTON, who was using (312) 523-1862. During the conversation, SHOULDERS stated, "Niecy said Mommio's [SANDRA SHOULDERS's] car got stopped?" WASHINGTON replied, "Mommio what?" SHOULDERS stated, "Her car got stopped, they took her in (unintelligible). Do you hear me?" WASHINGTON stated, "Yeah... you said she got stopped?" SHOULDERS stated, "Yeah." WASHINGTON stated, "Where at?" SHOULDERS stated, "The police stopped her car and took her in, on Laramie somewhere." WASHINGTON stated, "Aw...I'm over here at the store. I'm gonna try, I'm gonna call Mr. Doby to give me a ride."

245. On March 5, 2014, at approximately 11:13 p.m., SHOULDERS, using Target Phone 9, had a conversation (Call # 918) with HAYES, who was using Target Phone 10. During the conversation, HAYES stated, "What happened?" SHOULDERS stated, "Well I gotta, I, I don't know nothing. They got her. So I mean. That's, that's in itself enough details and shit I can't give

you." HAYES stated, "Uh naw, naw, naw, naw, I, I wasn't for sure what you said at first." SHOULDERS stated, "Yeah, they got her." HAYES stated, "When you said stopped." SHOULDERS stated, "Stopped, handcuffed, gone." HAYES stated, "Man, I wish you let me did it yesterday when I asked [HAYES wished SHOULDERS had allowed him to transport the heroin for sale the night before]." SHOULDERS stated, "Take these tickets mother fucker and get the fuck away from me. Get the fuck on. Got to go man, just go. Go, go to your place. Need to find yourself. Get on your horse and go. Damn! 'Cause motherfuckers don't be focused, motherfuckers don't listen. Motherfuckers you know? I know it was some stupid ass driving shit. Shit, some motherfucker just could've totally just avoided. Just, just too much."

246. On March 5, 2014, at approximately 11:30 a.m., SHOULDERS, using Target Phone 9, had a conversation (Call # 927) with WASHINGTON, who was using (312) 523-1862. During the conversation, SHOULDERS stated, "I went to the store 'Larry' [the SHOULDERS DTO stash house at 211 S. Lavergne]." WASHINGTON stated, "Yeah." SHOULDERS stated, "Yeah, just in case [SHOULDERS informed WASHINGTON that SHOULDERS went to the stash house at 211 S. Lavergne to see if the heroin was still there and SANDRA SHOULDERS had not already picked it up]." WASHINGTON

stated, "She probably came off up the expressway with the cell phone and shit and they ran that plate." SHOULDERS stated, "Huh?" WASHINGTON stated, "I said she probably came off that expressway on that cell phone or something and they ran that plate." SHOULDERS stated, "Yeah, even if you ain't, they just on Sac [the Sacramento Exit of the expressway]. They all up there. Just don't hate that mother fucker man. You damn near gotta go Western man. You gotta go all the way down. Cause they stopping everything trying to get lucky. You got to go early when the traffic early that's why it's early, early, 11, 10, they say you know. Early [SHOULDERS complained to WASHINGTON that when someone wants to transport heroin without being stopped by police they have to do it early in the morning]."

247. On March 5, 2014, at approximately 11:45 a.m., SHOULDERS, using Target Phone 9, had a conversation (Call # 936) with WASHINGTON, who was using (312) 523-1862. During the conversation, WASHINGTON stated, "I'm kicking myself because I swear I started to open my mouth last night. Should of chilled out like we did that last time you know?" SHOULDERS stated, "Yep." WASHINGTON stated, "Open your fucking mouth, I sure started to say no, come on [WASHINGTON told SHOULDERS they should have waited to distribute the heroin]."

248. On March 5, 2014, at approximately 5:39 p.m., KENNETH SHOULDERS, using Target Phone 9, had a conversation (Call # 972) with HAYES, who was using Target Phone 10. During the conversation, HAYES stated, "Let me tell you what happened, you ain't gonna believe this." SHOULDERS stated, "What?" HAYES stated, "He said her license is suspended. They pulled her over for a routine traffic stop. She had the stuff [the heroin] on her, she took it and put it on her."

> ixv. **On March 15, 2014, KENNETH SHOULDERS brings a supply of heroin to 2950 W. Fillmore which ANTHONY HAYES then distributes to DTO workers for further distribution to the DTO's retail heroin customers.**

249. On March 15, 2014, at approximately 12:52 a.m., HAYES, who was using Target Phone 10, sent a text message (Call #2209) to HALL, who was using Target Phone 8, asking if the DTO had more heroin available for street distribution at the 2950 W. Fillmore house. The text read: "R we good?"

250. On March 15, 2014, at approximately 7:41 a.m., HAYES, who was using Target Phone 10, sent a text message (Call #2214) to HALL, who was using Target Phone 8, asking if the DTO had more heroin available for street distribution at the 2950 W. Fillmore house. The text read: "We good?"

251. On March 15, 2014, at approximately 7:46 a.m., HAYES, who was using Target Phone 10, received a text message (Call #2216) from HALL, who was using Target Phone 8. The text read: "Not yet."

252. On March 15, 2014, at approximately 8:29 a.m., HAYES, who was using Target Phone 10, received a text message (Call #2217) from KENNETH SHOULDERS, who was using Target Phone 9. The text read: "Heading in 30."

253. On March 15, 2014, at approximately 9:17 a.m., surveillance observed KENNETH SHOULDERS leave his residence at 902 S. Mayfield in his gray Audi. At approximately 9:21 a.m., surveillance KENNETH SHOULDERS park his gray Audi near the corner of Quincy and Lavergne. Surveillance observed SHOULDERS get out of the car, go to the trunk, remove a tan bag and carry it into 211 S. Lavernge. Just three minutes later, at 9:24 a.m., surveillance observed SHOULDERS come out of 211 S. Lavergne, get into the gray Audi and drive away from the area.

254. On March 15, 2014, at approximately 9:26 a.m., KENNETH SHOULDERS, using Target Phone 9, had a telephone conversation (Call #28155) with HALL, who was using Target Phone 8. During the conversation, HALL asked, "You on your way [HALL asked if SHOULDERS

was bringing more heroin to 2950 W. Fillmore]?" SHOULDERS responded, "Yes."

255. On March 15, 2014, at approximately 9:33 a.m., KENNETH SHOULDERS, using Target Phone 9, had a telephone conversation (Call #2219) with HALL, who was using Target Phone 10. During the conversation, SHOULDERS asked, "You around?" HAYES responded, "Yeah, I'm walking out the door now." SHOULDERS asked, "Look around the neighborhood." HAYES stated, "I haven't been out but I'll look now and call you back."

256. On March 15, 2014, at approximately 9:34 p.m., KENNETH SHOULDERS, using Target Phone 9, had a telephone conversation (Call #28166) with HALL, who was using Target Phone 8. During the call, SHOULDERS stated, "In front [SHOULDERS informed HALL that SHOULDERS was in front of 2950 W. Fillmore with heroin]."

257. On March 15, 2014, at approximately 9:36 a.m., surveillance observed HALL park and get out of a white Chevy van and KENNETH SHOULDERS, carrying the tan bag, walk north across Fillmore from Sacramento Boulevard. Surveillance then observed both men enter 2950 W. Fillmore.

258. On March 15, 2014, at approximately 9:38 a.m., HAYES, who was using Target Phone 10, had a telephone conversation (Call #2221) with HALL, who was using Target Phone 8. During the conversation, HALL stated, "Come on. I'm at home [HALL informed HAYES that HALL received heroin from SHOULDERS for HAYES to distribute]."

259. On March 15, 2014, at approximately 9:39 a.m., surveillance observed KENNETH SHOULDERS leave 2950 W. Fillmore and meet with ANTHONY HAYES, who was getting out of a maroon Chrysler. A short time later, HAYES went inside 2950 W. Fillmore. At approximately 9:42 a.m., surveillance observed HAYES leave 2950 W. Fillmore and get back into his maroon Chrysler and drive away.

260. On March 15, 2014, at approximately 9:44 a.m., HAYES, who was using Target Phone 10, had a telephone conversation (Call #2229) with an unknown female ("UF3"). During the conversation, HAYES stated, "You ready? I'm gonna bring you 2 planes, which is 12 and 12 and one has 8 in it, so that's 3200 [HAYES was bringing UF3 3 packs of heroin, two with $1200 worth of heroin, and one with $800 worth of heroin, totaling $3200 worth of heroin]. You and 'Black' [Milton Taylor] can do all of it."

261. On March 15, 2014, at approximately 9:47 a.m., HAYES, who

was using Target Phone 10, had a telephone conversation (Call #2230) with UF3. During the conversation, HAYES stated, "Open the door."

262. On March 15, 2014, at approximately 9:52 a.m., surveillance observed HAYES's maroon Chrysler parked in front of 1132 S. Mozart, in Chicago. Surveillance then observed HAYES leave the residence at 1131 S. Mozart and get into the maroon Chrysler and drive away.

263. On March 17, 2014, at approximately 6:09 a.m., HAYES, who was using Target Phone 10, sent a text message (Call #2622) to David Higgs, who was using (312) 292-8558,[21] inviting Higgs to come out to sell heroin for HAYES and the DTO in the area of 1107 S. Mozart. The text read: "Come on dave."

264. On March 17, 2014, at approximately 6:12 a.m., HAYES, who was using Target Phone 10, received a text message (Call #2626) from Higgs, who was using (312) 292-8558. The text stated: "On mz way." HAYES responded (Call #2628): "Im at ur house cum out". Higgs replied (Call #2629): "Im cuming cuz."

---

[21] As detailed below, David Higgs reported that (312) 292-8558 was his telephone number to an undercover officer after selling the UC four bags of heroin on March 17, 2014, in an effort to entice the UC to buy more narcotics from him. Monitors recognized his voice on subsequent calls based upon a comparison to the voice on this number on prior calls and Higgs use of his nickname "Dave" on intercepted conversations.

265. On March 17, 2014, investigators established surveillance and an undercover officer ("UC") approached the area of 1107 S. Mozart to request narcotics from Amos Hadley, a man observed on previous surveillance conducting hand-to-hand transactions with people on the street at the location and a person UC recognized from his previous arrest photograph. Surveillance monitored and videotaped the meeting. At approximately 9:10 a.m., UC approached the area of 1107 S. Mozart and observed Hadley. UC made eye contact with Hadley while signaling with four fingers. Hadley approached the UC and stated, "You say you want four blows, right?" which the UC understood to mean four user portions of heroin. The UC confirmed.

266. Hadley pointed the UC to the wrought-iron gate at 1107 S. Mozart and instructed the UC to go to the gate and yell, "Peas in the hole." The UC recognized this as a street term used to signify that a buyer is in a spot waiting to purchase narcotics. UC followed Hadley's instruction and observed Hadley remain in his position apparently acting as a look-out for law enforcement. UC went to the gate and yelled, "Peas in the hole."

267. At this time, David Higgs, who UC recognized after law enforcement stopped him and UC returned to the scene from an unseen location to identify him later on March 17, 2014, approached UC and asked,

"How many?" UC asked for "four blows." Higgs responded, "C'mon," and nodded for UC to come closer to the gate. Higgs placed four clear/red tinted bags with black bomb stamps identical to those on the bags seized from SANDRA SHOULDERS into UC's hand and UC gave Higgs $40. While still at the gate Higgs asked UC if UC "messed with rocks?" which UC understood to mean whether UC was interested in purchasing crack cocaine. UC responded that he sometimes messed with rocks, and Higgs gave UC his phone number "(312) 292-8558" for UC to use if he ever wanted to purchase crack cocaine.

268. On March 17, 2014, at approximately 10:16 a.m., HAYES, who was using Target Phone 10, had a telephone conversation (Call #2689) with David Higgs, who was using (312) 359-0149. During the conversation, Higgs stated, "We need some more. We empty [Higgs and Hadley had sold all the heroin they had received]." HAYES stated, "He [Milton Taylor, aka "Black"] has a lot left. Higgs stated, "I knocked on the door and called his phone. He's not answerin'." HAYES stated, "Knock on his back door."

    **xv.    On March 31 and April 1, 2014, QUEENIE VARGAS delivers heroin to RODENY BEDENFIELD which BEDENFIELD delivered to DORIAN MILLER.**

269. On March 31, 2014, at approximately 7:36 p.m., BEDENFIELD,

using Target Phone 12, had a conversation (Call # 9467) with DORIAN MILLER, who was using telephone number 219-314-5612 (hereinafter "MILLER Phone").[22] MILLER stated, "What up, man?" BEDENFIELD replied, "What up with it 'D?' What going on?" MILLER stated, "Uh, shit I'm need to see you tomorrow." BEDENFIELD stated, "(Unintelligible) What you say? What you trying to do?" MILLER stated, "Half of my regular order [MILLER informed BEDENFIELD that he wanted to purchase heroin and MILLER stated that he needed half of his regular heroin order]." BEDENFIELD stated, "Alright, I'm gonna make, I'm gonna try to set something up." MILLER stated, "Alright." BEDENFIELD stated, "Let me call. You hear me 'Debo?' I said let me call and try to get it, set it up. I'm gonna call you when I'm ready though tomorrow [BEDENFIELD stated that he would contact his source and try to obtain the requested heroin]." MILLER stated, "Ok."

270. On March 31, 2014, at approximately 8:03 p.m., BEDENFIELD, using Target Phone 12, sent a text message (Call # 9472) to QUEENIE

---

[22] MILLER was identified as the user of the phone, and as the physical person, on April 8, 2014, during a traffic stop and seizure of approximately 50 grams of heroin as detailed below.

VARGAS, who was using Target Phone 13,[23] informing VARGAS that he wanted to purchase 50 grams of heroin the next day. The text read, "Need 50 2ma."

271. On March 31, 2014, at approximately 8:04 p.m., BEDENFIELD, using Target Phone 12, received a text message (Call # 9473) from VARGAS, who was using Target Phone 13. The text read, "Ok cool."

272. On April 1, 2014, at approximately 1:12 p.m., BEDENFIELD, using Target Phone 12, sent a text message (Call # 9572) to VARGAS, who was using Target Phone 13. The text read, "WAT UP."

273. On April 1, 2014, at approximately 1:13 p.m., BEDENFIELD, using Target Phone 12, received a text message (Call # 9574) from VARGAS, at Target Phone 13, informing BEDENFIELD that she would deliver the heroin at around 3:30 or 4:00 p.m. The text read, "Waiting on my ride. Im a

---

[23] Law enforcement identified VARGAS as the user of Target Phone 13 in the following manner: a LexisNexis search reveals that the telephone number (773) 647-5162, Target Phone 13, is associated with Queenie Vargas at 6303 S. Richmond, Chicago, Illinois. This is the same residence that surveillance observed the female involved in the April 1, 2014 transaction with BEDENFIELD enter following the transaction, as described below. Additionally, visitation records from the Cook County Jail were obtained for inmate, Marc Davis, booking number 2014-0225222. Information on the visitor's log included the name Queenie Vargas, 6303 S. Richmond, Chicago, Illinois. In addition to the required valid identification, Vargas supplied the telephone number (773) 647-5162, the same number associated with Target Phone 13. Vargas was also identified from a valid Illinois driver's license during surveillance, as described later, on April 8, 2014.

see u like around 330 or 4."

274. On April 1, 2014, at approximately 1:47 p.m., BEDENFIELD, using Target Phone 12, received a text message (Call # 9598) from MILLER, who was using the MILLER Phone, inquiring if BEDENFIELD was ready to deliver the heroin. The text read, "U ready 4 me bro."

275. On April 1, 2014, at approximately 4:54 p.m., BEDENFIELD, using Target Phone 12, sent a text message (Call # 9599) to VARGAS, at Target Phone 13. The text read, "Wat Up?"

276. On April 1, 2014, at approximately 5:01 p.m., BEDENFIELD, using Target Phone 12, had a telephone conversation (Call # 9467) with MILLER, who was using the MILLER Phone. During the call, MILLER stated, "What up, man?" BEDENFIELD replied, "Man, I just got off the phone, man she said she gonna call him. That's why I hate doing shit this way man. Soon as I meet her, you're talking about the '50' [50 grams of heroin] right?" MILLER stated, "Yeah." BEDENFIELD stated, "Anyway man, I'm hounding the shit out of her man. I'm on it for you bro. I already know what it is." MILLER stated, "Ok."

277. On April 1, 2014, at approximately 5:02 p.m., BEDENFIELD, using Target Phone 12, received a text message (Call # 9602) from VARGAS,

who was using Target Phone 13, informing BEDENFIELD that she was going to pick up the heroin. The text read, "Im on my way to get your bday present. I'm in traffic now so I can call u when I got im ready to go to u."

278. On April 1, 2014, at approximately 5:02 p.m., BEDENFIELD, using Target Phone 12, received a text message (Call # 9603) from VARGAS, who was using Target Phone 13. The text read, "Give me an hour."

279. On April 1, 2014, at approximately 5:03 p.m., BEDENFIELD, using Target Phone 12, sent a text message (Call # 9605) to VARGAS, who was using Target Phone 13, asking if she was being truthful about delivering the heroin in an hour. The text read, "Com on nw fa real?"

280. On April 1, 2014, at approximately 5:03 p.m., BEDENFIELD, using Target Phone 12, had a telephone conversation (Call # 9606) with MILLER, who was using the MILLER Phone. MILLER stated, "What up bro?" BEDENFIELD replied, "Yeah, she in traffic going to get it right now." MILLER stated, "(Unintelligible)." BEDENFIELD stated, "She said she be back this way about six [BEDENFIELD informed the MILLER that the source of the heroin, VARGAS, should be there to deliver it about 6:00 p.m.]."

281. On April 1, 2014, at approximately 5:04 p.m., BEDENFIELD, using Target Phone 12, received a text message (Call # 9607) from VARGAS,

134

who was using Target Phone 13. The text read, "Im serious. Ill see u soon."

282. On April 1, 2014, at approximately 5:04 p.m., BEDENFIELD, using Target Phone 12, sent a text message (Call # 9608) to VARGAS, who was using Target Phone 13. The text read, "Ok."

283. On April 1, 2014, at approximately 6:04 p.m., BEDENFIELD, using Target Phone 12, sent a text message (Call # 9611) to VARGAS, who was using Target Phone 13. The text read, "Wat up."

284. On April 1, 2014, at approximately 6:06 p.m., BEDENFIELD, using Target Phone 12, received a text message (Call # 9613) from VARGAS, who was using Target Phone 13. The text read, "Meet me at the same place. ill be there in 45."

285. On April 1, 2014, at approximately 6:13 p.m., BEDENFIELD, using Target Phone 12, sent a text message (Call # 9614) to VARGAS, who was using Target Phone 13, informing VARGAS that he did not have a car and that she would have to meet him where he was. The text read, "I CANT U GTTA CTM TO ME MY CAR N DA SHOP."

286. On April 1, 2014, at approximately 6:14 p.m., BEDENFIELD, using Target Phone 12, had a telephone conversation (Call # 9615) with MILLER, who was using the MILLER Phone. MILLER stated, "Hello."

135

BEDENFIELD stated, "Yeah, she said you can a. . . She said forty five minutes. I wondering, I have my car, but I ain't got my car. You can head this way I guess [BEDENFIELD informed MILLER to come to him to pick up the heroin he ordered]." MILLER stated, "Ok."

287. On April 1, 2014, at approximately 6:15 p.m., BEDENFIELD, using Target Phone 12, received a text message (Call # 9617) from VARGAS, who was using Target Phone 13. The text read, "Ok fine. Theres alot of traffic but im coming."

288. On April 1, 2014, at approximately 6:17 p.m., BEDENFIELD, using Target Phone 12, sent a text message (Call # 9618) to VARGAS, who was using Target Phone 13. The text read, "Ok cus i jus told dem to com on [BEDENFIELD informed VARGAS that he told his customer MILLER to come over for the heroin delivery]."

289. On April 1, 2014, at approximately 6:21 p.m., BEDENFIELD, using Target Phone 12, received a text message (Call # 9620) from VARGAS, who was using Target Phone 13. The text read, "K."

290. On April 1, 2014, at approximately 6:22 p.m., BEDENFIELD, using Target Phone 12, received a text message (Call # 9621) from VARGAS, who was using Target Phone 13, asking where she should meet him to deliver

the heroin. The text read, "Wheres exactly am imeeting u?"

291. On April 1, 2014 at approximately 6:26 p.m., BEDENFIELD, using Target Phone 12, sent a text message (Call # 9622) to VARGAS, who was using Target Phone 13. The text read, "ON trumbull n 16th." [Trumbull and 16th Streets in Chicago].

292. On April 1, 2014, at approximately 6:32 p.m., BEDENFIELD, using Target Phone 12, received a text message (Call # 9625) from VARGAS, who was using Target Phone 13. The text read, "Ok im coming from the northside."

293. On April 1, 2014, at approximately 6:50 p.m., BEDENFIELD, using Target Phone 12, sent a text message (Call # 9630) to VARGAS, who was using Target Phone 13. The text read, "HOW FAR?"

294. On April 1, 2014, at approximately 6:55 p.m., BEDENFIELD, using Target Phone 12, received a text message (Call # 9632) from VARGAS, who was using Target Phone 13. The text read, "Im a bit far I barely got to the city I was north suburbs."

295. On April 1, 2014, at approximately 7:13 p.m., BEDENFIELD, using Target Phone 12, sent a text message (Call # 9639) to VARGAS, who was using Target Phone 13. The text read, "U GOT ME TLLN PPL TO CUM

137

N U PLAYN DA LIVE N INDIANA [BEDENFIELD was upset because his heroin customer came all the way from Indiana based upon when VARGAS said she would arrive to complete the heroin in this action]."

296. On April 1, 2014, at approximately 7:40 p.m., BEDENFIELD, using Target Phone 12, had a telephone conversation (Call # 9647) with MILLER, who was using the MILLER Phone. MILLER stated, "Yo." BEDENFIELD stated, "Where the fuck you at, Rob?" MILLER stated, "Sitting in front of my cousin's house waiting on you." BEDENFIELD stated, "Damn, why had I been called. She just hung up. She said she like ten minutes away." MILLER stated, "Alright, I'm sitting right here."

297. On April 1, 2014, at approximately 8:01 p.m., surveillance observed a gray Audi arrive and park on the street at approximately 1612 S. Trumbull – the location where BEDENFIELD asked VARGAS to meet him. BEDENFIELD was seated in the Audi.

298. Approximately one minute later, BEDENFIELD, using Target Phone 12, had a telephone conversation (Call # 9654) with VARGAS, who was using Target Phone 13. During the conversation, BEDENFIELD stated, "Where you at right now?" VARGAS stated, "Ok, I'm on the next stop sign." BEDENFIELD stated, "Stop, no back up." VARGAS stated, "I stopped. I

stopped right before the stop sign." BEDENFIELD stated, "Ok, I see you right there. Just stay right there. I'm fittin' to come. I gonna come get some [BEDENFIELD directed VARGAS to park her car so he could come pick up the heroin]."

299. On April 1, 2014, at approximately 8:03 p.m., surveillance observed a black Ford SUV traveling northbound on S. Trumbull Avenue. Surveillance then observed the vehicle park at approximately 1642 S. Trumbull. BEDENFIELD exited his Audi and approached the black Ford SUV. Surveillance observed BEDENFIELD reach into the driver's side window and accept an object from the driver. Surveillance then observed BEDENFIELD place the object in his coat pocket and enter the residence located at 1638 S. Trumbull.

300. On April 1, 2014, at approximately 8:04 p.m., BEDENFIELD, using Target Phone 12, had a telephone conversation (Call # 9655) with MILLER, who was using the MILLER Phone. BEDENFIELD stated, "Come on, bro. I'm by my grandma's house. Come get this [BEDENFIELD instructed MILLER to pick up the heroin by his grandmother's house at 1638 S. Trumbull Avenue in Chicago, Illinois]." MILLER stated, "Here I come."

301. On April 1, 2014, at approximately 8:10 p.m., surveillance

observed a different black Ford SUV traveling northbound on S. Trumbull Avenue. Surveillance then observed the vehicle park at approximately 1640 S. Trumbull Avenue. Surveillance observed MILLER get out of the vehicle and enter the residence located at 1638 S. Trumbull.

302. On April 1, 2014, at approximately 8:15 p.m., surveillance observed BEDENFIELD and MILLER leave the residence located at 1638 S. Trumbull Avenue. Surveillance then observed MILLER enter his vehicle and drive away. BEDENFIELD then got into the passenger side of the black Ford SUV from which he had retrieved the package from VARGAS moments earlier.

303. On April 1, 2014, at approximately 8:16 p.m., surveillance observed BEDENFIELD exit the black Ford SUV and re-enter the residence located at 1638 S. Trumbull.

304. On April 1, 2014, at approximately 8:46 p.m., surveillance observed the black Ford SUV, from which BEDENFIELD retrieved the package, pull up and park in the parking lot of a Walgreen's located at 3405 S. King Drive. Surveillance then observed MARC DAVIS, recognized through comparison to his driver's license, exit a black Ford truck and enter the passenger side door of VARGAS's vehicle. Surveillance observed DAVIS

manipulating something in his waistband or lap area. DAVIS then left VARGAS's vehicle and reentered his black Ford truck. VARGAS then drove her black SUV away from the parking lot.

305. On April 1, 2014, at approximately 10:25 p.m., surveillance observed VARGAS's black SUV pull into a garage located at 2923 W. 63rd Street. VARGAS got out of the vehicle and entered a multi-unit building located at 6303 S. Richmond. Surveillance then observed a light go on in the second floor rear apartment.

306. Based upon the interceptions, surveillance of movement, the subsequent seizure of 50 grams of heroin from MILLER on April 8, 2014, detailed below, and the subsequent seizure of heroin from VARGAS on May 13, 2014, detailed below, I believe that on April 1, 2014, VARGAS and DAVIS supplied BEDENFIELD with 50 grams of heroin which BEDENFIELD then supplied to MILLER. BEDENFIELD then gave VARGAS payment from a share of the proceeds received from MILLER and VARGAS returned to DAVIS with that payment.

   **xvi. On April 8, 2014, law enforcement seizes 50 grams of heroin from MILLER, delivered to him by BEDENFIELD and given to BEDENFIELD by QUEENIE VARGAS and her supplier MARC DAVIS.**

307. On April 8, 2014, at approximately 10:16 a.m., BEDENFIELD,

using Target Phone 12, had a telephone conversation (Call #10191) with MILLER, who was using the Miller Phone. During the conversation, MILLER asked BEDENFIELD for more heroin. Specifically, MILLER stated, "Come with it." BEDENFIELD explained to MILLER that he was on a field trip with his child but asked MILLER to text him "what you want," and promised that BEDENFIELD would "make it happen."

308. On April 8, 2014, at approximately 10:36 a.m., BEDENFIELD, using Target Phone 12, received a text message (Call # 10196) from MILLER, who was using the Miller Phone, in which MILLER explained that he wanted to repeat the 50 gram heroin order he received on April 1, 2014. The text read: "Same as last time bro." Between 10:36 a.m. and 11:30 a.m., MILLER resent the same text to BEDENFIELD 15 times.

309. On April 8, 2014, at approximately 11:30 a.m., BEDENFIELD, using Target Phone 12, sent a text message (Call # 10212) to MILLER, who was using the Miller Phone. The text read: "Ok."

310. On April 8, 2014, at approximately 11:31 a.m., BEDENFIELD, using Target Phone 12, sent a text message (Call # 10213) to VARGAS, who was using Target Phone 13, in which BEDENFIELD explained that he needed 50 grams of heroin at 4 p.m. in the afternoon. The text read: "I

NEED 50 BOUT 4."

311. On April 8, 2014, at approximately 3:03 p.m., BEDENFIELD, using Target Phone 12, received a text message (Call # 10225) from VARGAS, who was using Target Phone 13, confirming the order. The text message read: "Ok." At approximately 3:10 p.m., VARGAS sent a follow up text (Call # 10229) explaining that she would not be able to deliver the heroin until later that evening. The text read: "I cant pick up my car till 730 so I will see u to ight."

312. On April 8, 2014, at approximately 7:08 p.m., BEDENFIELD, using Target Phone 12, received a text message (Call # 10269) from VARGAS, who was using Target Phone 13. The text message read: "Im leaving my house in 30 minutes. Once im on my way to u ill call u."

313. On April 8, 2014, at approximately 8:21 p.m., BEDENFIELD, using Target Phone 12, had a telephone conversation (Call #10279) with DORIAN MILLER, who was using the Miller Phone. During the conversation, BEDENFIELD explained he was waiting on his source, VARGAS, to call about the delivery of the heroin. Specifically, BEDENFIELD stated, "I'm waitin' for a call. She's trying to get her car." BEDENFIELD told MILLER that he would call him as soon as he heard

back.

314. On April 8, 2014, at approximately 8:36 p.m., BEDENFIELD, using Target Phone 12, received a text message (Call # 10287) from VARGAS, who was using Target Phone 13. The text message read: "Getting it now."

315. On April 8, 2014, at approximately 8:38 p.m., BEDENFIELD, using Target Phone 12, had a telephone conversation (Call #10289) with MILLER, who was using the Miller Phone. During the conversation, BEDENFIELD stated, "It's a go, bro. They grabbing it now." BEDENFIELD instructed MILLER to be ready for the call when BEDENFIELD had the heroin.

316. On April 8, 2014, at approximately 9:15 p.m., BEDENFIELD, using Target Phone 12, received a text message (Call # 10292) from VARGAS, who was using Target Phone 13. The text message read: "On my way to u. see u in 20."

317. On April 8, 2014, at approximately 9:16 p.m., BEDENFIELD, using Target Phone 12, had a telephone conversation (Call #10294) with MILLER, who was using the Miller Phone. During the conversation, BEDENFIELD stated, "I just got a text that said they be here in 20 minutes. You can probably come this way." MILLER stated, "I'm on the way."

318. On April 8, 2014, at approximately 9:17 p.m., BEDENFIELD, using Target Phone 12, sent a text message (Call # 10295) to VARGAS, who was using Target Phone 13, explaining that his customer was on his way and asking her not to mislead him about the timing of the delivery. The text message read: "OK cus da on da way so dnt fake me out."

319. On April 8, 2014, at approximately 9:18 p.m., BEDENFIELD, using Target Phone 12, received a text message (Call # 10296) from VARGAS, who was using Target Phone 13. The text message read: "Naw im on the eway."

320. On April 8, 2014, at approximately 9:40 p.m., surveillance observed VARGAS arrive in the area of 1638 S. Trumbull in the same black Ford SUV she drove on April 1, 2014 and parked.

321. On April 8, 2014, at approximately 9:41 p.m., BEDENFIELD, using Target Phone 12, received a text message (Call # 10304) from VARGAS, who was using Target Phone 13. The text message read: "Im here."

322. On April 8, 2014, at approximately 9:41 p.m., BEDENFIED, using Target Phone 12, had a conversation (Call # 10305) with VARGAS, who was using Target Phone 13. During the conversation, BEDENFIELD stated, "Where are you?" VARGAS stated, "On Trumbull." BEDENFIELD stated,

"I'm dropping off my girl's sister on Austin. I'll call my uncle and have him let you in the house at 1638 S. Trumbull [BEDENFIELD instructed VARGAS to go inside the house with the heroin so she would not be on the street with the narcotics]." VARGAS stated, "I'm right there." BEDENFIELD described his uncle as "bald headed" and instructed VARGAS to go in the house and "sit in there."

323. On April 8, 2014, at approximately 9:45 p.m., surveillance observed VARGAS get out of the black Ford SUV and enter the residence at 1638 S. Trumbull. At approximately 10:01 p.m., surveillance observed BEDENFIELD arrive and enter the same house.

324. On April 8, 2014, at approximately 10:02 p.m., BEDENFIELD, using Target Phone 12, had a telephone conversation (Call #10294) with MILLER, who was using the Miller Phone. During the conversation, BEDENFIELD stated, "Where you at?" MILLER stated, "Turning on 16th. I'll be there in less than two minutes." BEDENFIELD stated, "Park and come to the door."

325. At approximately 10:05 p.m., surveillance observed MILLER, the same man observed receiving heroin from BEDENFIELD during the April 1, 2014 transaction, arrive in a black Jeep and enter the residence at 1638 S.

Trumbull. At approximately 10:09 p.m., MILLER came out of the house and returned to the black Jeep. Surveillance observed MILLER drive east to Interstate 94 and east to the 159th Street exit. After exiting, surveillance observed MILLER pick up two other men at a gas station. MILLER proceeded over the Indiana border into Hammond. At approximately 10:53 p.m., an Indiana State Trooper working at the request of this investigation, observed MILLER commit a traffic violation and pulled him over. A subsequent search of the vehicle revealed approximately 50 grams of a substance which field tested positive for heroin and 8 bottles of Dormin, the sleeping aid utilized to dilute heroin for street-sale, concealed under the steering column in the Jeep. The substances have been submitted to the DEA's North Central Laboratory for analysis.

> **xvii. On May 13, 2014, law enforcement seizes 100 grams of heroin from QUEENIE VARGAS, who received the heroin from MARC DAVIS.**

326. On May 13, 2014, at approximately 7:31 p.m., VARGAS, using Target Phone 13, sent a text message (Call #3628) to MARC DAVIS, who was using (312) 888-5709 (the "DAVIS Phone"),[24] in which VARGAS stated to

---

[24] Law enforcement identified DAVIS as the user of (312) 888-5709 in the following manner: on April 11, 2014, VARGAS agreed to deliver 30 grams of heroin to BEDENFIELD. Mobile surveillance observed VARGAS arrive and park at approximately 722 W. 54th Place. As VARGAS remained seated in her vehicle,

DAVIS "call me."

327. On May 13, 2014, at approximately 7:39 p.m., VARGAS, using Target Phone 13, had a conversation (Call # 3269) with DAVIS, who was using the DAVIS Phone. VARGAS stated, "Hello." DAVIS replied, "What you doing?" VARGAS stated, "I'm in the house chillin." DAVIS stated, "Meet me like 8:15." VARGAS stated, "Um, where?" DAVIS stated, "Over there." VARGAS stated, "North?" DAVIS stated, "Yep" VARGAS stated, "Alright, bye [DAVIS informed VARGAS to meet him at a northern location known to the two of them at 8:15 p.m. in order to transport the heroin]."

328. On May 13, 2014, at approximately 7:52 p.m., surveillance monitoring a pole cam observed VARGAS leave her garage located at 6303 S. Richmond in Chicago, driving a black Ford Explorer. Surveillance observed VARGAS drive north out of the camera's view.

329. On May 13, 2014, at approximately 8:03 p.m., surveillance observed VARGAS driving the black Ford Explorer north on Western Ave approaching 39th Street. Surveillance observed VARGAS as she drove on

---

DAVIS approached on foot and began speaking with VARGAS through the window. Surveillance recognized DAVIS from previous dates of surveillance, such as April 1, 2014, and by comparison to his Illinois State driver's license photograph. As DAVIS remained in view on the street, surveillance dialed (312) 888-5709. DAVIS answered the call and had a brief conversation with the surveillance officer.

Interstates 55 and 94 and exited at the Kostner Avenue exit. At approximately 8:28 p.m., surveillance observed VARGAS park the black Ford Explorer at approximately 4235 W. Cullom, in Chicago.

330. On May 13, 2014, at approximately 8:33 p.m., VARGAS, using Target Phone 13, sent a text message (Call # 3279) to DAVIS, who was using DAVIS Phone. The text message read: "I'm here."

331. On May 13, 2014, at approximately 8:44 p.m., law enforcement surveillance observed DAVIS driving a silver Mercedes Benz SUV park at approximately 4440 N. Keokuk, in Chicago. DAVIS then got out of the vehicle and walked north across Elston Avenue.

332. On May 13, 2014, at approximately 8:50 p.m., VARGAS, using Target Phone 13, had a conversation (Call # 3284) with DAVIS, who was using DAVIS Phone. During the conversation, DAVIS asked, "Where you at?" VARGAS replied, "I'm like two blocks west of the light." DAVIS stated, "Come on back down here close by the A, right there by the god damn A, you know when you come by the lounge? Come on start coming this way. You can park on the street right there somewhere." VARGAS asked, "Where? Where do you want me to go?" DAVIS replied, "Around the corner from the house down the street from the bar." VARGAS stated, "From the bar, ok bye." DAVIS stated,

"Can you not mess that up? VARGAS replied, "I'm going down by the bar, like that little thing." DAVIS stated, "Alright." VARGAS stated, "Alright, bye."

333. On May 13, 2014, at approximately 8:53 p.m., surveillance observed DAVIS leave the front of a residence located at 4522 N. Kasson. DAVIS then walked southeast on N. Kasson then southbound out of view.

334. On May 13, 2014, at approximately 8:54 p.m., surveillance observed VARGAS drive away from 4235 W. Cullom.

335. On May 13, 2014, at approximately 8:56 p.m., VARGAS, using Target Phone 13, had a conversation (Call # 3287) with DAVIS, who was using DAVIS Phone. VARGAS stated, "Hello." DAVIS stated, "Where you at?" VARGAS stated, "Um, I went down a little bit down the block. Passing the bar." DAVIS stated, "I don't see you." VARGAS stated, "I'm parked." DAVIS stated, "Put your foot on the brake. Oh, I'm right on you, I didn't see you." VARGAS stated, "Bye."

336. On May 13, 2014, at approximately 8:56 p.m., surveillance observed VARGAS as she parked her vehicle at approximately 4421 N. Keeler Avenue, in Chicago. Surveillance then observed DAVIS approach VARGAS's vehicle on foot and enter the front passenger area of that vehicle.

Surveillance then observed DAVIS exit VARGAS's vehicle, which then left the area and drove west on Montrose Avenue.

337. On May 13, 2014, at approximately 9:06 p.m., CPD officers working at the request of investigators in this case observed VARGAS driving the black Ford Explorer in traffic without an operating front right headlight. Officers stopped VARGAS's Ford Explorer at approximately 4540 W. Montrose. During this time, surveillance observed DAVIS driving a silver Mercedes Benz following VARGAS's black Ford Explorer. Following the traffic stop of the black Ford Explorer, DAVIS immediately entered onto Interstate 90 heading east.

338. Upon stopping the black Ford Explorer, officers approached the driver's side and asked VARGAS for her driver's license. VARGAS stated that she did not possess a driver's license. Officers then asked VARGAS to step out of the car at which time she complied and was walked to the rear of the vehicle. VARGAS was placed under arrest and handcuffed.

339. Law enforcement asked VARGAS to provide a different form of identification. VARGAS replied that she did not have any identification on her person but did possess an Illinois identification card that was located in the Ford Explorer, inside her purse. Officers located a brown Coach purse on

the front passenger seat of the Ford Explorer. Officers unzipped a zipper pocket inside the purse and discovered that the pocket contained a balled object that contained a tan substance that was wrapped in clear plastic. Based upon training and experience, the arresting officers suspected the substance to be heroin, recovered the object from inside the purse, and secured it. Also recovered from inside the purse was a Illinois State identification card belonging to VARGAS.

340. The recovered heroin was inventoried and sent to the Illinois State Laboratory for testing and analysis. Arresting officers performed a field test on the substance which was positive for the presence of heroin. The suspect heroin weighed approximately 100 grams.

341. Upon arrival into the CPD's 11th District lockup, VARGAS was asked by lockup personnel if she wanted to make a phone call and what number she wanted to call. VARGAS indicated that she would like to make a call and provided the lockup keeper with DAVIS's telephone number, DAVIS Phone.

> **xviii. On June 2, 2014, investigators seize approximately 11 grams of heroin from JEWNEUS WILSON, which he received from BEDENFIELD.**

342. On June 1, 2014, at approximately 5:39 p.m., RODNEY

BEDENFIELD, using Target Phone 14, had a telephone conversation (Call # 3665) with JEWNEUS WILSON, who was using (773) 936-0760.[25] During the conversation, WILSON stated, "Hey, what up with it, Bro [WILSON asked BEDENFIELD about the availability of heroin]?" BEDENDIELD stated, "Oh, when I get back that way, because I'm out west. When I get back that way, I'm gonna do what I said for you because we ain't did that yet [BEDENFIELD told WILSON he would supply him with heroin when BEDENFIELD got back to the location where he stored the drugs]." WILSON stated "Alright, Alright." BEDENFIELD stated, "Ok, I got you, as soon as I get back." WILSON stated, "Alright, Bro."

343. On June 2, 2014, at approximately 12:31 p.m., BEDENFIELD, using Target Phone 14, had a telephone conversation (Call # 3702) with WILSON, who was using (773) 936-0760. During the conversation, BEDENFIELD stated, "Hey, listen man, my fault, man if something happens to me my listen, listen. I'm fittin' to get up [BEDENFIELD was about to receive a new supply of heroin]. Soon as I get up I'm gonna call you and bump

---

[25] Investigators identified WILSON as the user of (773) 936-0760 through his traffic stop and arrest as detailed below. Officers on surveillance were familiar with WILSON from his prior arrest photograph possessed by CPD and recognized him as the driver of the Chevy Malibu on June 2, 2014, through a comparison to that photograph as noted below.

into you. I'm getting up now [BEDENFIELD promised to supply WILSON with heroin as soon as he received it]." WILSON stated, "Alright."

344. On June 2, 2014, at approximately 2:58 p.m., BEDENFIELD, using Target Phone 14, had a telephone conversation (Call # 3735) with WILSON, who was using (773) 936-0760. During the conversation, WILSON asked, "Can I run over there (unintelligible)?" BEDENFIELD stated, "You got to wait till I grab my kids now. Man, I was calling you, huh." WILSON stated, "Yeah, ok." BEDENFIELD stated, "Let me grab my kids, soon as I get through [BEDENFIELD informed WILSON that he would supply him with heroin after he picked up his children]." WILSON stated, "Yeah, I'm a, I'm on my way back around, Joe. I'm gonna give you a little time." BEDENFIELD stated, "Alright."

345. On June 2, 2014, at approximately 5:04 p.m., BEDENFIELD, using Target Phone 14, had a telephone conversation (Call # 3737) with WILSON, who was using (773) 936-0760. WILSON answered, "What up with it Bro?" BEDENFIELD stated, "Where you at, Bro?" WILSON stated, "I'm right here on Harrison and Sacramento." BEDENFIELD stated, "So a, I'm gonna meet you on a by where I sent you before right. You pull up on 18th and St. Louis [BEDENFIELD arranged to deliver the heroin to WILSON in

154

the area of 18th and St. Louis Streets in Chicago]." WILSON stated, "Alright, ok, alright."

346. On June 2, 2014, at approximately 5:16 p.m., BEDENFIELD, using Target Phone 14, had a telephone conversation (Call # 3738) with WILSON, who was using (773) 936-0760. BEDENFIELD stated, "I'm outside, Bro. I'm fittin' to pull up on you [BEDENFIELD informed WILSON he was on his way to deliver the heroin]." WILSON stated, "Alright."

347. On June 2, 2014, at approximately 5:21 p.m., surveillance observed BEDENFIELD pull up and park his grey Audi at approximately 1637 S. Trumbull. Surveillance observed BEDENFIELD get out of his vehicle with a child and enter the residence located at 1638 S. Trumbull.

348. On June 2, 2014, at approximately 5:24 p.m., surveillance observed BEDENFIELD and a child leave the residence located at 1638 S. Trumbull. BEDENFIELD and the child then walked south on Trumbull. BEDENFIELD was talking on his cellular phone as he walked.

349. On June 2, 2014 at approximately 5:26 p.m., BEDENFIELD, using Target Phone 14, had a telephone conversation (Call # 3739) with WILSON, who was using (773) 936-0760. WILSON stated, "What up, Bro?" BEENFIELD stated, "Is that you, right there? Back up by this park. Yeah, I

155

see you I'm right here." WILSON stated, "Alright."

350. On June 2, 2014, at approximately 5:28 p.m., surveillance observed WILSON drive a purple Chevy Malibu in reverse on 18th Street and then turn and face north on Trumbull near 1658 S. Trumbell. Surveillance observed BEDENFIELD reach into the driver-side window of the purple Malibu. Surveillance then observed WILSON drive the purple Malibu north on Trumbull to Douglas Boulevard. Surveillance observed WILSON drive east on Douglas Boulevard. WILSON then turned north into the east alley of Kedzie Avenue.

351. On June 2, 2014, at approximately 5:32 p.m., Chicago Police Department officers observed WILSON operating the Chevrolet Malibu in traffic with a broken left tail light. Officer's observed WILSON park the purple Malibu in the alley at approximately 1327 S. Kedzie. Officers then observed as WILSON left the vehicle and began walking away. As WILSON was walking away he looked in the direction of the officers and surveillance observed WILSON place a golf ball-sized object in the right side of his shorts. Officers then observed the golf ball-sized object fall through WILSON's right pant leg and onto the ground. Officers immediately recovered the golf ball-sized object and found it to be a knotted piece of clear plastic containing

suspect heroin.

352. Officers arrested WILSON and the suspect heroin was submitted to the Illinois State Police Forensic Lab for further testing where the analysis found it to be 10.1 grams of heroin.

**D.     Search Warrants**

353. This Affidavit is also offered in support of search warrants for the following locations ("**Stash House Sites**") for evidence pertaining to the commission of conspiracy to possess a controlled substance with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Section 846, and possession of a controlled substance with the intent to distribute, in violation of Title 21, United States Code, Section 841(a)(1):

a.     **211 S. Lavergne, Apartment 3, Chicago, Illinois (SHOULDERS DTO's stash house):**

i.     As set forth in Application A for the Application for a search warrant for 211 S. Lavergne, Chicago, Illinois, the premises to be searched is the apartment on the third floor of a multi-unit brick apartment building. The entrance door is a white door. The apartment building is on the east side of the street and the entrance door faces west.

157

ii.     In the course of the investigation, interceptions of SHOULDER's communications and surveillance of his activities have shown the SHOULDERS DTO to use the 211 S. Lavergne apartment many times for manufacturing and storage of his narcotics and to facilitate the distribution of narcotics. Several of these instances were detailed in the body of the Affidavit, such as:     1) the December 30, 2013 occasion on which SHOULDERS supplied WILLIAMS and TIARA with heroin from the 211 S. Lavergne stash house, as detailed in paragraphs 132-57; and 2) the March 5, 2014 the seizure from SANDRA SHOULDERS of heroin retrieved from the 211 S. Lavergne stash house, as detailed in paragraphs 214-48.

iii.     Additionally, On June 4, 2014, at approximately 9:00 a.m., uniformed Chicago Police Department officers working with this investigation approached the multi-unit building at 211 S. Lavergne and rang all three bells that were located on the outside. Officers were allowed entry to the building by a Second floor tenant who informed officers her name was "Mrs. W__." Upon entering the common area of the front entrance, officers observed three mailboxes. The third mailbox from left to right was tagged with the name "Shoulders." Officers met Mrs. W. on the second floor and in response to the officer's statement that they were looking for a missing

child that might be residing in the building, Mrs. W. informed the officers that a female and her young children lived on the first floor and that she resided in the second floor apartment with her daughter. Mrs. W. stated a female lived on the third floor but that Mrs. W. had not seen her for some time. Officers relocated to the third floor and observed only one door on the floor. Officers stated that the door had a number 3 on it. Officers then knocked on the door with no response.

     iv.   An Accurint law enforcement database check of the building located at 211 S. Lavergne revealed that a woman with the same last name as "Mrs. W" resides at 211 S. Lavergne Apt. 2, Chicago, Illinois.

     v.   On January 7, 2014, at approximately 10:42 a.m., SANDRA SHOULDERS, using Target Phone 7, had a telephone conversation (Call # 6498) with a woman who was using a telephone number registered to the same last name as Mrs. W at the address 211 S. Lavergne, Apt. 2, Chicago, Illinois. SANDRA SHOULDERS answered and stated, "Hello" Caller stated, "Hi, Penny [SANDRA SHOULDERS's nickname]." SHOULDERS stated, "Hey, who this?" Caller stated, "[nickname starting with same letter as Mrs. W's first name]" SHOULDERS stated, "Who's [name]?" Caller stated, "Downstairs from you." SHOULDERS stated, "Oh hey." Caller stated, "Hey, I

want to know, did somebody come in your apartment yesterday to bleed the heaters?" SHOULDERS stated, "Uh, uh" [Negative response].

vi.     I believe that based upon the repeated observations of the DTO Members use of the 211 S. Lavergne location, the "Shoulders" name on the mailbox, the phone call between SANDRA SHOULDERS and the second floor resident, that the SHOULDERS DTO utilizes the 3rd floor apartment at 211 S. Lavergne, as its stash house.

**b.     2950 W. Fillmore, Chicago, Illinois (HARRISON HALL's stash house):**

i.     As set forth in Attachment A for the Application for a search warrant for 2950 W. Fillmore, Chicago, Illinois is a multi-story, brick, single-family home. The main entrance door is a brown door located inside a black, metal door at the top of a brown staircase.

ii.     In the course of the investigation, and as detailed above in the affidavit, interceptions of HALL's and others' communications and surveillance of their activities have shown that HALL and KENNETH SHOULDERS and the SHOUDLERS DTO utilize the 2950 W. Fillmore residence to store narcotics and to facilitate their narcotics trafficking such as the date on March 15, 2014. *See* paragraphs 249-68.

c. **1638 S. Trumbull, 1st floor, Chicago, Illinois (location used by RODNEY BEDENFIELD for the distribution of narcotics):**

i. As set forth in Attachment A for the Application for a search warrant for 1638 S. Trumbull, Chicago, Illinois, the premises to be searched is the first floor apartment within a blue-gray, multi-unit apartment building surrounded by a black, wrought-iron fence. The main entrance door is an unmarked blue-gray door at the top of a small flight of concrete steps.

ii. BEDENFIELD used the 1638 S. Trumbull residence multiple times in the course of the investigation in order to facilitate the sale of narcotics. Several of the occasions were detailed in the body of the affidavit, such as: 1) the April 8, 2014 seizure of approximately 50 grams of heroin from the car of DORIAN MILLER, involving RODNEY BEDENFIELD, QUEENIE VARGAS and MARC DAVIS, as detailed in paragraphs 307-26; and 2) the May 13, 2014 seizure of approximately 100 grams of heroin from VARGAS, involving DAVIS, as detailed in paragraphs 327-42.

354. This Affidavit is also offered in support of search warrants for the following residences ("**Resident Search Sites**") for documents pertaining to

the commission of conspiracy to possess a controlled substance with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Section 846, and possession of a controlled substance with the intent to distribute, in violation of Title 21, United States Code, Section 841(a)(1):

a. **902 S. Mayfield, Chicago, Illinois (KENNETH SHOULDERS's residence):**

i. As set forth in Attachment A for the Application for a search warrant for 902 S. Mayfield, Chicago, Illinois is a single-family home the left portion of which is brick and the right portion of which is covered in beige siding. The brick portion of the front of the residence has a placard affixed that reads 902. The main entrance door is located inside a black, metal storm door at the top of a small staircase. The residence also has a detached garage in the rear.

ii. In the course of the investigation, interceptions of SHOULDER's communications and surveillance of his activities have shown him to use the 902 S. Mayfield, Chicago, Illinois location as his residence. Surveillance has observed SHOULDERS at the location on multiple dates as he began activity in the morning, including: January 16, 2014; February 14,

162

2014; March 15, 2014; and April 30, 2014.

      **b.**    **2103 S. Spaulding, 3rd Floor, Chicago, Illinois.**
**(RODNEY BEDENFIELD's residence);**

      i.    As set forth in Attachment A for the Application for a search warrant for 2103 S. Spaulding, Chicago, Illinois is a third floor apartment in a a three story multi-unit, brick apartment building with white trim. The main entrance door is a white door located inside a black, metal storm door.

      ii.    Investigators have established that BEDENFIELD utilizes 2103 S. Spaulding as his residence through surveillance and interceptions as well as a utilities check which registers the utilities for the apartment in his name.

      **c.**    **17613 Arlington Lane, Hazel Crest, Illinois (DERRICK WASHINGTON's Residence);**

      i.    As set forth in Attachment A for the Application for a search warrant for 17613 Arlington Lane, Hazel Crest, Illinois is a single-family, brick home with an attached garage framed with a brick wall bearing the number 17613 to the left of the garage door. The main entrance door is a brown door with an oval shaped glass pane in the middle and is set back

inside a brick archway.

ii. In the course of the investigation, interceptions of communications and surveillance of WASHINGTON's activities have shown him to use the 17613 Arlington Lane, Hazel Crest, Illinois location as his residence. Surveillance has observed WASHINGTON at the location on multiple dates, including: May 9, 2013; December 30, 2013; January 9, 2014; January 17, 2014; February 5, 2014; and June 8, 2014.

**d. 3527 S. Martin Luther King Drive Apt. 3N, Chicago, Illinois (MARC DAVIS's residence):**

i. As set forth in Attachment A for the Application for a search warrant for 3527 S. Martin Luther King Drive Apt. 3N, is the third-floor north apartment in a cream colored brick, multi-unit building, with a garden apartment and three additional floors. The building structure has two addresses. Apartments on the 3527 portion occupy the north section of the entire building structure. Apartments on the 3529 portion occupy the south section of the entire building structure. The target apartment is on the third (top) floor of 3527.

ii. In the course of the investigation, interceptions of communications and surveillance of DAVIS's activities have shown him to

use the 3527 S. Martin Luther King Drive Apt. 3N location as his residence. Surveillance has observed DAVIS enter the location and the light of the rear room of the apartment come on immediately thereafter on April 15, 2014, following DAVIS's delivery of heroin to QUEENIE VARGAS on that date.

355. I have participated in investigations which have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence, searched for, and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized there from, monetary instruments and various assets that were purchased with the proceeds of the drug trafficking.

356. Through training, experience, and discussions with other experienced agents, I know that:

a. Drug traffickers commonly maintain books, papers, files, and other records which reflect the names, addresses and/or telephone numbers of their suppliers, couriers, customers, and other associates in the illegal drug trade.

b. Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other files relating to the purchase, packaging, sale, distribution, and transportation of their product.

c.    Drug traffickers conceal in their residences and/or places of business the proceeds of their illegal activity, including large amounts of United States currency, financial instruments, precious metals, jewelry, rare coins, works of art, and other items of value, as well as books and records regarding the acquisition, use, and disposition of such items of value.

d.    When drug traffickers amass large proceeds from the sale of controlled substances, they attempt to legitimize these profits, often accomplishing this goal by using the services of banks, other financial institutions, and real estate brokers; and maintain books and papers related to such efforts.

e.    It is common for drug traffickers to maintain the aforementioned books, papers, and documents in secure places within their residences and/or places of business so that the drug traffickers have ready access to such information.

f.    Drug traffickers frequently take, or cause to be taken, photographs of themselves, their associates in the drug trade, property acquired from the distribution of drugs, and their product, and such photographs are often kept in their residences and/or places of business.

### Items Requested To Be Seized at Stash House Sites

357.  Based on the foregoing it appears that there is probable cause to seize from the foregoing locations the following items:

a.    Narcotics. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat sealing devices.

b.    Paraphernalia for packaging cash drug proceeds including heat sealing devices, plastic packaging for cash, rubber bands, and money counting devices.

**c.**     Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to distribution of controlled substances.

**d.**     Books, records, receipts, notes, ledgers, airline tickets, money orders, wire transfer or money remittance records, and other records related to the receipt, expenditure and concealment or other disposition of income.

**e.**     Cash, currency, financial instruments, and records relating to controlled substances income and expenditures of proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging, in drug trafficking activities.

**f.**     Photographs of individuals, associates, their property and their drugs.

**g.**     Records reflecting names, nicknames, addresses, and telephone numbers of both current and past drug associates.

**h.**     Safes, safety deposit boxes, keys for safety deposit boxes, hidden compartments and other secure locations, which often contain the proceeds of narcotics trafficking activity, including large amounts of United States currency, financial instruments, precious metals, jewelry, and other items of value, as well as books and records regarding the acquisition, use, and disposition of such items of value.

**i.**     Canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents and keys.

## Items Requested To Be Seized at Resident Search Sites

358.   Based on the foregoing it appears that there is probable cause to seize from the foregoing locations the following items:

**a.**     Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels,

sifters, grinders, glass panes and mirrors, razor blades, plastic bags, heat-sealing devices, and dilutants; and paraphernalia for packaging cash drug proceeds including heat sealing devices, plastic packaging for cash, rubber bands, and money-counting devices.

b.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to distribution of controlled substances, which may be maintained in either paper form or on computers, computer disks, CD-ROM disks, DVD disks, electronic storage or other related equipment.

c.  Books, records, receipts, notes, ledgers, airline tickets, money orders, wire transfer or money remittance records, and other records related to the receipt, expenditure and concealment or other disposition of income, which may be maintained in either paper form or on computers, computer disks, CD-ROM disks, DVD disks, electronic storage or other related equipment, relating to the distribution of controlled substances.

d.  Cash, currency, financial instruments, and records relating to controlled substances income and expenditures of proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging, in drug trafficking activities.

e.  Pagers, cellular phones, electronic organizers, caller identification, answering machine tapes, and other communication devices and the contents thereof, including names, addresses, telephone numbers and other contact or identification information of participants in drug trafficking activities.

f.  Photographs of individuals, associates, their property and their drugs.

g.  Records reflecting names, nicknames, addresses, and telephone numbers of both current and past drug associates.

h.  Safes, safety-deposit boxes, keys for safety-deposit boxes, hidden compartments and other secure locations, which often contain the

proceeds of narcotics-trafficking activity, including large amounts of United States currency, financial instruments, precious metals, jewelry, and other items of value, as well as books and records regarding the acquisition, use, and disposition of such items of value.

      i.    Canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents and keys.

      j.    Documents related to rental, lease, or ownership of the search sites identified herein.

FURTHER AFFIANT SAYETH NOT.


                              JAMES LONG
                              Special Agent
                              Drug Enforcement Administration

Subscribed and sworn to before me this __ day of June, 2014.


DANIEL G. MARTIN
Magistrate Judge
United States District Court
Northern District of Illinois